November 13, 2020

Gerardo Alcazar
Blackwell Burke P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN  55415

**Re: 20823 – Moore v. 3M, report and professional opinions.**

I am an expert in the engineering and testing of fall protection equipment and systems, with more than 40 years of experience in this field. I enclose my CV as Appendix A to this report.

As requested, I have reviewed all the evidence you forwarded to me in the subject case, organized by date it was downloaded to my computer, in the groupings I list below. All evidence I have reviewed will be provided electronically in folders matching the names of the groupings and descriptions listed below:

- 20-09-11 (1 document) Plaintiff's complaint
- 20-10-07 (11 folders plus 9 documents) Equipment Inspection at ESI (I witnessed via web)
- 20-10-12 (6 documents) Plaintiff's (Moore) deposition
- 20-10-14 (3 documents) Plaintiff's Expert Witness Disclosures
- 20-10-30 (2 documents plus one data sheet) My notes on Exemplar testing I requested and witnessed via web.
- 20-11-09 (1 document) Rick Miller Deposition
- 20-11-11 (2 folders) Records from the lab technicians from 20-10-30 exemplar Testing

**I – Examination of equipment involved in the incident (Oct 7 2020):**

I participated in the examination via web meeting on Oct 7 2020. I took a few screen shots; however, my record is primarily the photographs and measurements subsequently provided to me by the other experts who were at the inspection. At one point, when the experts were ready to begin disassembling the Fall Arrester, I strongly requested some basic "Competent Person" functional testing be done prior to disassembly, since we could not do this type of testing afterwards. Under my direction, my colleagues at the site conducted several simple tests (dropping the fall arrester installed on the cable to see how far it would fall to engage, holding the lever up to disengage the primary locking mechanism (simulating a panic grab) and then attempting to accelerate it downward at gravitational acceleration to see if the secondary locking mechanism would engage).

The first test showed that the device primary locking mechanism was operating properly.

The "Panic Grab" simulation to verify the secondary locking mechanism was not, in my opinion, conducted properly since the experts seemed to be concerned about stopping the device before it reached the lower mark they had taped on the cable. Although they started to accelerate the device, as it descended, they (consciously or unconsciously) slowed it down and stopped it before reaching the lower mark on the cable. It did not appear to me that they were reaching gravitational accelerations and I pointed this out. Someone suggested installing a small weight on the fall arrester with the primary locking mechanism disabled, and letting gravity accelerate it. When this was done, it locked exactly as expected. Overall, my opinion was that the device was functioning exactly as it should, with a minor caveat that since the energy absorber was partially deployed, the center of gravity was shifted and might detrimentally change how it was balanced. However, in the end, this didn't seem to affect the performance since it "passed" both functional tests I had asked for.

 Elevated Insight &
Engineering Ltd.

I observed the disassembly of the device which was very carefully undertaken by the experts who were on site. Upon subsequent review of the photographs provided by those who attended the examination in person (including the fall arrester, the cable it locked onto in the incident, and the full body harness), my preliminary opinion was that there were no defects that might have impaired the fall arrester's function or any signs that any of the components may have seen an impact beyond what should have occurred with a properly functioning device.

## II - Exemplar Testing (Oct 30 2020) and Analysis:

The exemplar testing on 20-10-30 was undertaken at my request and under my direction. Due to travel restrictions from the Covid-19 Pandemic, I participated via web meeting. The testing intended to:

- Provide engineering data on how the energy absorber performs once the device has locked onto the cable.
- Simulate the short fall I believed had occurred.
- Simulate the fall the plaintiff and his experts claimed to have occurred.

The data from these tests would enable me to perform an engineering analysis on the energies, distances and forces involved in the fall to substantiate or refute claims by the plaintiff and his experts. This engineering analysis could be compared to the fall I suspected may have occurred (my preliminary opinion based on the Oct 7 examination) as well as the fall that was being claimed to have occurred. The testing would help me to either refute or confirm several of my preliminary opinions in this matter.

## Static Force vs. Displacement Test:

At my request, the laboratory undertook a static force vs. displacement test of an exemplar fall arrester installed on an exemplar cable, approximately 18 ½ feet below the top anchor.

- Unfortunately, the top anchor was not the same "Tuff Tug" anchor involved in the incident, however, I do not believe there would be a significant material difference in the results if we had used an exemplar of the anchor involved in the incident.
- We determined that it was too dangerous to have technicians in the line of fire, at the fall arrester to measure the displacement of the energy absorber, particularly as the forces of the test reached their highest values. As a result, we used a long tape measure connected to the fall arrester so the displacements of the entire system were measured from the safety of the platform at the top of the test tower.
- I also know that an assembled system of components has multiple means of absorbing energy and that, particularly in a minor fall, less than half the fall energy may go into the energy absorber. Measuring the displacement of the end of the energy absorber (that would connect to the worker's harness) would capture the overall displacement of the connection point on the worker's harness, capturing the total displacement (and energy absorption) of the energy absorber PLUS the top anchor and the cable. This, unfortunately did not capture the energy absorbed by the worker's harness, which at low impacts is usually negligible, but at large impacts can play a significant role.
- I chose to stop the test at just over 3,000 lbs Force since this is well above the legal impact limit allowed by US OSHA and the ANSI Z359 standards (1800 lbs), and was safely below the breaking strength of the components in the system, including the top anchor, cable, fall arrester and the ladder it was mounted on.

The report from the Static Force vs. displacement test is provided as appendix B to this report.

**Basic Free Fall Test:**

We conducted a dynamic performance test similar to the requirements of the A14.3-2008 standard. The main exception was that we adjusted the test torso weight to approximately what we believed the plaintiff weighed at the time of the accident (240 lbs), wearing the same model of harness used by the plaintiff (we used a new DBI Sala Exofit harness).

We did not put a load cell between the harness and the fall arrester to measure the peak impact force because it would have substantially increased the free fall, and we wanted to simulate how the fall arrest would occur for a properly functioning fall arrester with a normal free fall. Given the collection and use of force vs. displacement data from the static test, I am able to back calculate a conservative estimate of the impact force.

The results of the Basic Free Fall Test are enclosed as Appendix C to this report.

**Large Free Fall Test:**

We performed a dynamic test similar to the above, but simulating as much free fall as we could accommodate within the height limitations of the drop test tower. The feet of the mannequin were taped up to give us a few more feet, but we were only able to create approximately 16 feet of free fall of the mannequin. We had wanted to do the full 20 ft free fall claimed by the plaintiff and his experts, however, this was not possible at this facility. Even a sixteen ft free fall is an order of magnitude greater than the basic free fall of my preliminary opinion (tested, above) and provides valuable comparative data to help confirm or refute my preliminary opinion.

The results of the Large Free Fall Test are enclosed as Appendix D to this report. You will note that there were substantial damages to the harness that obviously absorbed a significant amount of energy.

**Energy Analysis**

Appendix E attached to this report contains a printout of my calculations (in a MS Excel Spreadsheet that I modified for the purposes of this investigation). The spreadsheet is one I distribute to students who take my Qualified Fall Protection Engineer course, and is used to fit a curve to testing data in order to develop formulae that will accurately predict the forces and energies absorbed by devices that do not behave in a linear fashion. In my courses, it is used to develop the energy efficiencies of synthetic ropes to compensate for their non-linear behavior. I modified this sheet so that I could plot the data from the static test and then fit a curve to it, so the spreadsheet would provide formulae to accurately model the force and energies absorbed for any given displacement, or conversely to predict the overall displacement for any given force.

I used the following measurement provided to me in the lab report in Appendix B:
- Total displacement at 3100 lb = 8.5 inches
- The fall arrester PEA deployed 3.19 inches
- The fall arrester slid 1.25 inches down the cable.

From photos, I estimated that the top anchor deformed approximately 0.5 inches and I have calculated the elastic stretch of an 18.5-foot cable at the 3100 lb test force to be approximately 0.91 inches.

The difference between the 8.5 inches and the rest of the values listed above is 2.65 inches and represents other displacements such as the flex of the top anchor post and ladder, but mainly, the rotation of the fall arrester on the rope (kinking the cable). As a result, at a force of 3100 lbs, the displacement of the energy absorber is 3.19 inches and the displacement of the rest of the system was 5.31 inches. Although the displacement of the other parts of the system is unlikely to be a consistent ratio of the PEA deployment, I can estimate the displacement of the other parts of the system as being 8.5/3.19 = 2.66 x the PEA deployment in order to estimate "X" for the full displacement of all

components in the system at any given measurement of PEA deployment. Once I have this "X", the formula for "F" will estimate the peak impact force seen by the user, and using energy balance equations, I can calculate how much free fall is required to consume this much energy.

The results of my calculation are that:
- the plaintiff experienced a free fall of less than 12.74 inches and an impact of less than 1802 lbs.
- in the short free fall test, the mannequin experienced a free fall of less than 7.38 inches and an impact of less than 1288 lbs.

I use the words "less than" because my calculations have ignored the stretch of the harness which does let the worker decelerate over a longer distance, and will reduce the impact forces.

For comparative purposes, I also modified my spreadsheet to perform inverse calculations (solving for X and F for a given h, instead of solving for F and h for a given X). For a 16 ft free fall, my computer model calculates a peak impact force of 17,760 lbs which is more than 4x higher than the 4200 lb force we actually measured in the test. The low force in the test does confirm that the harness and other mechanisms do absorb a lot of the energy to significantly reduce the forces, especially when there are very large free falls and energies. In the test we severely damaged (put a lot of energy into) the harness which may have been the main reason the force did not exceed 4200 lbs.

I must caution that none of the data in the static test was above 3100 lbs, so the accuracy of a calculated value of 17,760 lb is probably poor, particularly since the energy dissipation mechanisms (and shape of the curve) will change at higher forces, as the top anchor post and the ladder rungs start to bend and the cable starts to plastically stretch. The main point is that notionally, the calculation clearly shows that ignoring the harness (and other) energy absorption effects can grossly overestimate the impact forces.

### III – Review of the Assertion by the Plaintiff and his Experts of a 20 ft free fall:

- The plaintiff himself is unsure of exactly how much free fall he experienced and, in his deposition, he estimates between 10 and 20 feet, and he stated that this is not his own evidence. These values were suggested by whoever investigated his accident. He stated he really does not know how far he fell.
- The plaintiff's experts state that a full 20 ft free fall is a "fact" of the case, with no evidence whatsoever to justify using this value as even a hypothesis.
- I have not seen evidence of a rigorous investigation of the accident by either the employer or the plaintiff's experts to justify a claim of a 20 ft free fall. The opinions focus on proposing unsupported hypothetical scenarios, requiring defective fall protection equipment, that would allow such a large free fall to occur.
- The experts do not seem to understand the significant damages such a large free fall would create in the equipment, other than to speculate on serious impacts to the plaintiff assuming all the fall energy went into him. They have not done any testing to compare the damage to exemplar equipment to the plaintiff's equipment to verify whether or not such a large free fall could possibly have happened.

### IV – Review of Assertions by Dr. Cornelissen and Dr. Russell, Spectrum Forensics, in their report dated Oct 14 2020:

Their evidence does not support a claim that there was a 20 ft or any substantial Free Fall, and thus does not prove that the LadSaf X3 failed to operate properly.

- Engineering Analysis Page 10, states that Mr. Moore's injuries were consistent with the high forces he sustained from the 20 ft free fall with average G forces near 20 and peak forces up to 40 G's. So far, I have not seen evidence professing or detailing significant injuries. The exemplar test of the 16-foot free fall

showed only 4200 lbs peak force which was very high, but nowhere near the forces estimated. Furthermore, the employer's incident report supplied in evidence (with no date other than stating that it happened on Thursday, and no name of the person filling the form) classifies the incident as a "near miss" with no classification of requiring first aid, or there being a reportable or unreportable injury. There is no evidence of an injury, and if so, no evidence that the injury was sustained as a result of a large impact?

- Opinion 4 on page 12 of their report asserts that Mr. Moore fell "more than" 20 feet. As noted above, there has been no scientific evidence provided to support this opinion, which has to be proven in order to substantiate their claim that the Lad-Saf X3 was defective. In fact, there is no evidence that Mr. Moore fell more than the ANSI A 14.3 standard permits.
- Opinion 5 once again relies on there being a 20 ft free fall for the device to be defective.
- Opinion 6 must be substantiated with evidence of high impact forces (above the 1800 lb limits allowed by OSHA). The equipment involved in Mr. Moore's fall does not indicate this level of impact.
- Opinion 8 requires proof of defects in the design or the performance. There are no specific assertions (applicable standards it does not meet, or proof that it operated in the incident differently than stated in Opinion 7 where they say the device seemed to be operating normally).
- Opinion 9 also requires substantiation of defects in the design or the performance. There are no specific assertions (clauses of applicable standards that it does not meet), or proof or even conjecture about how it operated in the incident differently than stated in Opinion 7 other than the continuing claim of a 20-foot free fall.
- Opinion 10 states that safer designs were technically and economically feasible, without demonstrating through evidence that the design of the device was indeed unsafe in the subject incident. Furthermore, Spectrum Forensics has not revealed a superior design, nor has it conducted testing to prove the superiority of any other design as compared to the LadSaf X3.

**V – Review of Assertions by Dr. Ellis, Litigation Support, in his report dated Oct 14 2020:**

Dr. Ellis's evidence does not support that there was a 20 ft or any substantial Free Fall, and thus does not prove that the LadSaf X3 failed to operate properly.

- "Summary of Facts" 5 on page 5, that the plaintiff fell approximately 20 feet, has not been proven by scientific evidence to support this claim as a fact.
- "Summary of Facts" 6 on page 5, states that the force of the fall "is reported to have resulted in injury to his upper body" without offering estimates of the impact forces or describing the nature of the injuries. The employer's incident report supplied in evidence (with no date other than stating that it happened on Thursday, and no name of the person filling the form, classifies the incident as a "near miss" with no first aid or a reportable or unreportable injury). There is no evidence of an injury which might serve as evidence of a high force fall.
- The "Hazard-Background" Item 2 on page 3 discusses some of the requirements of ANSI Z359,16 (which were not applicable to the subject device at the time it was sold because it was not yet a published standard). Nonetheless, the LadSaf X3 was one of the few devices on the market at the time that had features that would likely meet the requirements of that new standard, particularly, the very features that are cited in this Hazard Background paragraph to mitigate a panic grab. I understand that the device was subsequently certified to the new standard.
- "The Hazard-Background", Item 3 on page 3 asserts that a 20 ft free fall resulted from failure of the device because the locking lever was held in its unlocked position. Once again, there is no evidence of a 20 foot or any substantial free fall. Furthermore, the Plaintiff states in his written statement provided within hours of the incident, and confirmed in his deposition, that he does not believe his hand was on the fall arrester, although he does admit that anything is possible.
- "Hazard Controls", Item 1 on Page 4, states that testing should be <u>by both manual means and test weights</u>", again referring to the Z359.16 standard. Note that this standard does not call for manual testing

since this is subjective and unreliable. It is my understanding that the LadSaf X3 was subsequently certified to that standard, which indicates that the new standard was probably considered during development of the device. The Z359.16 standard only requires testing of lock-off and panic resistance by use of test weights. In my experience at other incident investigations with forensic experts, manual "gravitational" acceleration to lock off other fall protection devices is unreliable since most people with no experience do not have a good sense of how quickly to accelerate the device. During the October 7 inspection, at my request, several people unsuccessfully tried to lock the device by manually accelerating it downward with the primary mechanism disabled. But, as described at the beginning of this report, attaching and allowing a weight to fall (establishing proper gravitational acceleration) did lock the device properly.

- "Hazard Controls", Item 4 on Page 4, describes a test in A14.3 2008 that was "not met with the inertia lock function and not reported". It has not been not stated what aspect of the test was not met and what reporting is required. Was this test performed by or observed by this expert before making this assertion. The cited test uses a 500 lb test mass in an 18-inch free fall and usually results in significantly shorter lock distance of the fall arrester because the device must accelerate quickly to catch up with the 18-inch free fall.

- "Preliminary Opinions" Number 1. Once again, the 20 ft free fall is taken as a fact of the case, and without this being proven, Opinion 1 has no merit.

- "Preliminary Opinions" Numbers 2, 3, 4 and 5, discuss known compatibility issues between fall arresters that rely on inertial (acceleration) sensing and climb assist systems that unweight the worker to make climbing easier. This compatibility problem has not so far been presented as a theory in the case that would have led to a large free fall, because the evidence so far indicates that it was the loss of the climb assist force that caused the fall, so the free fall should have been at 1g. These opinions have no bearing or merit in this case.

## VI – Opinions and findings:

The following summarizes my opinions and findings, based on the evidence presented to me and developed in my investigation, as listed and discussed in this report. I have the right to amend and extend this report if further discovery becomes available:

1. There has been no credible evidence provided by anyone to support an assertion that the plaintiff's free fall was as much as 20 feet. Most of the claims of design flaws require this assertion to be true, which in my opinion is incorrect and thus most claims are invalid.

2. My examination of the evidence, coupled with exemplar testing that duplicates the performance of the plaintiff's equipment in a short free fall and in a much larger free fall manifests significant damage, leads me to contend that the plaintiff actually had a very short fall. The short free fall exemplar equipment matches the condition of the plaintiff's equipment. This assertion was also confirmed by my computer modelling of the system.

3. In deposition or court testimony I would like to demonstrate how the design of the LadSaf X3 makes it difficult to hold the lever in its disengaged position, and that a panic squeezing of the device is more likely to release the lever than to hold it disengaged. Furthermore, I would like to demonstrate how difficult and unlikely it would be to apply a side loading to the device for sufficient duration to prevent lock-off to cause a 20 ft free fall.

4. The subject LadSaf X3 was not defective in design or manufacturing. It performed as expected and required. The evidence I have analyzed confirms it arrested the fall within the limits specified in the A14.3 standard and as claimed by the manufacturer.

If you have any questions do not hesitate to contact me.



**State of Arizona BTR Firm Registration 20385-0**



**November 13, 2020**

PERMIT TO PRACTICE

Elevated Insight & Engineering Ltd.

Signature

Date   **November 13, 2020**

PERMIT NUMBER: P-13771

The Association of Professional Engineers,
Geologists and Geophysicists of Alberta

Greg Small, M.Eng., P.Eng.
Founder – Elevated Insight &Engineering Ltd.

Appendix A - Greg Small CV



# Greg Small, P.Eng., M.Eng



Greg Small is highly respected as one of the leading Fall Protection engineering experts in the World. Approximately one-third of presenters at the last ten "International Society for Fall Protection" Symposiums have received Fall Protection Engineering Training from Greg.

He began his professional career with CN Rail as a bridge engineer, where, in the early 1980s he implemented a fall protection program for bridge workers. He was soon appointed to CN's quality team that created one of the earliest managed fall protection programs in the world. He developed essential engineering techniques for analysis of horizontal lifeline systems, discovering critical flaws in some systems being purchased by the railway. His work led to proposal and development of several patented fall protection components & systems.

In 1991, Greg was appointed to the Canadian Standards Association Z259 technical committee on fall protection and served on its executive for more than 10 years, stepping down as its vice-chair in 2016. He has played a very active role in the development of standards in fall protection. He has made significant contributions to the last two editions of Z259.13, "Flexible Horizontal Lifeline Systems", and chaired the first edition of Z259.15, "Anchorage Connectors". His proudest achievement, however, was conceiving and chairing the original and all subsequent editions of Z259.16, for the "Design of Active Fall Protection Systems". This ground-breaking standard was adopted, almost verbatim, as ANSI Z359.6-09 in the United States and SS607 in Singapore.

At ANSI Z359, Greg stepped down as chair of ANSI Z359.18, "Anchorage Connectors" in 2020 but remains a very active participant many of the standards, particularly ANSI Z359.6 ("Design of Active Fall Protection Systems") and ANSI Z359.17 ("Horizontal Lifelines").

In 1996, Greg left CN Rail for an appointment as Vice President of Engineering with Gravitec Systems Inc., of Calgary, AB and Seattle WA, specializing in fall protection engineering training and consulting.

In seven years at Gravitec, Greg:

- Developed fall hazard survey and reporting techniques, including a hazard ranking system that objectively rates the risk a hazard poses.
- Oversaw development of Managed Fall Protection programs for several major corporations, including program manuals, work procedures, equipment selection, user training, and engineered systems.

**Education:**
➢ Bachelor of Applied Science (Honours), Civil Engineering, University of British Columbia, 1979
➢ Master of Engineering (Structural Engineering) University of Alberta, 1987.

**Professional Registrations:**
➢ State of Arizona Board of Technical Registration – Structural Engineer
➢ Association of Professional Engineers, Geologists and Geophysicists of Alberta
➢ Association of Professional Engineers and Geoscientists of Saskatchewan
➢ Retired in good standing, and can reactivate quickly in BC, MB, ON, YK, NT

**Professional Associations:**
➢ American National Standards Institute, technical subcommittees Z359.6, Design of Active Fall Protection Systems and Z259.17, Horizontal Lifelines, 2009-present. Currently Chair of ANSI Z359.18 – Anchorage Connectors.
➢ Canadian Standards Association, technical committee Z259, Fall Protection 1992-present. Served on executive 2008-2016 and Vice-Chair 2012 -2016. Chair of CSA Z259.16 2002-present. Chaired CSA Z259.15 2006-2015.
➢ American Railway Engineering and Maintenance-of-Way Association, Committee 15, Steel Bridge Design Code 2003-present

**Papers & Presentations:**
➢ All Systems Go: Engineering Fall Arrest, by Gregory Small, Occupational Health and Safety Magazine Buyer's Guide 1997.
➢ The Personal Energy Absorber Equation, by Gregory Small, Construction Safety & Health supplement to Occupational Hazards Magazine, February 2000.
➢ Latitude for Longitudinal Force, by Small, Berry & Jenkins, AREMA Annual conference proceedings, September 2004
➢ Investigation of Service Loading of a BTPG span, Unsworth, Small, and Afhami, AREMA Annual conference proceedings, September 2005.

Appendix A - Greg Small CV

# Greg Small, P.Eng., M.Eng

- Developed and taught a 5-day "Qualified Person" course on techniques for engineering fall protection systems.
- Co-developed and co-instructed a 5-day course, "Managed Fall Protection Program".
- Wrote a seed document used to develop the first draft of the ANSI Z359.0 and Z359.2 standards for "Definitions" and "Managed Fall Protection Program".
- Tested numerous fall protection systems and components, including horizontal lifelines, rigid rails, energy absorbers, lanyards and carabiners.
- Directed or participated in forensic investigations of numerous fall protection systems.

In 2003 Greg left Gravitec, returned to his work as a Railway Bridge Engineer, and was appointed to AREMA committee 15 (the North American steel railway bridge design code). In 2005, after completion of his non-competition agreement with Gravitec, he formed "High Engineering Corp." to continue his work in Fall Protection.

In 11 years at High Engineering Corp, Greg:

- Developed, tested and implemented, several innovative Fall Protection solutions, including double travel restraint, hip connection in travel restraint, and using dual SRLs as an alternative to horizontal lifelines.
- Invented testing techniques to determine lock-off distances of SRLs, engineering properties of Horizontal Lifeline Energy absorbers, frictional properties between ballasted anchorage systems and the surfaces they stand on.
- Developed and participated in numerous advances in engineering techniques, including the effects from deforming anchors, dynamic analysis of ballasted anchorages and the performance of dual SRLs.
- Developed innovative ways to install stiff and strong anchorages on weak surfaces, enabling faster arrest of falls.
- Conducted forensic investigation of numerous fall accidents, including inspection, computer modelling, expert reports and testimony.
- Refined engineering techniques for fall protection that have become part of the current ANSI Z359.6, CSA Z259.16 and SS607 standards.
- Conceived and developed the smartphone App, "FallClear", used around the world for clearance calculations.

In 2014, High Engineering Corp merged with Parsons Engineering from St. John's NF, retaining the name, "High Engineering Corp". Greg served

---

- Salvage of an HTPG span and conversion to a BDTPG by Small & Ketler, AREMA Annual Conference Proceedings, September 2006
- Adjusting fall arrest clearance for changes in Free Fall, worker weight and PEA forces, , ISFP, Baltimore, MD, June 2010
- Specifying Fall Protection to get what you really need, ASSE annual conference, Denver, CO, June 2012
- Is Gravity Different Where You Live?, AIHCE Conference, Montreal, PQ, May 2013
- Clearance Calculations Made Easy, ASSE annual conference, Las Vegas, NV, June 2013
- Design Considerations for Travel Restraint HLLs, ISFP, Las Vegas, NV, June 2013
- Innovative Fall Protection for Low Clearance applications, ASSE annual conference, Orlando, FL, June 2014
- Managing Fall Protection Programs for Optimal Safety and Efficiency, AIHA annual conference, Small & Parsons, Salt Lake, UT, June 2015
- New Standards, Methods and Technologies for Self Retracting Devices, ASSE annual conference, Small, Parsons, Henn & Laurie, Dallas, TX, June 2015
- Design considerations for sliding resistance of ballasted anchorages used in active fall protection systems, Parsons and Small, ASSE annual conference, Dallas, TX, June 2015
- Fall Protection and Façade Anchorage Load Testing: Best Practices, ISFP, New Orleans, LA, June 2019

**Patents:**

- US No 5,799,760: Energy Absorbing Device
- US No 7,992,680 B2: Pass-by Rigid Rail system
- Patent Pending: Force Management Anchor for Horizontal Lifelines
- Engineered or conceived several devices, subsequently patented by manufacturers, including a "Rail Slider", "Energy Absorbing Strut", "Reinforcing Spider" products, including, 3 "Roof Anchorages", "Guardrail testing system",

Appendix A - Greg Small CV



# Greg Small, P.Eng., M.Eng

as the Chief Engineer for 2 ½ years, before selling his remaining shares, retiring from that Company in August 2016.

Greg wasn't ready to fully retire, and incorporated "Elevated Insight and Engineering Ltd." in September 2016, working from his home in service of the fall protection industry.

In his volunteer work, Greg remains active with CSA Z259 and ANSI Z359 and continues collaborating with regulators to improve worker safety at height.

He continues to consult to engineering firms and manufacturers, serves as an expert witness in a variety of liability cases, and offers his industry-leading training in "Qualified Fall Protection Engineer" and "Competent Person Advanced".

Greg has a deep curiosity and innate ability to understand how things work. This helps him develop useful mathematical and computer models to explore behaviour of the physical world, sometimes using tests to prove unexpected results from his calculations. He has a natural teaching ability, with a contagious passion for the truth, that helps him explain complicated things in understandable ways.

He has participated in many forensic investigations of incidents, accidents, equipment failures, design flaws, and mis-use of equipment and systems.

Greg's experience with forensics and expert testimony is listed in the column to the right.

**Forensics & Expert Witness:**

- 1981 - Labour Canada vs. CN Rail, Federal Court, Ottawa, ON. Assist Counsel - successful defence of scaffold collapse.
- 1998, Robert Phalin vs. Klein Tools, Fall of a worker from a utility pole. Successful out of court settlement after deposition testimony.
- 1999, testing military descent controller to investigate heat build-up that was causing ropes to jam in the device.
- 2000, Inspection/testing/report: horizontal lifeline representing DBI/SALA against Metro North Railroad. Resolution unknown.
- 2001, Mine Safety Institute, witnessed/assisted forensic dismantling/inspection of SRL. Lawsuit not initiated.
- 2002, Discovered dangerous fall protection system in St. Paul, MN. Computer modelling and dynamic testing proved claim. Owner dismantled system but chose not to pursue breach of contract lawsuit against the Supplier.
- 2010, Temprile vs. College Pro Painters, forensic investigation defending ladder set-up. Judicial ruling in favor of defendant.
- 2011, Expert Witness in a Hydro One application to Ontario Ministry of Labour to reinstate use of a banned anchorage device. Successful reinstatement of device.
- 2012, Expert analysis /esting of ladder climbing system on behalf of Enercon, to to revoke a CSST ban. Successful reinstatement of system.
- 2012, Flores vs. Falltech, Product Liability claim that fall arrester did not engage. Settled out of court.
- 2013, Investigation and expert report to NWT WH&S Comission on non-fatal fall accident. Status not known.
- 2013, David Jordan Johnson v. Trommel, Fall from a residential roof, claiming homeowner failure. Lawsuit dropped.
- 2014, Expert review of Window Cleaning anchorage system. Settled by negotiation.
- 2014, Zimmerman vs FallTech, Product liability case: Hip D-ring pulled out of harness. Ongoing?
- 2014 – Kirkendall vs. Falltech, Product liability case regarding claim that SRL did not engage in large swing fall. Settled out of court.
- 2015 – Hall vs. FallTech, Product liability case regarding claim that rope grab did not engage, case withdrawn by plaintiff.
- 2015 – Palacios vs. FallTech, Product liability case regarding claim that snaphooks in Y-lanyard were defective. Ongoing.
- 2016 – James vs. Guardian, Product liability case regarding claim that SRL did not lock off. Settled out of Court.
- 2016 – Benevides vs. TS Group, Product liability case claiming that rigid ladder system fall arrester did not engage. Ongoing
- 2017 – James vs Guardian, Product Liability case claiming malfunctioning SRL. Settled out of Court.
- 2017 - Gish vs Solid Platforms, Liability case claiming improper construction and tagging of scaffolding. Ongoing.
- 2018 – Najarro vs Guardian, Product Liability Case claiming malfunction of Self Retracting Device – Ongoing.
- 2018 – Gundersen vs Guardian, Product liability case claiming malfunction of fall protection equipment - Ongoing
- 2018 – Rubycela Lopez v Yoke, Product liability case claiming malfunction of ladder fall protection – Settled out of court
- 2018 – Rubycela Lopez v 3M, Product Liability case claiming malfunction of ladder fall protection – Settled out of court
- 2018 – Mora vs Guardian, Product Liability case claiming malfunction of fall protection equipment - Ongoing
- 2019 – Mendoza v Reliance, Product Liability case claiming malfunction of connector between twin SRDs and harness – Settled out of court.

# Appendix B – Static Test Report

Report: Force vs. Displacement Test

## Quality Lab - Test Report

**Test No.:**  44217

**Test  Date:**  10/30/2020

**ECN No.:**  65866

**3M Fall Protection**
3833 Sala Way
Red Wing, MN 55066
USA



| | |
|---|---|
| **Customer:** Rick Miller | **Product Manufacturer:** 3M Fall Protection |
| **Received Date:** 10/27/2020 | **Model No.(s):** 6160054 |
| **Project/Task No.** L-086765-L3-012 | **Product Serial No.(s):** E004035009200CCE |
| **Product Description:** | **Product Lot No.(s):** 16093769 |
| FLEX SLEEVE,LS X3, 3/8"-9.5mm, ANSI,CSA | **Product Mfg. Date:** 2016/September |
| | **Product Condition:** N/A |

**Procedure No.** 99          **Standard:** Other          **Section:**

**Test Description:**

See test exceptions/deviations.

**Test Exceptions / Deviations:**

See page 2 for test procedure.
Initial measurements were taken with a 6.7# weight attached.

**Test Results:** ☐ Pass ☐ Fail    **Max Load:** 3104 lbs          **Arrest Distance:** N/A

**Results Description**

The sample reached 3100# with 8.50 inches of total displacement. During testing the energy absorber experienced 3.19 inches of elongation and the sleeve slipped 1.25 inches. See spreadsheet, photos, & graph.
Tested with cable 6106025 lot #4929549.

| **Comments:** | **Test Equipment Used:** |
|---|---|
| This test report is attorney-client privileged. | T-9090 MX840A DAQ; T-9432 load cell; T-9466 static test machine; T-1344 precision ruler; T-2122 tape measure; & T-2096 6.8# weight. |
| Tested by Shawn & Jordan. Witnessed by Kayleigh Nyquist, Rick Miller, Jerry Alcazar, & Greg Small. | |

**Technician:** Kate          Sanocki          **Witness:**     See comments

**Title:**          Technical Report Writer          **Test Location:** 1

Monday, November 9, 2020

# Appendix B – Static Test Report

Static Test Procedure:

i. Install DBI-SALA Lad-Saf X3 fall arrester on a Lad-Saf cable system with a 3/8" 7x19 strand stainless steel cable (same type of cable involved in the incident).
ii. Position the Lad-Saf X3 approximately 20 feet from the top bracket of the cable system. The cable needs to be tensioned to the specs for Lad-Saf cable system.
iii. Mark the cable immediately above the fall arrester so that any slippage down the cable can be measured.
iv. Install a load cell & puller on the Lad-Saf X3's carabiner at the end of the energy absorber, and anchor them to a rigid anchor that is in-line with the cable (direction of pull to simulate the direction of the fall impact).
v. Measure the length of the energy absorber ("LEA") bearing point to bearing point, Record length ("L").
vi. Apply a light force (5 to 10 lbs) & measure the distance, L, from a fixed reference point to the carabiner connection on the end of the energy absorber (connected to the static puller & load cell), in line with the pull direction (parallel to or in-line with the cable). Measurements are in-line with the direction of pull. Record force ("F") & L.
vii. Apply a small displacement (½") and measure and record the new F & L.
viii. Repeat Step vi, recording F & L at each increment (1/2") until the energy absorber is fully deployed. Keep adding displacements (towards the end, probably in smaller displacement increments) until the force reaches 3,000 lbs. Record the final F & L.
ix. Release the load & do a final measurement of F = 0, L; measure & record the final LEA.
x. Measure any slippage of the Fall Arrester down the cable from its starting position.
xi. Photograph fully deployed energy absorber.

| Static Test Results | |
| --- | --- |
| Displacement (inches) | Force (lbf) |
| 0.50 | 33 |
| 1.00 | 80 |
| 1.50 | 147 |
| 2.00 | 250 |
| 2.50 | 400 |
| 3.00 | 618 |
| 3.50 | 760 |
| 4.00 | 691 |
| 4.50 | 794 |
| 5.00 | 926 |
| 5.50 | 1102 |
| 6.00 | 1299 |
| 6.50 | 1554 |
| 7.00 | 1853 |
| 7.50 | 2144 |
| 8.00 | 2458 |
| 8.50 | 3100 |

# Appendix B – Static Test Report



**3M Fall Protection**
**3833 Sala Way**
**Red Wing, MN 55066**





Static Test Setup



Static Test Setup

# Appendix B – Static Test Report



Quality Lab - Test Report

Force vs. Time

| Maximum Force | Average Force | Arrest Distance |
|---|---|---|
| 3104 lbs | NaN lbs | NaN in |
| 13.81 kN | NaN kN | NaN cm |

44217
Page 4 of 4

## Appendix C – Basic Free Fall Test Report

**Quality Lab - Test Report**

**Test No.:**  44218

**Test  Date:**  10/30/2020

**ECN No.:**  65866

**3M Fall Protection**
3833 Sala Way
Red Wing, MN 55066
USA



---

**Customer:**  Rick Miller

**Received  Date:** 10/27/2020

**Project/Task No.**  L-086765-L3-012

**Product Description:**

  FLEX SLEEVE,LS X3, 3/8"-9.5mm,
  ANSI,CSA

**Product Manufacturer:** 3M Fall Protection

**Model No.(s):**  6160054

**Product Serial No.(s):**  E00403500A610521

**Product Lot No.(s):**  16093769

**Product Mfg. Date:**  2016/September

**Product Condition:**  N/A

---

| Procedure No.  187 | Standard:  ANSI A14.3 | Section:  7.5.4 |
|---|---|---|

**Test Description:**

Install the ladder safety system onto the test ladder as it would be in service.  Position the safety sleeve on the carrier at least 6 feet above ground level.  Fit the harness to the test torso and adjust snugly as though the torso were a person.  Connect the safety sleeve to the harness as it would be in normal use.  Using the quick release mechanism raise the torso to a position that will create the greatest free fall and mark the position of the sleeve on the carrier.  Release the test weight. The maximum length of movement of the safety sleeve shall not be more than 6 inches.

Reference section 7.3.2.

**Test Exceptions / Deviations:**

None.

---

| **Test Results:** ☑ Pass ☐ Fail | **Max Load:** N/A | **Arrest Distance:**  N/A |
|---|---|---|

**Results Description**

The sample arrested the weight with 3.88 inches of sleeve travel and 2.75 inches of energy absorber elongation.

Tested with harness 1113192 lot #6877246 & cable 6106025 lot #4929549.

---

**Comments:**

This test report is attorney-client privileged.

Tested by Shawn & Jordan.
Witnessed by Kayleigh Nyquist, Rick Miller, Jerry Alcazar, & Greg Small.

**Test Equipment Used:**

T-2179 220# test dummy; T-1344 precision ruler; & T-2122 tape measure.

---

**Technician:** Kate      Sanocki

**Title:**      Technical Report Writer

**Witness:**      See comments

**Test Location:** 1

Monday, November 9, 2020

# Appendix C – Basic Free Fall Test Report



**3M Fall Protection**
**3833 Sala Way**
**Red Wing, MN 55066**





Test Setup



Post-Dynamic Performance Drop

# Appendix C – Basic Free Fall Test Report



**3M Fall Protection**
**3833 Sala Way**
**Red Wing, MN 55066**





Post-Dynamic Performance Drop



Post-Dynamic Performance Drop

# Appendix D – Large Free Fall Test Report



## Quality Lab - Test Report

**Test No.:** 44219

**Test Date:** 10/30/2020

**ECN No.:** 65866

**3M Fall Protection**
3833 Sala Way
**Red Wing, MN 55066**
**USA**

---

**Customer:** Rick Miller

**Received Date:** 10/27/2020

**Project/Task No.** L-086765-L3-012

**Product Description:**

FLEX SLEEVE,LS X3, 3/8"-9.5mm, ANSI,CSA

**Product Manufacturer:** 3M Fall Protection

**Model No.(s):** 6160054

**Product Serial No.(s):** E004035008FBC6FF

**Product Lot No.(s):** 16031469

**Product Mfg. Date:** 2016/March

**Product Condition:** N/A

---

**Procedure No.** 99 **Standard:** Other **Section:**

**Test Description:**

See test exceptions/deviations.

**Test Exceptions / Deviations:**

See page 2 for test procedure..

**Test Results:** ☐ Pass ☐ Fail **Max Load:** 4202 lbs **Arrest Distance:** 22.25 in

**Results Description**

The sample arrested the weight with with 22.13 inches of total movement, 5.13 inches of sleeve travel, & 3.50 inches of energy absorber elongation (graphing software rounds distance to the nearest 0.25 inch). See photos and graph.
Tested with harness 1113192 lot #6877246, cable 6106025 lot #4929549, & tie off adaptor 5900550.

| Comments: | Test Equipment Used: |
|---|---|
| This test report is attorney-client privileged.<br><br>Tested by Shawn & Jordan.<br>Witnessed by Kayleigh Nyquist, Rick Miller, Jerry Alcazar, & Greg Small. | T-9090 MX840A DAQ; T-9432 load cell; T-2179 220# test dummy; T-1344 precision ruler; & T-2122 tape measure. |

**Technician:** Kate Sanocki **Witness:** See comments

**Title:** Technical Report Writer **Test Location:** 1

Monday, November 9, 2020

## Appendix D – Large Free Fall Test Report

Dynamic Test Procedure:

The Plaintiff alleges that he sustained a 20 ft free fall. This test will drop a test torso that is approximately the Plaintiff's weight, in a full body harness, to simulate a 20 ft fall.

i. Install the cable with proper top and bottom anchors, tensioned to spec, so that the fall arrester can be installed to allow a 20 foot free fall with as much cable as possible above the X3 sleeve.

ii. Measure the length of the energy absorber as described in 1) iv above.

iii. Mark the cable above the fall arrester as a reference to measure how much the fall arrester slips down the cable.

iv. Connect the test torso to the fall arrester with a 10 ft wire rope lanyard.

v. Lift the test mass 10 ft above the fall arrester.

vi. Drop the test mass.

vii. Measure the length of the energy absorber as described in 1) iv above.

viii. Photograph the energy absorber and kink in the cable and possibly any scoring on the cable.

# Appendix D – Large Free Fall Test Report



**3M Fall Protection**
**3833 Sala Way**
**Red Wing, MN 55066**





Post-Dynamic Drop



Post-Dynamic Drop

# Appendix D – Large Free Fall Test Report



**3M Fall Protection**
3833 Sala Way
Red Wing, MN 55066





Post-Dynamic Drop



Post-Dynamic Drop

# Appendix D – Large Free Fall Test Report



**3M Fall Protection**
**3833 Sala Way**
**Red Wing, MN 55066**





Post-Dynamic Drop



Post-Dynamic Drop

# Appendix D – Large Free Fall Test Report



**3M Fall Protection**
**3833 Sala Way**
**Red Wing, MN 55066**





Post-Dynamic Drop



Post-Dynamic Drop

# Appendix D – Large Free Fall Test Report

Quality Lab - Test Report

Force vs. Time



| | Maximum Force | | Average Force | | Arrest Distance | |
|---|---|---|---|---|---|---|
| | 4202 | lbs | 2151 | lbs | 22.25 | in |
| | 18.69 | kN | 9.57 | kN | 57 | cm |

# Appendix E – Energy Analysis

## Analysis of Oct 30 2020 Exemplar Test Data

LadSaf X3 on 18.4 ft of ca

Rope Diameter = d = 0.375 in
Length of Rope = Lo = 18.4 ft

Breaking Strength = BS = 14000 lb

Stretch Data:

| Force F (lb) | Stretch x (in) |
|---|---|
| 0 | 0 |
| 147 | 1 |
| 400 | 2.5 |
| 691 | 4 |
| 2144 | 7.5 |
| 3100 | 8.5 |

| Strain ε (%) | Stress σ (ksi) |
|---|---|
| 0 | 0 |
| 0.45% | 1.331 |
| 1.13% | 3.622 |
| 1.81% | 6.256 |
| 3.4% | 19.412 |
| 3.85% | 28.068 |

### Polynomial Curve Fit to Data:

ft-lb x units: in

Rope Diameter = d = 0.375 in
Length of Rope = Lo = 18.4 ft

| | | | | | | |
|---|---|---|---|---|---|---|
| | σ (ksi) = | 265.1993 ε | + 7835.12 ε² | - 370074 ε³ | + 7883246 ε4 | + 1.2E+08 ε5 |
| Local | E (ksi) = | 265.1993 | + 15670.2 ε | - 1110222 ε² | + 3.2E+07 ε³ | + 5.9E+08 ε4 |
| | F (lb) = | 132.6556 x | + 17.7501 x² | - 3.79703 x³ | + 0.36632 x4 | + 0.02501 x5 |
| | U (lb-ft) = | 5.527318 x² | + 0.49306 x³ | - 0.0791 x4 | + 0.00611 x5 | + 0.00035 x6 |

**Point 1: Highest Force of Static Test with Fall Arrester Installed on 20 ft of Cable**
F1 (lb) = 3,100 lb x = 8.50 in ε = 3.85% σ (ksi) = 28.068 U (lb-ft) = 691.110
Correct force at this stretch: Use Linear E (ksi) = 729.1 But the correct U is 62.95% of Linear E Calculation

**Point 2: 16 ft FF of 240 lb Mannequin (Note that calculated x ignores damage energy in Harness)**
F2 (lb) = 4,200 lb x = 9.30 in ε = 4.21% σ (ksi) = 38.027 U (lb-ft) = 933.516
Correct force at this stretch: Use Linear E (ksi) = 902.5 But the correct U is 57.34% of Linear E Calculation

Rope Grab Slipped 1.25 in, Top Anchor Displaced 1/2",
18.43 ft of Cable has a stiffness of 41,000 lb/ft = 3400 lb/in
At 3100 lb the cable would elastically stretch 0.1025 ft = 0.91 inches
**AT 3100 lbs, Total movement = 1.25 + 0.5 + 0.91 = 2.66 inches**

Final PEA measured = 5.9375 inches
Initial PEA measured = 2.75inches
**Total Deployment = 3.1875 inches**

At 3100 lb: ∑X = 8.5 in, Therefore rotation of Fall Arrester (Kinking Cable) = 8.5-2.66-3.1875 = 2.6525 inches
2.66" + 2.6525" = 5.3125" = total displacement in addition to PEA Deployment at 3100 lb static force
8.5/3.1875 = 2.67. Mujltiply measured fall arrester length x 2.67 to estimate "X"

© 2020 Elevated Insight and Engineering Ltd.

**LadSaf X3 on 18.4 ft of cable**

Data Type: Force vs. Stretch
Units: ft-lb
Rope dia: 0.375 in
Rope BS: 14,000 lb
Rope Length: 18.4 ft

Data:

| Force F (lb) | Stretch x (in) |
|---|---|
| 147 | 1 |
| 400 | 2.5 |
| 691 | 4 |
| 2,144 | 7.5 |
| 3,100 | 8.5 |

Data: Force vs Displacement Test Oct 30 2020 (Includes PEA deployment, Cable Stretch, Anchor Displacement)

| F (lb) | x (in) | stress (ksi) | strain | U (ft-lb) |
|---|---|---|---|---|
| 0 | 0 | 0.000 | 0.000 | |
| 33 | 0.5 | 0.299 | 0.002 | 0.688 |
| 80 | 1 | 0.724 | 0.005 | 3.042 |
| 147 | 1.5 | 1.331 | 0.007 | 7.771 |
| 250 | 2 | 2.264 | 0.009 | 16.042 |
| 400 | 2.5 | 3.622 | 0.011 | 29.583 |
| 618 | 3 | 5.595 | 0.014 | 50.792 |
| 760 | 3.5 | 6.881 | 0.016 | 79.500 |
| 691 | 4 | 6.256 | 0.018 | 109.729 |
| 794 | 4.5 | 7.189 | 0.020 | 140.667 |
| 926 | 5 | 8.384 | 0.023 | 176.500 |
| 1102 | 5.5 | 9.978 | 0.025 | 218.750 |
| 1299 | 6 | 11.761 | 0.027 | 268.771 |
| 1554 | 6.5 | 14.070 | 0.029 | 328.208 |
| 1853 | 7 | 16.777 | 0.032 | 399.188 |
| 2144 | 7.5 | 19.412 | 0.034 | 482.458 |
| 2458 | 8 | 22.255 | 0.036 | 578.333 |
| 3100 | 8.5 | 28.068 | 0.038 | 694.125 |

W = 240 lb

| | X(in) | F* (lb) | U (ft-lb) | Free Fall* h (in) =12U/W-X |
|---|---|---|---|---|
| Plaintiff: | 7.01 | 1802 | 395 | 12.74 |
| ANSI Z359.15 Test of 240 lb Mannequin | 6.01 | 1288 | 268 | 7.38 |

| | X(in)* | F* (lb) | U (ft-lb) | h (in) |
|---|---|---|---|---|
| Mannequin 16 ft Free Fall | 13.29 | 17,760 | 4106 | 192.00 |
| Plaintiffs Alleged 20 ft Free Fall | 13.88 | 21,593 | 5078 | 240.00 |

*These Calculations assume all Fall Energy goes into Fall Arrester, Cable and Top Anchor
(Ignores Energy Absorbed in Mannequin/Worker and Harness)

**Plaintiff's PEA Deployment = 2.625 in**
**Plaintiff's X = 2.625 *2.67 = 7.01** F*<1796 lb

**ANSI test PEA Deployment = 2.25 in**
**ANSI Test X = 2.25 x 2.67 = 6.01 in** F*<1284 lb

# Greg Small, P.Eng., M.Eng





Greg Small is highly respected as one of the leading Fall Protection engineering experts in the World. Approximately one-third of presenters at the last ten "International Society for Fall Protection" Symposiums have received Fall Protection Engineering Training from Greg.

He began his professional career with CN Rail as a bridge engineer, where, in the early 1980s he implemented a fall protection program for bridge workers. He was soon appointed to CN's quality team that created one of the earliest managed fall protection programs in the world. He developed essential engineering techniques for analysis of horizontal lifeline systems, discovering critical flaws in some systems being purchased by the railway. His work led to proposal and development of several patented fall protection components & systems.

In 1991, Greg was appointed to the Canadian Standards Association Z259 technical committee on fall protection and served on its executive for more than 10 years, stepping down as its vice-chair in 2016. He has played a very active role in the development of standards in fall protection. He has made significant contributions to the last two editions of Z259.13, "Flexible Horizontal Lifeline Systems", and chaired the first edition of Z259.15, "Anchorage Connectors". His proudest achievement, however, was conceiving and chairing the original and all subsequent editions of Z259.16, for the "Design of Active Fall Protection Systems". This ground-breaking standard was adopted, almost verbatim, as ANSI Z359.6-09 in the United States and SS607 in Singapore.

At ANSI Z359, Greg stepped down as chair of ANSI Z359.18, "Anchorage Connectors" in 2020 but remains a very active participant many of the standards, particularly ANSI Z359.6 ("Design of Active Fall Protection Systems") and ANSI Z359.17 ("Horizontal Lifelines").

In 1996, Greg left CN Rail for an appointment as Vice President of Engineering with Gravitec Systems Inc., of Calgary, AB and Seattle WA, specializing in fall protection engineering training and consulting.

In seven years at Gravitec, Greg:
- Developed fall hazard survey and reporting techniques, including a hazard ranking system that objectively rates the risk a hazard poses.
- Oversaw development of Managed Fall Protection programs for several major corporations, including program manuals, work procedures, equipment selection, user training, and engineered systems.

**Education:**
- Bachelor of Applied Science (Honours), Civil Engineering, University of British Columbia, 1979
- Master of Engineering (Structural Engineering) University of Alberta, 1987.

**Professional Registrations:**
- State of Arizona Board of Technical Registration – Structural Engineer
- Association of Professional Engineers, Geologists and Geophysicists of Alberta
- Association of Professional Engineers and Geoscientists of Saskatchewan
- Retired in good standing, and can reactivate quickly in BC, MB, ON, YK, NT

**Professional Associations:**
- American National Standards Institute, technical subcommittees Z359.6, Design of Active Fall Protection Systems and Z259.17, Horizontal Lifelines, 2009-present. Currently Chair of ANSI Z359.18 – Anchorage Connectors.
- Canadian Standards Association, technical committee Z259, Fall Protection 1992-present. Served on executive 2008-2016 and Vice-Chair 2012 -2016. Chair of CSA Z259.16 2002-present. Chaired CSA Z259.15 2006-2015.
- American Railway Engineering and Maintenance-of-Way Association, Committee 15, Steel Bridge Design Code 2003-present

**Papers & Presentations:**
- All Systems Go: Engineering Fall Arrest, by Gregory Small, Occupational Health and Safety Magazine Buyer's Guide 1997.
- The Personal Energy Absorber Equation, by Gregory Small, Construction Safety & Health supplement to Occupational Hazards Magazine, February 2000.
- Latitude for Longitudinal Force, by Small, Berry & Jenkins, AREMA Annual conference proceedings, September 2004
- Investigation of Service Loading of a BTPG span, Unsworth, Small, and Afhami, AREMA Annual conference proceedings, September 2005.

# Greg Small, P.Eng., M.Eng



- Developed and taught a 5-day "Qualified Person" course on techniques for engineering fall protection systems.
- Co-developed and co-instructed a 5-day course, "Managed Fall Protection Program".
- Wrote a seed document used to develop the first draft of the ANSI Z359.0 and Z359.2 standards for "Definitions" and  "Managed Fall Protection Program".
- Tested numerous fall protection systems and components, including horizontal lifelines, rigid rails, energy absorbers, lanyards and carabiners.
- Directed or participated in forensic investigations of numerous fall protection systems.

In 2003 Greg left Gravitec, returned to his work as a Railway Bridge Engineer, and was appointed to AREMA committee 15 (the North American steel railway bridge design code). In 2005, after completion of his non-competition agreement with Gravitec, he formed "High Engineering Corp." to continue his work in Fall Protection.

In 11 years at High Engineering Corp, Greg:

- Developed, tested and implemented, several innovative Fall Protection solutions, including double travel restraint, hip connection in travel restraint, and using dual SRLs as an alternative to horizontal lifelines.
- Invented testing techniques to determine lock-off distances of SRLs, engineering properties of Horizontal Lifeline Energy absorbers, frictional properties between ballasted anchorage systems and the surfaces they stand on.
- Developed and participated in numerous advances in engineering techniques, including the effects from deforming anchors, dynamic analysis of ballasted anchorages and the performance of dual SRLs.
- Developed innovative ways to install stiff and strong anchorages on weak surfaces, enabling faster arrest of falls.
- Conducted forensic investigation of numerous fall accidents, including inspection, computer modelling, expert reports and testimony.
- Refined engineering techniques for fall protection that have become part of the current ANSI Z359.6, CSA Z259.16 and SS607 standards.
- Conceived and developed the smartphone App, "FallClear", used around the world for clearance calculations.

In 2014, High Engineering Corp merged with Parsons Engineering from St. John's NF, retaining the name, "High Engineering Corp". Greg served

- Salvage of an HTPG span and conversion to a BDTPG by Small & Ketler, AREMA Annual Conference Proceedings, September 2006
- Adjusting fall arrest clearance for changes in Free Fall, worker weight and PEA forces, , ISFP, Baltimore, MD, June 2010
- Specifying Fall Protection to get what you really need, ASSE annual conference, Denver, CO, June 2012
- Is Gravity Different Where You Live?, AIHCE Conference, Montreal, PQ, May 2013
- Clearance Calculations Made Easy, ASSE annual conference, Las Vegas, NV, June 2013
- Design Considerations for Travel Restraint HLLs, ISFP, Las Vegas, NV, June 2013
- Innovative Fall Protection for Low Clearance applications, ASSE annual conference, Orlando, FL, June 2014
- Managing Fall Protection Programs for Optimal Safety and Efficiency, AIHA annual conference, Small & Parsons, Salt Lake, UT, June 2015
- New Standards, Methods and Technologies for Self Retracting Devices, ASSE annual conference, Small, Parsons, Henn & Laurie, Dallas, TX, June 2015
- Design considerations for sliding resistance of ballasted anchorages used in active fall protection systems, Parsons and Small, ASSE annual conference, Dallas, TX, June 2015
- Fall Protection and Façade Anchorage Load Testing: Best Practices, ISFP, New Orleans, LA, June 2019

**Patents:**
- US No 5,799,760: Energy Absorbing Device
- US No 7,992,680 B2:  Pass-by Rigid Rail system
- Patent Pending: Force Management Anchor for Horizontal Lifelines
- Engineered or conceived several devices, subsequently patented by manufacturers, including a "Rail Slider", "Energy Absorbing Strut", "Reinforcing Spider" products, including, 3 "Roof Anchorages", "Guardrail testing system",

# Greg Small, P.Eng., M.Eng



as the Chief Engineer for 2 ½ years, before selling his remaining shares, retiring from that Company in August 2016.

Greg wasn't ready to fully retire, and incorporated "Elevated Insight and Engineering Ltd." in September 2016, working from his home in service of the fall protection industry.

In his volunteer work, Greg remains active with CSA Z259 and ANSI Z359 and continues collaborating with regulators to improve worker safety at height.

He continues to consult to engineering firms and manufacturers, serves as an expert witness in a variety of liability cases, and offers his industry-leading training in "Qualified Fall Protection Engineer" and "Competent Person Advanced".

Greg has a deep curiosity and innate ability to understand how things work. This helps him develop useful mathematical and computer models to explore behaviour of the physical world, sometimes using tests to prove unexpected results from his calculations. He has a natural teaching ability, with a contagious passion for the truth, that helps him explain complicated things in understandable ways.

He has participated in many forensic investigations of incidents, accidents, equipment failures, design flaws, and mis-use of equipment and systems.

Greg's experience with forensics and expert testimony is listed in the column to the right.

## Forensics & Expert Witness:

- 1981 - Labour Canada vs. CN Rail, Federal Court, Ottawa, ON. Assist Counsel - successful defence of scaffold collapse.
- 1998, Robert Phalin vs. Klein Tools, Fall of a worker from a utility pole. Successful out of court settlement after deposition testimony.
- 1999, testing military descent controller to investigate heat build-up that was causing ropes to jam in the device.
- 2000, Inspection/testing/report: horizontal lifeline representing DBI/SALA against Metro North Railroad. Resolution unknown.
- 2001, Mine Safety Institute, witnessed/assisted forensic dismantling/inspection of SRL. Lawsuit not initiated.
- 2002, Discovered dangerous fall protection system in St. Paul, MN. Computer modelling and dynamic testing proved claim. Owner dismantled system but chose not to pursue breach of contract lawsuit against the Supplier.
- 2010, Temprile vs. College Pro Painters, forensic investigation defending ladder set-up. Judicial ruling in favor of defendant.
- 2011, Expert Witness in a Hydro One application to Ontario Ministry of Labour to reinstate use of a banned anchorage device. Successful reinstatement of device.
- 2012, Expert analysis /esting of ladder climbing system on behalf of Enercon, to to revoke a CSST ban. Successful reinstatement of system.
- 2012, Flores vs. Falltech, Product Liability claim that fall arrester did not engage. Settled out of court.
- 2013, Investigation and expert report to NWT WH&S Comission on non-fatal fall accident. Status not known.
- 2013, David Jordan Johnson v. Trommel, Fall from a residential roof, claiming homeowner failoure. Lawsuit dropped.
- 2014, Expert review of Window Cleaning anchorage system. Settled by negotiation.
- 2014, Zimmerman vs FallTech, Product liability case: Hip D-ring pulled out of harness. Ongoing?
- 2014 – Kirkendall vs. Falltech, Product liability case regarding claim that SRL did not engage in large swing fall. Settled out of court.
- 2015 – Hall vs. FallTech, Product liability case regarding claim that rope grab did not engage, case withdrawn by plaintiff.
- 2015 – Palacios vs. FallTech, Product liability case regarding claim that snaphooks in Y-lanyard were defective. Ongoing.
- 2016 – James vs. Guardian, Product liability case regarding claim that SRL did not lock off. Settled out of Court.
- 2016 – Benevides vs. TS Group, Product liability case claiming that rigid ladder system fall arrester did not engage. Ongoing
- 2017 – James vs Guardian, Product liability case claiming malfunctioning SRL. Settled out of Court.
- 2017 - Gish vs Solid Platforms, Liability case claiming improper construction and tagging of scaffolding. Ongoing.
- 2018 – Najarro vs Guardian, Product Liability Case claiming malfunction of Self Retracting Device – Ongoing.
- 2018 – Gundersen vs Guardian, Product Liability case claiming malfunction of fall protection equipment - Ongoing
- 2018 – Rubycela Lopez v Yoke, Product Liability case claiming malfunction of ladder fall protection – Settled out of court
- 2018 – Rubycela Lopez v 3M, Product Liability case claiming malfunction of ladder fall protection – Settled out of court
- 2018 – Mora vs Guardian, Product Liability case claiming malfunction of fall protection equipment - Ongoing
- 2019 – Mendoza v Reliance, Product Liability case claiming malfunction of connector between twin SRDs and harness – Settled out of court.

## Forensic Investigations, Expert Opinion, Depositon and Testimony Rates

### Rates Submitted to:

**Gerardo Alcazar**
**Blackwell Burke P.A.**
**431 South Seventh Street, Suite 2500**
**Minneapolis, MN 55415**

| | Unit Cost | |
|---|---|---|
| Principal Engineer (Greg Small, P.E., P.Eng., M.Eng.) - Forensic Investigation/Written Opinion | $465 | per hour |
| Principal Engineer (Greg Small, P.E., P.Eng., M.Eng) - Depositions & Court Testimony | $690 | per hour |
| Travel Time for Principal Engineer* | $230 | per hour |
| Admin Support | $115 | per hour |
| | | |
| | | |
| | | |
| | | |
| | | |

**All other Travel Expenses (Air, Taxi, Hotel, Meals, Rentals) will be charged at Cost + 10%**
**(Note Travel time rates are based on First or Business Class for flight durations over 3 hours)**
**The above rates, in $USD, are net of applicable taxes, which will be added to the final invoice**

### Terms (Attached terms of engagement are applicable)

**Client to Provide the Following:**

**1 -** Copies of all documents on which opinions are requested.

These rates are in effect for short duration projects initiated in 2020

*9/11/2020* **Blackwell Burke P.A.**

## 1. PROFESSIONAL RESPONSIBILITY

Elevated Insight and Engineering Ltd., hereafter referred to as "the CONSULTANT", shall provide the noted engineering services to the CLIENT exercising the standard of care, skill and diligence which is reasonably expected within the engineering profession in the location of the project, as measured by professional standards applicable during the performance of the services. No other warranty or guarantee, expressed, implied or statutory, is made or intended by this Agreement.

## 2. SUBCONSULTANTS

The CONSULTANT may, with the permission of the CLIENT and at any stage of the project, engage subconsultants to perform all or any part of the services. The CLIENT shall not unreasonably withhold permission to engage subconsultants.

## 3. DISCLOSURE

The CLIENT agrees to provide full disclosure to the CONSULTANT of all drawings, reports, schedules and other data pertinent to the execution of the CONSULTANT's work on behalf of the CLIENT under this agreement. The CONSULTANT shall not be responsible for the interpretation or verification of information supplied by the CLIENT or others, or for any errors or omissions therein. The CONSULTANT may rely on the accuracy of any data provided by the CLIENT, or by other parties engaged by the CLIENT, for use on the project.

## 4. COMPENSATION

Fees for the work performed under this Agreement shall be in the form agreed to by the CONSULTANT and CLIENT. All fees and charges shall be payable in Canadian funds unless noted otherwise. Invoices shall be due and payable within thirty (30) days of the invoice date, as presented and without hold backs, by the CLIENT upon receipt. Accounts unpaid after thirty (30) days are subject to interest compounded at 1 per cent per month past-due. The CONSULTANT reserves the right, without penalty, to discontinue services in the event of non-payment.

## 5. REPRESENTATIVES

The CONSULTANT and the CLIENT shall each designate a representative who is authorized to act on behalf of the designating party on matters related to the project. Each such representative shall be the person to whom notices required under this Agreement shall be directed. Either party may change their representative upon written notice to the other party.

## 6. TERMINATION

Either party may terminate this Agreement without cause upon thirty (30) days written notice. Upon termination by either party, the CLIENT shall forthwith pay to the CONSULTANT the fees and charges due for services rendered under this Agreement to the date of termination, including all reasonable termination costs incurred by the CONSULTANT in closing down the project work.
If either party breaches this Agreement, the non-defaulting party may terminate this Agreement if the breach is not remedied by the seventh (7th) day following written notice of default from the non-defaulting party. Non-payment by the CLIENT of invoices issued by the CONSULTANT shall constitute a breach of this Agreement.

## 7. CLIENT'S RESPONSIBILITIES

The CLIENT shall be responsible for all things reasonably required to facilitate the project and to aid the CONSULTANT to provide the services. Unless otherwise stated elsewhere, the CLIENT shall apply for and obtain all permits and licenses.

## 8. LIMITATION OF LIABILITY

The CONSULTANT shall not be responsible for;
  a. the failure of a contractor, retained by the CLIENT, to perform the work required for the Project in accordance with the applicable contract documents.
  b. the design of or defects in equipment supplied or provided by the CLIENT for incorporation into the Project.
  c. any cross contamination resulting from subsurface examinations.
  d. any damage to subsurface structures and utilities which were identified and located by the CLIENT.
  e. any Project decisions made by the CLIENT if the decisions were made without the advice of the CONSULTANT or contrary to or inconsistent with the advice of the CONSULTANT.
  f. Any consequential loss, injury or damages suffered by the CLIENT, including but not limited to the loss of use, earnings and business interruption.
  g. The unauthorized distribution of any confidential document or report prepared by or on the behalf of the CONSULTANT for the exclusive use of the CLIENT.
Notwithstanding any other provisions of this Agreement, the total amount of all claims the CLIENT may assert against the CONSULTANT, including all directors, officers, employees, agents, subconsultants and shareholders under this project, including but not limited to claims for negligence, negligent misrepresentation and breach of contract, shall not exceed the amount of the engineering fees paid by the CLIENT to the CONSULTANT.
No claim may be brought against the CONSULTANT in contract or tort more than one (1) year after the services were completed or terminated under this agreement.

9/11/2020                                          **Blackwell Burke P.A.**

**9. INSURANCE**

The CONSULTANT will maintain insurance for the Agreement, including the following items:

  a. Worker's Compensation Insurance at statutorily required levels.

  b. Comprehensive General Liability (CGL) insurance.

  c. Professional Liability Insurance (PLI)

  d. Automotive insurance for all vehicles used in rendering the services under this Agreement.

**10. DOCUMENTS**

All documents and drawings prepared by the CONSULTANT or by others on the behalf of the CONSULTANT, in connection with this Project are instruments of service for the execution of the Project.  The CONSULTANT retains the property and copyright in these documents and drawings, whether the project is executed or not.  These documents and drawings may not be used on any other project or for any other purpose without the prior written consent of the CONSULTANT.  At the request and expense of the CLIENT, the CONSULTANT shall provide the CLIENT with copies of any and all drawings, specifications and other documents prepared by the CONSULTANT, if requested not more than ten (10) years after the services are completed or after this Agreement is terminated.

**11. FIELD SERVICES**

Where applicable, field services recommended for the Project are the minimum necessary, in the sole discretion of the CONSULTANT, to observe whether the work of a contractor retained by the CLIENT or CONSULTANT is being carried out in general conformity with the intent of the services.  Any reduction from the level of services recommended will result in the CONSULTANT providing qualified certifications for the work.

**12. ENVIRONMENTAL**

The CONSULTANT's field investigation, laboratory testing, and engineering investigations will not address or evaluate pollution of soil, or pollution of groundwater.  The CONSULTANT will cooperate with the CLIENT's environmental consultant during any investigations during the field work phase of the CONSULTANT's work.

**13. DISPUTE RESOLUTION**

If requested in writing by either the CLIENT or the CONSULTANT, the parties shall attempt to resolve any dispute, arising out of or in connection with this Agreement, by entering into structured non binding negotiations with the assistance of a mediator on a without prejudice basis.  The mediator shall be appointed by agreement with the parties.  If a dispute cannot be settled within a period of thirty (30) calendar days with the mediator, the dispute shall be referred to and finally resolved through arbitration by an arbitrator appointed by agreement of the parties of by reference to a judge of the Court.

**14. ENTIRE AGREEMENT**

Upon authorization by the CLIENT and commencement of performance hereunder, these terms constitute the entire agreement between the parties concerning its subject matter.  Any changes or additional conditions proposed by the CLIENT are hereby rejected, unless expressly stated in the Agreement or incorporated by a change order executed in writing by the CLIENT and CONSULTANT.

*9/11/2020*

**Blackwell Burke P.A.**