

November 16, 2020

Ryan L. Marlatt
Lewis Brisbois Bisgaard & Smith LLP
24 Greenway Plaza, Suite 1400
Houston, Texas 77046

Steven Augustine
Thompson, Coe, Cousins & Irons, LLP
One Riverway, Suite 1400
Houston, Texas 77056

Re:    Justin Moore and Judith Moore v. DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety USA, Capital Safety Group, and DBI/SALA; SafeWorks, LLC d/b/a Power Climber Wind; and Power Climber BVBA d/b/a Power Climber Wind

Dear Mr. Marlatt and Mr. Augustine:

Pursuant to your request we performed the procedures described below for the purpose of evaluating the August 14, 2020 economic analysis of the "present value of the economic loss as a result of the injury of Mr. Justin Moore" ("Mr. Moore"), prepared by John A. Swiger, Ph.D. ("Dr. Swiger") (the "Swiger Report").[1] We also calculated Mr. Moore's monthly net earning capacity.

## PROCEDURES

In order to reach our conclusions, we performed the following procedures:

- Reviewed the documents listed in Exhibit A to this report.
- Reviewed the deposition of Mr. Moore taken September 24, 2020.[2]
- Analyzed the assertions and opinions set forth in the Swiger Report.
- Reviewed the Rodney Isom, Ph.D., C.R.C. Preliminary Rehabilitation Plan Report for Mr. Moore, dated August 7, 2020 (the "Isom Report").[3]
- Reviewed the Arthur Joyce, Ph.D., ABN Report of Neuropsychological Evaluation of Mr. Moore, dated July 31, 2020 (the "Joyce Report").[4]

---

[1] John A. Swiger, Ph.D., Business and Economic Consultant, Present Value of the Economic Loss as a Result of the Injury of Justin Moore, an Economic Analysis, dated August 14, 2020 (PLG SWIGER 000001-PLG SWIGER 000034).

[2] Justin Moore Deposition taken September 24, 2020.

[3] Rodney Isom, Ph.D., C.R.C., of Isom Rehabilitation Consulting, Preliminary Rehabilitation Plan Report for Justin Moore, dated August 7, 2020 (PLG ISOM 000001-PLG ISOM 000040).

[4] Arthur Joyce, Ph.D., ABN Report of Neuropsychological Evaluation of Justin Moore, dated July 31, 2020 (PLG JOYCE 000001-PLG JOYCE 000037).

EXHIBIT 11

- Reviewed the Jacqueline Kelly, MD, CLCP Life Care Plan for Mr. Moore, dated May 27, 2020 (the "Kelly Life Care Plan").[5]
- Reviewed the Robert D. Cox, MA, CRC, LPC-S ("Mr. Cox") Vocational Rehabilitation Report for Mr. Moore, dated November 12, 2020 (the "Cox Report").[6]
- Reviewed the Ginny Stegent, RN, CRRN, CDMS, CLCP Evaluation and Preliminary Life Care Plan Report for Mr. Moore, dated November 12, 2020 (the "Stegent Life Care Plan").[7]
- Reviewed the Susan J. Garrison, M.D. Preliminary Report regarding Mr. Moore, dated November 12, 2020 (the "Garrison Report").[8]
- Reviewed the David G. Vanderweide, M.D., P.A. Report regarding Mr. Moore, dated November 4, 2020 (the "Vanderweide Report").[9]
- Reviewed the Mohammad Etminan, M.D. Report regarding Mr. Moore, dated November 9, 2020 (the "Etminan Report").[10]
- Reviewed the Corwin Boake, Ph.D., ABPP Neuropsychological Evaluation Report regarding Mr. Moore, dated November 11, 2020 (the "Boake Report").[11]
- Calculated Mr. Moore's monthly net earning capacity.

## BACKGROUND

Mr. Moore was employed as a wind technician by Invenergy Services LLC ("Invenergy") at the time of the Incident. Mr. Moore is suing the defendants in this case for economic damages, alleging loss of earnings and/or loss of earning capacity and medical care expenses, as a result of injuries he allegedly sustained on June 8, 2017 (the "Incident").[12]

## SUMMARY OF OPINIONS

### OPINIONS – EARNINGS AND/OR EARNING CAPACITY

Dr. Swiger's opinion of the "present value of the economic loss as a result of the injury" (lost earnings/lost earning capacity and lost household services) for Mr. Moore is flawed, overstated, unsupported, and unreliable. His analysis is not based on the facts of this case and contains errors.

---

[5] Jacqueline Kelly, MD, CLCP Life Care Plan for Justin Moore, dated May 27, 2020 (PLG KELLY LCP 000001-PLG KELLY LCP 000027).
[6] Robert D. Cox, MA, CRC, LPC-S, of The World of Work, Inc., Vocational Rehabilitation Report for Justin Moore, dated November 12, 2020.
[7] Ginny Stegent, RN, CRRN, CDMS, CLCP, of Med-Legal Services, Inc., Evaluation and Preliminary Life Care Plan Report for Justin Moore, dated November 12, 2020.
[8] Susan J. Garrison, M.D., of Physical Medicine & Rehabilitation, Preliminary Report regarding Justin Moore, dated November 12, 2020.
[9] David G. Vanderweide, M.D., P.A. Report regarding Justin Moore, dated November 4, 2020.
[10] Mohammad Etminan, M.D. Report regarding Justin Moore, dated November 9, 2020.
[11] Corwin Boake, Ph.D., ABPP Neuropsychological Evaluation Report regarding Justin Moore, dated November 11, 2020.
[12] Plaintiffs' Amended Complaint, filed June 13, 2019.



Dr. Swiger assumes Mr. Moore's alleged economic loss began on the date of the June 8, 2017 Incident and extends through his alleged work-life expectancy and life expectancy (household services). However, it is our understanding that Mr. Moore continued to work for a period of time following the June 8, 2017 Incident and also continued to receive employment benefits for a period of time even after he stopped actively working.[13],[14],[15] The Swiger Report does not appear to account for the earnings or employment benefits Mr. Moore received after the Incident.

Additionally, the Swiger Report assumes Mr. Moore will receive no income following the date of the Incident for the remainder of his life. However, this is inconsistent with the facts of this matter and is inconsistent with the opinions expressed in reports by other experts in this matter.

The Swiger Report erroneously extends Mr. Moore's work-life expectancy by 1.50 years. This results in Dr. Swiger overstating various components of his calculations and opinions.

Additionally, the Swiger Report does not appear to consider Mr. Moore's medical history and/or other causes that could affect Mr. Moore's earning capacity or result in medical treatments and expenses.

Mr. Cox opines that "Mr. Moore would be immediately able to work at many jobs," and the Cox Report provides examples of such jobs which earn wages comparable to Mr. Moore's pre-Incident earning capacity.[16]

It is our understanding that Mr. Moore may have missed and/or may miss some work following the Incident; therefore, his lost earnings and/or lost earning capacity consists of the wages he lost due to being in the hospital, surgery, recovery, therapy, medical treatment, and/or other causes directly related to the Incident.

In our opinion the sum of money that, if paid now in cash, would fairly and reasonably compensate Mr. Moore for his net earning capacity is $4,449 per month for the number of months he was unable to work and was not being compensated by his employer, as a direct result of the Incident.[17] We have no opinion as to whether or not Mr. Moore suffered any alleged economic losses as a direct result of the June 8, 2017 Incident.

## OPINIONS – PRESENT VALUE OF STEGENT LIFE CARE PLAN

The Stegent Life Care Plan, in collaboration with the Garrison Report, is an "evaluation and preliminary report after reviewing the [Kelly Life Care Plan]."[18],[19]

---

[13] Justin Moore Deposition taken September 24, 2020, page 162-164.
[14] Justin Moore Records from Invenergy Services LLC (PLG EMP 000001-PLG EMP 000012).
[15] Justin Moore Records from Invenergy Services LLC (INV_000168-INV_000172).
[16] Cox Report dated November 12, 2020, page 2.
[17] It is to be noted that we have no opinion as to Mr. Moore's vocational capacity limitations, if any; we have relied upon the opinions expressed in the Cox Report for our calculations.
[18] Stegent Life Care Plan dated November 12, 2020.
[19] Garrison Report dated November 12, 2020.



We have been asked to calculate the present value of the Stegent Life Care Plan; however, the Stegent Life Care Plan only includes a single one time cost for individual counseling (in the ancillary assessments/care category) for the amount of $2,250. Therefore, the present value of the Stegent Life Care Plan is $2,250. If the Stegent Life Care Plan is amended or if any additional information becomes available, we may update or supplement this report and our opinions.

Our conclusions are based on information and methodologies of a type reasonably relied upon by experts in our field and are determined within a reasonable degree of certainty. Our analysis and calculations are based on information that was available to us as of the date of this report. If any additional information becomes available, we may update or supplement this report.

## ANALYSIS OF THE SWIGER REPORT

### SWIGER REPORT'S CONCLUSIONS

As set forth in the Swiger Report dated August 14, 2020, the following table summarizes Dr. Swiger's opinions of Mr. Moore's alleged economic losses.[20]

|  | Past Losses | Future Losses | Total Losses |
|---|---|---|---|
| Lost Income |  |  |  |
| Salary | 210,950 | 946,438 | 1,157,388 |
| Benefits | 31,642 | 141,966 | 173,608 |
| Household Services | 13,955 | 124,068 | 138,023 |
| Total Lost Earnings | 256,547 | 1,212,472 | 1,469,019 |
| Less: Income Taxes | 21,095 | 94,644 | 115,739 |
| Net Economic Loss | 235,452 | 1,117,828 | 1,353,280 |

Dr. Swiger's calculations are presented in "Table II" and "Table III" of his report dated August 14, 2020.

## ANALYSIS OF THE SWIGER REPORT

*Work-Life Expectancy*

The Swiger Report indicates Mr. Moore's work-life expectancy is 15.56 years at the time of the June 8, 2017 Incident.[21] Mr. Moore was 49.44 years of age as of the date of the Incident; therefore, Dr. Swiger calculates "lost future incremental earnings of" Mr. Moore through 65.00 years of age, or approximately December 30, 2032.

---

[20] Swiger Report dated August 14, 2020.
[21] Swiger Report dated August 14, 2020, page 4.



However, according to Table II of the Swiger Report, Dr. Swiger calculates "potential lost earnings" through 2033, which is an additional year to Mr. Moore's alleged work-life expectancy.

The Swiger Report references the following outdated source in determining Mr. Moore's work-life expectancy: Journal of Forensic Economics 22(2), 2011, pp. 165-229; "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger.[22] However, based on more recent statistical tables produced by the Journal of Forensic Economics in 2019, the median work-life expectancy of a 49.44-year-old (Mr. Moore's age as of the June 8, 2017 Incident) initially active man, with some college, no degree, is 14.06 years, or through 63.50 years of age.[23]

Dr. Swiger erroneously extends Mr. Moore's alleged work-life expectancy by a total of 1.50 years. This extension adds $137,853 (approximately $110,650 in present value terms) to Dr. Swiger's calculation of Mr. Moore's alleged "lost future incremental earnings," adds $16,598 to Dr. Swiger's calculation of Mr. Moore's alleged employment benefits, and adds $11,065 to Dr. Swiger's calculation of Mr. Moore's alleged income taxes.

Therefore, Dr. Swiger's calculations and opinions are based on inaccurate information and overstate various components of his calculations, which results in an overstated "net economic loss."

*Earnings and/or Earning Capacity ("Earnings Capacity on an Uninjured Basis")*

The Swiger Report states, "For purposes of this analysis, it is projected that Mr. Moore, had he not been injured, would have continued to work in the renewable energy service sector as a technician or related services, and that his income base of $62,114 [sic][24] would have increased at a 2.5% rate to reflect inflation and productivity increases during his work life."[25]

Dr. Swiger projects Mr. Moore's earnings as starting at $62,415 in 2017 and progressively growing 2.50% per year to $92,655 over the remainder of Mr. Moore's alleged work-life.

Dr. Swiger projects Mr. Moore's but-for earnings as a "wind turbine technician" based on the following statement: "Invenergy Payroll Register Data records for Mr. Moore indicate that for the 12 months prior to his injury, Mr. Moore's earnings were $62,415 including overtime. For purposes of this analysis, $62,415, will be used as a basis for future earnings projections."[26]

---

[22] Journal of Forensic Economics 22(2), 2011, pp. 165-229; "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger.

[23] Journal of Forensic Economics 28(1-2), 2019, pp. 15-108: "The Markov Model of Labor Force Activity 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger; Table 6.

[24] This appears to be a typo in the Swiger Report, as other sections of the Swiger Report state that Mr. Moore's alleged annual earnings of $62,415 (Swiger Report dated August 14, 2020).

[25] Swiger Report dated August 14, 2020, page 5.

[26] Swiger Report dated August 14, 2020, page 5.



As of the date of this report, we have not received "Invenergy Payroll Register Data records for Mr. Moore," as referenced in the Swiger Report. Therefore, Dr. Swiger's apparent basis for Mr. Moore's alleged earning capacity cannot be verified. It is to be noted that Dr. Swiger's "basis for future earnings projections" of $62,415 for Mr. Moore is inconsistent with Mr. Moore's tax records produced to us as of the date of this report.

According to the Mr. Moore's tax records produced to us as of the date of this report, Mr. Moore reported total income of $45,543 in 2013, $45,533 in 2014, $59,987 in 2015, $37,104 in 2016, and $34,091 in 2017.[27]

Dr. Swiger's statement that in "the 12 months prior to his injury, Mr. Moore's earnings were $62,415 including overtime," effectively asserts that from approximately June 2016 through June 2017 Mr. Moore earned $62,415. However, Mr. Moore's tax records produced as of the date of this report indicate Mr. Moore reported total income of $71,195 for both 2016 and 2017 combined ($37,104 in 2016 and $34,091 in 2017).[28] Therefore, Dr. Swiger's assertion that Mr. Moore earned $62,415 in a period of 12 months prior to the June 8, 2017 Incident is inconsistent with Mr. Moore's tax records, and appears to be overstated.

In addition, the Swiger Report's assumption that $62,415 represents Mr. Moore's alleged annual earning capacity, is higher than Mr. Moore's annually reported income for 2013 through 2017 based on the tax records produced as of the date of this report. Specifically, the Swiger Report's alleged annual earning capacity for Mr. Moore of $62,415, when compared to Mr. Moore's actual reported income on his tax records, is $16,872 higher than in 2013 (27.03% higher), is $16,882 higher than in 2014 (27.05% higher), is $2,428 higher than in 2015 (3.89% higher), is $25,311 higher than in 2016 (40.55% higher), and is $28,324 higher than in 2017 (45.38% higher).[29] Therefore, when compared to Mr. Moore's reported income, Dr. Swiger's assumed annual earning capacity for Mr. Moore appears overstated.

Additionally, the Swiger Report does not appear to account for the fact that Mr. Moore worked in some capacity for a period following the Incident, and at other subsequent periods in time.[30,31,32]

The Swiger Report estimates Mr. Moore's but-for earning capacity allegedly based solely on his earnings "for the 12 months prior to his injury;" Dr. Swiger does not consider Mr. Moore's earnings from any other years. The Swiger Report does not provide any basis or support for reliance solely on this alleged 12 month period of earnings.

It is to be noted that Mr. Moore's employment for Invenergy began on or about August 26, 2013, and he was involved in the Incident that occurred on June 8, 2017; therefore, Mr. Moore had been working for Invenergy for 3.78 years at the time of the Incident. Considering Mr. Moore's earnings

---

[27] Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014).
[28] Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014).
[29] Mr. Moore's reported income in 2017 may represent a partial year of earnings; as of the date of this report it is unclear the specific date Mr. Moore actually stopped working and stopped being paid by his employer Invenergy following the Incident.
[30] Justin Moore Deposition taken September 24, 2020, page 162-164.
[31] Justin Moore Records from Invenergy Services LLC (PLG EMP 000001-PLG EMP 000012).
[32] Justin Moore Records from Invenergy Services LLC (INV_000168-INV_000172).



over the course of his employment for Invenergy, not just the alleged 12 months prior to the Incident, provides a more reliable representation of Mr. Moore's but-for earning capacity.

In addition to basing his calculation on a limited earnings history, Dr. Swiger projects stable and steady earnings growth for Mr. Moore without any support, and despite the fact that Mr. Moore's actual earnings as a wind technician for Invenergy varied from year to year.

Dr. Swiger's calculation of Mr. Moore's pre-event earning capacity assumes Mr. Moore will continue working as a wind technician until he is 65 years of age.

*Mitigating Earnings and/or Earning Capacity ("Earnings Capacity with His Injury")*

The Swiger Report states that "Mr. Moore's probable future lifetime earnings/earnings capacity, had he not been injured, are projected. These are then compared with his potential earnings on an injured basis in order to evaluate the potential lost earnings/earnings capacity resulting from his injuries." [33]

The Swiger Report states, referencing the Isom Report dated August 7, 2020 (Dr. Isom evaluation dated June 30, 2020): [34],[35]

> Justin is not able to return to work at this time. He is totally disabled as of now. He is in need of substantial future care for his orthopedic injuries, his TBI, PTSD and Depression. He will need to be re-evaluated once he has completed recommended therapies and surgeries to see if he will be employable at all, and if he is to what degree. I would add that the longer it takes for him to receive these required services, the less likely it is that he will ever return to work.

The Swiger Report goes on to state: [36]

> It is beyond the expertise of the author of this analysis [i.e., Dr. Swiger] to make a pronouncement on the current medical condition, medical prognosis of, or vocational outlook for Mr. Moore, or to assign him an earnings capacity on an injured basis. It is clear from the facts in the case that Mr. Moore's injury has resulted in a diminution in the physical dimensions of his human capital, which in turn may result in a corresponding reduction in his earnings capacity. In order to allow the jury to comprehend the potential magnitude of the economic loss to Mr. Moore as a result of his injuries, no future income on an uninjured basis is assigned to Mr. Moore, and consequently, his potential losses in that event would be the earnings capacity that has been calculated for him on an uninjured basis from the time of this report.

It is to be noted that the Isom Report also states (not mentioned in the Swiger Report) that, Mr. Moore "will reportedly most likely be restricted to a sedentary or light physical demand level

---

[33] Swiger Report dated August 14, 2020, page 3.
[34] Isom Report dated August 7, 2020.
[35] Swiger Report dated August 14, 2020, page 6.
[36] Swiger Report dated August 14, 2020, page 6-7.



occupation when he returns to work."[37] The Isom Report also states, "Ms. Jones says she does not see any accommodations that could benefit [Mr. Moore] outside of an office job, given the nature of his job."[38]

The Kelly Life Care Plan states that even if Mr. Moore's "symptoms did not improve, he would be limited to performing office work."[39]

The Swiger Report does footnote the following, "Naturally, if Mr. Moore is able to resolve the medical issues that prevent him from entering the workplace, any income that Mr. Moore earns in the future must be offset against this amount."[40] However, Dr. Swiger does not appear to consider the opinions expressed by the vocational rehabilitation experts and medical experts in this matter in their entirety.

Mr. Cox opines that "Mr. Moore would be immediately able to work at many jobs."[41] The Cox Report goes on to state, "A representative sample of such jobs includes Dispatcher, Shuttle Van Driver, Escort Vehicle Driver, Order Clerk, and Electric Meter Repairer. [Mr. Cox has] provided information about Dispatcher and wages paid to persons doing that job in the Austin area."[42] The Cox Report also states, "If Mr. Moore were to get training as a Drafter with the assistance of the Vocational Rehabilitation program, he would find there are jobs in the Area."[43] The Cox Report also provides information and wages associated with Drafter jobs in the Austin area.[44]

Mr. Cox opines that "Mr. Moore would be immediately able to work at many jobs," and the Cox Report provides examples of such jobs which earn wages comparable to Mr. Moore's pre-Incident earning capacity.[45]

Additionally, when asked in his deposition, "If Invenergy made an office job available to you, would you have been able to drive there and do an office-like job at Invenergy?" Mr. Moore responded, "If it was an office job, with no labor whatsoever." Mr. Moore testified that he "could have done that type of work" after the Incident.[46] The Swiger Report does not appear to consider the fact that Mr. Moore testified that he could perform an "office-like job."

Dr. Swiger assumes Mr. Moore's alleged lost earning capacity began on the date of the June 8, 2017 Incident and extends through his alleged work-life expectancy. However, it is our understanding that Mr. Moore continued to work for a period of time following the June 8, 2017 Incident.[47,48,49] According to Mr. Moore's "Notice of Termination of Employment" from Invenergy,

---

[37] Isom Report dated August 7, 2020, page 1, 9.
[38] Isom Report dated August 7, 2020, page 4.
[39] Kelly Life Care Plan dated May 27, 2020, page 8, 14, 19.
[40] Swiger Report dated August 14, 2020, page 7.
[41] Cox Report dated November 12, 2020, page 2.
[42] Cox Report dated November 12, 2020, page 2.
[43] Cox Report dated November 12, 2020, page 2.
[44] Cox Report dated November 12, 2020.
[45] Cox Report dated November 12, 2020, page 2.
[46] Justin Moore Deposition taken September 24, 2020, page 53-54.
[47] Justin Moore Deposition taken September 24, 2020, page 162-164.
[48] Justin Moore Records from Invenergy Services LLC (PLG EMP 000001-PLG EMP 000012).
[49] Justin Moore Records from Invenergy Services LLC (INV_000168-INV_000172).



dated November 15, 2019, Mr. Moore was terminated effective November 15, 2019, his "final pay" was issued by November 22, 2019, and his "benefit are effective through November 30, 2019." [50,51,52]

Additionally, it is our understanding that Mr. Moore also had other employment endeavors subsequent to the Incident (e.g., 360 Vista, the virtual reality company Mr. Moore owns). [53] The Joyce Report states, "Mr. Moore also started a virtual reality company called 360 Vista. He has his own website and is self-taught. He is currently trying to repurpose this business to allow for virtual apartment tours. He reports working on jobs in this capacity for a few hours per week." [54] The Joyce Report also states, "On a typical day, Mr. Moore walks, runs errands with his wife and studies software programs related to his virtual reality business." [55] The Joyce Report indicates Mr. Moore is actively involved with his company, 360 Vista.

The Swiger Report does not appear to account for Mr. Moore's actual earnings during the period of time he returned to his pre-Incident employment for Invenergy, or Mr. Moore's other employment endeavors subsequent to the Incident, in his calculation of Mr. Moore's alleged "earnings capacity with his injury" (i.e., Mr. Moore's actual earnings after the Incident).

The Swiger Report assumes Mr. Moore will receive no income following the date of the Incident for the remainder of his life. However, this is inconsistent with the facts of this matter and is inconsistent with the opinions expressed in reports by other experts in this matter. Therefore, Dr. Swiger's opinion of Mr. Moore's alleged lost earning capacity and net economic loss is overstated and unreliable.

*Growth Rate*

The Swiger Report projects Mr. Moore's annual income growth at a rate of 2.50% per year over the course of his alleged work-life expectancy. The Swiger Report assumes that Mr. Moore's "income base of $62,114 [sic] would have increased at a 2.5% rate to reflect inflation and productivity increases during his work life." [56] It is unclear to basis or support for Dr. Swiger's applied growth rate.

Mr. Moore's actual reported income from his employment for Invenergy varied from year to year and did not increase year over year. Based on Mr. Moore's total annual reported income, his percent change in earnings from 2013 to 2014 was -0.02%, from 2014 to 2015 was 31.74%, from 2015 to 2016 was -38.15%%, and from 2016 to 2017 was -8.12%. [57]

Dr. Swiger's applied growth rates assume Mr. Moore's earnings will increase every year through the end of his alleged work-life expectancy. However, data from the U.S. Census Bureau shows

[50] Justin Moore Records from Invenergy Services LLC (PLG EMP 000008-PLG EMP 000009).
[51] The Kelly Life Care Plan states that Mr. Moore "has been working on wind turbines since 2011," and that "his last day of work was in mid-December, 2019" (Kelly Life Care Plan dated May 27, 2020, page 9).
[52] Justin Moore Deposition taken September 24, 2020, page 166.
[53] Justin Moore Deposition taken September 24, 2020, page 46-54, 162-164.
[54] Joyce Report dated July 31, 2020, page 5.
[55] Joyce Report dated July 31, 2020, page 5.
[56] Swiger Report dated August 14, 2020, page 5.
[57] Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014).



that the annual median earnings of a Texas male, who is a year-round full-time worker, with some college (but no degree), actually declines after 56 years of age.[58]

*Benefits*

In the text of his report, Dr. Swiger states, "In the United States, employee benefits often amount to 25% or more of total compensation. In many instances a majority of this compensation consists of retirement benefits such as formula and 401K plans and Social Security."[59] The Swiger Report goes on to state that, "As an employee of Invenergy Services LLC, Mr. Moore's benefits package is projected to be at least 15% of his salary."[60]

Additionally, it is not clear which benefits Dr. Swiger includes in his calculation of the benefits Mr. Moore actually received from his employment for Invenergy at the time of the Incident. Dr. Swiger does not provide any basis or support for his applied benefits percentage, assuming Mr. Moore's benefits equaled 15% of his alleged salary.

The Swiger Report calculates Mr. Moore's employment benefits as a percent of his salary (gross earning capacity), and because the Swiger Report appears to overstate Mr. Moore's alleged gross earning capacity, this results in the Swiger Report overstating the calculation of Mr. Moore's alleged employment benefits.

Additionally, the Swiger Report does not appear to account for the fact that continued to receive employment benefits for a period of time after the Incident (even after he stopped actively working for Invenergy).[61,62,63]

The Swiger Report's calculation of Mr. Moore's alleged employment benefits is overstated; therefore, Dr. Swiger's calculation of Mr. Moore's alleged net economic loss is overstated.

*Taxes*

Dr. Swiger applies an "average tax rate" of 10.00% to Mr. Moore's alleged gross income. The Swiger Report states, "After all deduction and exemptions, it is projected that Mr. Moore would have experienced an average tax rate on gross income of approximately 10%."[64] It is unclear how Dr. Swiger determines that Mr. Moore's "average tax rate on gross income" is "approximately 10%;" the Swiger Report does not provide any basis or support for the applied effective tax rate.

Dr. Swiger does not specify the income level, deductions, or exemptions he uses as the basis to project Mr. Moore's tax liability as 10.00%; calculated as 10.00% of Mr. Moore's "salary." Mr.

---

[58] U.S. Census Bureau: Table 1. Employment, Work Experience, and Earnings by Age and Education: Civilian Noninstitutional Population, Texas Males; last revised August 18, 2016.
[59] Swiger Report dated August 14, 2020, page 8.
[60] Swiger Report dated August 14, 2020, page 8.
[61] Justin Moore Deposition taken September 24, 2020, page 162-164.
[62] Justin Moore Records from Invenergy Services LLC (PLG EMP 000001-PLG EMP 000012).
[63] Justin Moore Records from Invenergy Services LLC (INV_000168-INV_000172).
[64] Swiger Report dated August 14, 2020, page 9.



Moore's actual tax liability would vary depending on his actual level of income, filing status,[65] exemptions, deductions being claimed, etc.

According to Mr. Moore's tax records produced as of the date of this report, Mr. Moore's effective Federal income tax rate was 10.66% in 2014, 12.17% in 2015, 9.58% in 2016, and 9.05% in 2017 (average effective Federal income tax rate from 2014-2017 of 10.36%).[66]

Additionally, the Swiger Report does not appear to account for Mr. Moore's tax liability related to the employee's portion of FICA taxes (Social Security taxes and Medicare taxes). The employee's portion of Social Security taxes is based on the employee rate of 6.20% and the employee's portion of Medicare taxes is based on the employee rate of 1.45%,[67] each of which would be applied to and deducted from Mr. Moore's gross earnings.

Dr. Swiger's calculation of Mr. Moore's tax liability is not supported and appears to be understated; therefore, Dr. Swiger's calculation of Mr. Moore's alleged lost earning capacity and alleged net economic loss is overstated.

*Household Services*

The Swiger Report states;[68]

> In addition to lost income, Mr. Moore, as a result of his injuries, has likely lost the ability to perform certain services around the home. These tasks might include lawn work as well as house and car maintenance. It is estimated, for exposition purposes, that Mr. Moore, due to his injuries, is unable to provide approximately 8 hours per week in household services that he would ordinarily have contributed. On average, it is projected that it would cost an average of $10 per hour or $4,160 annually to hire someone to replace this lost household contribution and this cost is expected to increase at approximately 2.0% annually.

Dr. Swiger does not provide any basis or support for his assumption that Mr. Moore is unable to perform eight hours per week in household services, nor does he provide any explanation of how he valued the replacement cost of household services at $10.00 per hour, and nor does he provide any explanation as to why he assumes Mr. Moore lost household services through his alleged life expectancy.

It is our understanding that the Swiger Report's calculation of Mr. Moore's alleged lost household services are "for exposition purposes," and have no basis on Mr. Moore or the facts of this case.

According to Mr. Moore's deposition testimony, Mr. Moore still performs household services; as shown in the following deposition excerpt.[69]

---

[65] It is to be noted that Mr. Moore's tax records produced to us as of the date of this report indicates he files his taxes as single, despite being married; this would also affect the determination of Mr. Moore income tax liability (Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014)).
[66] Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014).
[67] IRS Publication 15 (Circular E): "Employer's Tax Guide."
[68] Swiger Report dated August 14, 2020, page 8.
[69] Justin Moore Deposition taken September 24, 2020, page 159-160.



Q. Okay. How would you describe just a typical weekday? What do you do when you wake up? How do you fill your time during a weekday?

A. I try to wake up fairly early. That's probably my most -- I'll just tell you my routine. I get up. I usually will take my wife to work, if she's working that day, drop her off. I'll go try to walk a bit.
And then after that I'll try to, you know, study something, read something, keep myself active. Mentally, if I can. And really noneventful, Gerry.

Q. Any difference on the, on weekends? About the same schedule?

A. No, no. There's no...

Q. Who does the grocery shopping at your house?

A. Me and Judith.

Q. Housework, how is that split?

A. About the same. I mean, there's light stuff, but, yeah, we split it up.

Q. What kinds of things do you do?

A. Take out the trash, sweep, stuff of that nature.

Q. All right. Laundry, who does that?

A. She does most of the laundry.

Q. Vacuuming?

A. She will not let me vacuum, so she does that.

Q. Are you able to vacuum?

A. I could, if I wanted.

Q. Talked about sweeping floors. Cooking, who does most of the cooking?

A. I would say it's half and half.

Q. Yardwork, lawn maintenance --

A. I don't do any of that.

Q. Family finances, paying bills, who is responsible for that?

A. I usually am.

The Joyce Report states, "On a typical day, Mr. Moore walks, runs errands with his wife and studies software programs related to his virtual reality business." [70] The Vanderweide Report states that on July 31, 2019, Mr. Moore's medical records indicate Mr. Moore received medical attention and Mr. Moore stated "that he walks "approximately 60-70 miles per week" and had walked 6 miles that day and felt like he may have gotten "overheated."" [71]

Dr. Swiger's assertion that Mr. Moore has lost household services is inconsistent with the facts of this matter and is inconsistent with the opinions expressed in reports by other experts in this matter. Based on Mr. Moore's deposition testimony [72] and the expert reports produced in this matter, it appears Mr. Moore still performs household services.

As of the date of this report, no evidence has been produced indicating that the Mr. Moore has incurred or will incur additional expenses or replacement costs relating to household services as a result of the Incident. Therefore, and due to the facts of this case, alleged lost household services should not be included in the calculation of Mr. Moore's alleged net economic loss.

---

[70] Joyce Report dated July 31, 2020, page 5.
[71] Vanderweide Report dated November 4, 2020, page 5.
[72] Justin Moore Deposition taken September 24, 2020, page 159-160.



Dr. Swiger's calculation of Mr. Moore's alleged lost household services is not supported and does not appear to be based on the facts of this case.

*Present Value*

In order to calculate the present value of Mr. Moore's alleged future economic losses, Dr. Swiger applies a discount rate of 1.75%. The Swiger Report states that the applied discount rate of 1.75% "represents the average current yield on a mixed portfolio of long term U.S. Government bonds. These securities provide a reasonable yield with very low risk to the investor."[73]

## CALCULATION OF NET EARNING CAPACITY

### CONCLUSION – NET EARNING CAPACITY

We have calculated Mr. Moore's net earning capacity by taking into consideration the facts of this case discussed throughout this report.

In our opinion the sum of money that, if paid now in cash, would fairly and reasonably compensate Mr. Moore for his net earning capacity is $4,449 per month for the number of months he was unable to work and was not being compensated by his employer, as a direct result of the Incident.[74] We have no opinion as to whether or not Mr. Moore suffered any alleged economic losses as a direct result of the June 8, 2017 Incident.

| Justin Moore - Calculation of Monthly Net Earning Capacity | |
|---|---|
| Monthly Gross Earning Capacity | $4,091 |
| Plus: Monthly Employment Benefits | $1,094 |
| Less: Monthly Federal Income Taxes | ($424) |
| Less: Monthly Employee FICA Taxes | ($313) |
| Monthly Net Earning Capacity | $4,449 |

Our conclusions are based on information and methodologies of a type reasonably relied upon by experts in our field and are determined within a reasonable degree of certainty. Our analysis and calculations are based on information that was available to us as of the date of this report. If any additional information becomes available, we may update or supplement this report.

---

[73] Swiger Report dated August 14, 2020, page 8.
[74] It is to be noted that we have no opinion as to Mr. Moore's vocational capacity limitations, if any; we have relied upon the opinions expressed in the Cox Report for our calculations.



## ANALYSIS – NET EARNING CAPACITY

### *Earnings and/or Earning Capacity*

We have calculated Mr. Moore's annual gross earning capacity as $49,097 (in 2017 dollars), equivalent to a monthly gross earning capacity of $4,091; based on Mr. Moore's average total reported annual earnings from 2013-2016, adjusted annual for inflation.[75,76]

### *Employment Benefits*

We have calculated the value of Mr. Moore's employment benefits, based on statistical tables produced by the U.S. Department of Labor, Bureau of Labor Statistics news release, "Employer Costs for Employee Compensation - June 2020," as equal to 26.74% of his gross earning capacity; consisting of insurance, retirement and savings, and legally required benefits.[77]

### *Taxes*

Mr. Moore's earnings would be subject to Federal income taxes, the employee's portion of Social Security taxes, and the employee's portion of Medicare taxes; all of which would be applied to and deducted from earnings. Based on Mr. Moore's level of income, and based on the facts of this case, we have deducted Federal income taxes from Mr. Moore's gross earning capacity using an effective Federal income tax rate of 10.36%; based on Mr. Moore's average effective Federal income tax rate from 2014-2017.[78]

As stated above, Mr. Moore is also liable for the employee's portion of FICA taxes (Social Security taxes and Medicare taxes). Therefore, we have also deducted Social Security taxes based on the employee rate of 6.20% and Medicare taxes based on the employee rate of 1.45% from Mr. Moore's gross earning capacity (together, FICA taxes equal 7.65% of earning capacity).[79]

### *Unreimbursed Work Expenses*

Based on the documentation produced as of the date of this report, it does not appear that Mr. Moore incurred any unreimbursed work expenses from his employment as a wind technician for Invenergy.

---

[75] Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014).
[76] U.S. Department of Labor, Bureau of Labor Statistics: Consumer Price Index (www.bls.gov/cpi/).
[77] U.S. Department of Labor, Bureau of Labor Statistics, News Release USDL-20-1736, dated September 17, 2020; "Employer Costs for Employee Compensation - June 2020;" Table 5 - Employer Costs for Employee Compensation for Private Industry Workers by Bargaining and Work Status; Full-Time; Occupational Group; Installation, Maintenance, and Repair.
[78] Justin Moore Tax Records, 2009-2017 (PLG TAXES 000001-PLG TAXES 000014).
[79] IRS Publication 15 (Circular E); "Employer's Tax Guide."



## QUALIFICATIONS AND COMPENSATION

Weaver and Tidwell, L.L.P. has been retained by Lewis Brisbois Bisgaard & Smith LLP and Thompson, Coe, Cousins & Irons, LLP, as attorneys for the defendants, to provide professional services in the above referenced matter. This report and our analyses have been prepared solely for use by Lewis Brisbois Bisgaard & Smith LLP and Thompson, Coe, Cousins & Irons, LLP, as attorneys for the defendants, in the above referenced matter and should not be used for any other purpose. Possession of this report does not carry with it the right to publish all or part of it, nor may this report be used for any other purpose without the previous written consent by the signee(s) of this report.

Our analysis and conclusions are based on information that was available to us as of the date of this report. We may update or supplement this report if any additional information becomes available. We are billing our time on this matter at $310 per hour. Our fee is not contingent upon the outcome of this matter or upon our reaching any particular conclusions or opinions. Our curriculum vitae and list of testifying experience is attached as Exhibit B-1 and Exhibit B-2 to this report.

Sincerely,

Helga Zauner

Kevin Kozlowski



Exhibit A

| Documents Reviewed |
|---|

| Bates Start | Bates End | Document |
|---|---|---|
| N/A | N/A | Plaintiffs' Amended Complaint, filed June 13, 2019. |
| N/A | N/A | Defendant DB Industries, LLC, Capital Safety USA, Capital Safety Group, and DBI/SALA's Answer to Plaintiffs' Original Complaint, filed August 6, 2019. |
| N/A | N/A | Defendants Safeworks, LLC d/b/a Power Climber Wind and Power Climber BVBA d/b/a Power Climber Wind's Original Answer to Plaintiffs' Amended Complaint, filed August 7, 2019. |
| N/A | N/A | Plaintiffs' Disclosure of Expert Witnesses, filed August 14, 2020. |
| N/A | N/A | Defendant, Safeworks, LLC's Objections and Answers to Plaintiffs' Interrogatories, filed June 15, 2020. |
| N/A | N/A | Invenergy Services LLC's Responses and Objections to DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety, USA, Capital Safety Group's Subpoena Duces Tecum, filed February 10, 2020. |
| N/A | N/A | Plaintiffs' Certificate of Interested Persons, filed June 6, 2019. |
| N/A | N/A | Plaintiffs' Initial Disclosures, filed October 11, 2019. |
| N/A | N/A | Safeworks, LLC d/b/a Power Climber Wind and Power Climber BVBA d/b/a Power Climber Wind Certificate of Interested Persons, filed August 8, 2019. |
| PLG EMP 000001 | PLG EMP 000012 | Justin Moore Records from Invenergy Services LLC. |
| INV_000168 | INV_000172 | Justin Moore Records from Invenergy Services LLC. |
| PLG TAXES 000001 | PLG TAXES 000014 | Justin Moore Tax Records, 2009-2017. |
| N/A | N/A | Justin Moore Deposition taken September 24, 2020. |
| N/A | N/A | Letter from George (Tex) Quesada, of Sommerman, McCaffity, Quesada & Geisler, LLP, dated August 17, 2020. |
| PLG ISOM 000001 | PLG ISOM 000040 | Rodney Isom, Ph.D., C.R.C., of Isom Rehabilitation Consulting, Preliminary Rehabilitation Plan Report for Justin Moore, dated August 7, 2020. |
| PLG JOYCE 000001 | PLG JOYCE 000037 | Arthur Joyce, Ph.D., ABN Report of Neuropsychological Evaluation of Justin Moore, dated July 31, 2020. |
| PLG KELLY LCP 000001 | PLG KELLY LCP 000027 | Jacqueline Kelly, MD, CLCP Life Care Plan for Justin Moore, dated May 27, 2020. |
| PLG SWIGER 000001 | PLG SWIGER 000034 | John A. Swiger, Ph.D., Business and Economic Consultant, Present Value of the Economic Loss as a Result of the Injury of Justin Moore, an Economic Analysis, dated August 14, 2020. |
| N/A | N/A | Plaintiffs' Disclosure of Expert Witnesses (Second), filed October 14, 2020. |
| N/A | N/A | Bastiaan E. Cornelissen, Ph.D., P.E. and Mark D. Russell, Ph.D., P.E., of Spectrum Forensics, LLC, Justin Moore Fall Incident Investigation Initial Report, dated October 14, 2020. |
| N/A | N/A | J. Nigel Ellis, Ph.D., CSP, P.E., CPE, of Dynamic Scientific Controls, Inc., Preliminary Report on the Justin Moore Case, dated October 14, 2020. |
| N/A | N/A | David G. Vanderweide, M.D., P.A. Report regarding Justin Moore, dated November 4, 2020. |
| N/A | N/A | Mohammad Etminan, M.D. Report regarding Justin Moore, dated November 9, 2020. |
| N/A | N/A | Corwin Boake, Ph.D., ABPP Neuropsychological Evaluation Report regarding Justin Moore, dated November 11, 2020. |
| N/A | N/A | Robert D. Cox, MA, CRC, LPC-S, of The World of Work, Inc., Vocational Rehabilitation Report for Justin Moore, dated November 12, 2020. |



Exhibit A

| | Documents Reviewed | |
|---|---|---|

| Bates Start | Bates End | Document |
|---|---|---|
| N/A | N/A | Ginny Stegent, RN, CRRN, CDMS, CLCP, of Med-Legal Services, Inc., Evaluation and Preliminary Life Care Plan Report for Justin Moore, dated November 12, 2020. |
| N/A | N/A | Susan J. Garrison, M.D., of Physical Medicine & Rehabilitation, Preliminary Report regarding Justin Moore, dated November 12, 2020. |
| N/A | N/A | Journal of Forensic Economics 28(1-2), 2019, pp. 15-108; "The Markov Model of Labor Force Activity 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger. |
| N/A | N/A | Journal of Forensic Economics 22(2), 2011, pp. 165-229; "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," by Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger. |
| N/A | N/A | National Vital Statistics Reports, Vol. 68, No. 7, dated June 24, 2019; "United States Life Tables, 2017," by Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics. |
| N/A | N/A | National Vital Statistics Reports, Vol. 66, No. 3, dated April 11, 2017; "United States Life Tables, 2013," by Elizabeth Arias, Ph.D., Melonie Heron, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics. |
| N/A | N/A | U.S. Department of Labor, Bureau of Labor Statistics, News Release USDL-20-1736, dated September 17, 2020; "Employer Costs for Employee Compensation - June 2020." |
| N/A | N/A | U.S. Census Bureau; Table 1. Employment, Work Experience, and Earnings by Age and Education: Civilian Noninstitutional Population; last revised August 18, 2016. |
| N/A | N/A | IRS website (www.irs.gov). |
| N/A | N/A | IRS Publication 15 (Circular E): "Employer's Tax Guide." |
| N/A | N/A | U.S. Department of Labor, Bureau of Labor Statistics; Consumer Price Index (www.bls.gov/cpi/). |
| N/A | N/A | U.S. Department of Labor, Bureau of Labor Statistics; "Consumer Price Index for All Urban Consumers (CPI-U): U.S. City Average, by Expenditure Category." |
| N/A | N/A | U.S. Department of the Treasury, Interest Rate Statistics (https://home.treasury.gov/policy-issues/financing-the-government/interest-rate-statistics). |



**Exhibit B-1**



# Helga A. Zauner, CVA, CFE, MAFF

*Managing Director, Forensics and Litigation Services*

**Helga A. Zauner, CVA, CFE, MAFF,** is a testifying expert witness with 25 years of experience in litigation consulting, financial analysis, banking, research and teaching. She focuses on financial modelling and statistical techniques, with extensive experience in quantitative data analysis. In addition, Helga has built a successful practice as an expert witness in personal injury, divorce and commercial litigation. She has served as a consultant, financial advisor and financial manager in banking, corporate credit, construction, retail, energy, health care, real estate and other industries.

Helga is recognized as a Certified Fraud Examiner (CFE) by the Association of Fraud Examiners and as a Certified Valuation Analyst (CVA) and Master Analyst in Financial Forensics (MAFF) by the National Association of Certified Valuators and Analysts. She earned a bachelor's degree in mathematics from the Facultad de Matemáticas of the Universidad de Guanajuato and an MBA from Boston College Carroll Graduate School of Management; she also studied for a Ph.D. in statistics, econometrics and time series analysis at the Centro de Investigación en Matemáticas in Guanajuato. Helga holds American and Mexican dual citizenship and is bilingual in English and Spanish, as well as being conversational in French.

## Professional Experience

- 25 years of experience in litigation consulting, financial analysis, banking, research, and teaching
- Specializes in financial modelling and statistical techniques
- Extensive experience in quantitative data analysis
- Built a successful practice as an expert in personal injury and commercial litigation
- Served as a financial advisory in banking and corporate credit and as a partner and financial manager where she handled treasury, accounting, and other financial duties
- Experienced in the field of energy, construction, home health care, real estate, auto and other industries

## Professional Involvement and Recognition

- Member, National Association of Certified Valuators and Analysts (NACVA)
- Member, Association of Certified Fraud Examiners (ACFE), Houston chapter

## Presentations

- 2019: "The Advantages and Challenges of Using Advanced Statistical Methods in Litigation and Valuation." NACVA and the CTI's 2019 Annual Consultant's Conference.
- 2018: "Lost Profits in Commercial Litigation: Proving and Defending Damages." Strafford Webinars.
- 2014: "Regression Analysis in Residential Real Estate Litigation", Appraisal Institute Annual Meeting

## Publications

- "Some Matters to Consider Before Filing for Bankruptcy." May 13, 2020. Weaver Thought Leadership.
- "How to Prepare for Potential Construction Disputes Resulting From COVID-19." July 14, 2020. Helga A. Zauner and Sonia Desai. Construction Executive.

## Education and Certifications

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners
- Certified Valuation Analyst (CVA), National Association of Certified Valuators and Analysts
- Master Analyst in Financial Forensics (MAFF), National Association of Certified Valuators and Analysts
- PhD candidate, statistics, Centro de Investigación en Matemáticas

Exhibit B-1



- Master of Business Administration, finance, Boston College Carroll Graduate School of Management
- Bachelor of Science, mathematics with a minor in computer science, Universidad de Guanajuato

## Testimony

- **Diane G. Reed, as Chapter 7 Trustee of Soporex Respiratory, Inc. d/b/a Independence Home Pharmacy, and Wingmar Diagnostics North Central, Inc. vs. Med 4 Home, Inc. and Lincare, Inc.**
  Case No. 08-34174-BJH-7 in the United States Bankruptcy Court for the Northern District of Texas Dallas Division. Provided trial testimony regarding the design of a random sample of medical files.
- **In Re: Wilcare Inc. Chapter 11 Bankruptcy Case**
  Case No. 11-40808 (Chapter 11) in the United States Bankruptcy Court for the Southern District of Texas Houston Division. Provided hearing testimony about the Trustee's management of the operations of the Debtor.
- **Marc Schwartz, as Chapter 11 Trustee of Wilcare Inc. vs. Mortenson Broadcasting Company, et al. Case No. 11-40808 (Chapter 11) in the United States Bankruptcy Court for the Southern District of** Texas Houston Division. Provided deposition testimony and trial testimony regarding asserted fraudulent transfers by the debtor.
- **Felipe Gonzalez, et al. vs. Universal Pegasus International, Inc.**
  Cause No. 2014-31576 in the District Court of Harris County, Texas 55th Judicial District. Provided deposition testimony regarding the asserted losses of minority shareholders.
- **Joseph Geldrich vs. 3M Company, et al.**
  Cause No. DV-13-269 in the Montana Twentieth Judicial District Court Lake County. Provided deposition testimony regarding the asserted lost earnings and future medical costs of the plaintiff as a result of his injuries.
- **Cristopher Prest vs. Wells Fargo Bank, N.A.**
  Case No. 5:14-CV-02235 in the United States District Court for the Western District of Louisiana Shreveport Division. Provided deposition testimony to rebut the asserted losses suffered by the plaintiff as a result of a difference in interest rates in a mortgage loan.
- **A Better Tripp Moving and Storage Co., Inc. vs. Navistar, Inc., et al.**
  Cause No. 2015-13319 in the District Court of Harris County, Texas 127th Judicial District. Provided deposition testimony regarding the asserted losses suffered by the plaintiff as a result of leasing two trucks with break-down issues.
- **Stewart Title Guaranty Company vs. Stewart Title Latin America, Inc., et al.**
  Case No. (Civil Action No.) 4:12-CV-03269 in the United States District Court for the Southern District of Texas Houston Division. Provided deposition testimony regarding reliance damages.
- **Robert W. Pate and Sandra L. Pate vs. The Bishop's Lodge Resort and Spa, et al.**
  Case No. (Civil Action No.) 16-CV-274-WPL-KK in the United States District Court for the District of New Mexico Albuquerque Division. Provided deposition testimony regarding the rebuttal of plaintiff's expert's economic loss report.
- **D & D, LLP vs. Goldfarb PLLC and H.P.L.**
  Cause No. DC 16-07193 in the District Court of Dallas County, Texas 116th Judicial District. Provided deposition testimony regarding the statistical analysis of client counsel data.
- **Manjari Enterprises LLC, et al. vs. Texas Concrete Enterprise Ready Mix Inc., et al.**
  Cause No. 2015-66481 in the District Court of Harris County, Texas 189th Judicial District. Provided deposition testimony regarding business valuation, damages and lost profits.
- **Earicka D. Nolden, Individually and as the Representative of the Estate of Eryc Shelby, Deceased vs. BNSF Railway Company**
  Cause No. 2015-77247 in the District Court of Harris County, Texas 127th Judicial District. Provided deposition testimony for Plaintiff in wrongful death case.
- **Dominique Constancio, IANF Alexavier Andrade and Marcella Valadez, IANF Nicole Salaz vs. O'Reilly Automotive Stores, Inc. and Francisco Javier Sanchez**

**Exhibit B-1**



Cause No. 2014-DCV-1958 in the County Court of El Paso County, Texas at Law Court No. 6. Provided deposition testimony regarding the rebuttal of plaintiff's expert's economic damages reports in personal injury case.

- **Alondra Guevara, and Genesis Guevara vs. Nancy Davis vs. the Navigators**
  Cause No. D-101-CV-2016-01952 in the State of New Mexico County of Santa Fe First Judicial District.  Provided deposition testimony regarding the rebuttal of plaintiff's expert's economic damages reports in personal injury and wrongful death case.
- **Elizabeth Rios Dehoyos, Ursula Eileen Fernandez vs. Delbert McKibben, Special Logistics LLC, Special Distribution Services, Inc. et al.**
  Cause No. 2016-76335 in the District Court of Harris County, Texas 125th Judicial District. Provided deposition testimony regarding the rebuttal of plaintiff's expert's economic damages reports in personal injury case.
- **Gary Adams v. American Optical Corporation, Coast Holdings Incorporated, 3M Holdings, and Mine Safety Appliances Company.**
  Civil Action No.  2:16-cv-00027-JPJ-P M S in the Circuit Court for Wise County, Virginia. Provided deposition testimony regarding plaintiff's economic damages in personal injury case.
- **Steve and Rhonda Devillier v. Chevron Pipeline Drilling Co., Shamrock Vacuum Services, Inc., Point to Point Directional Drilling, Inc., and Duphil, Inc.**
  Cause No. 17DCV0390 in the District Court of Chambers County, Texas 344th Judicial District. Provided deposition testimony regarding Plaintiff's lost profits.
- **Oswerl Wells v. Melvin Vega, and Horizon Freight System, Inc.**
  Cause No. 2017-39471 in the District Court of Harris County, Texas 152nd Judicial District. Provided deposition testimony for the defense regarding the plaintiff's economic damages in personal injury case.

**Exhibit B-2**



# Kevin R. Kozlowski, CFE

*Manager, Forensics and Litigation Services*

Kevin R. Kozlowski, CFE, has over seven years of experience in forensics and litigation services. He has experience with engagements in various areas, including personal injury, wrongful death, employment disputes, commercial disputes, divorce, bankruptcy and valuation. Kevin regularly performs economic damages analysis, lost profit analysis, business interruption analysis, fraudulent transfer and solvency analysis, prepares written expert reports, creates trial demonstratives and provides litigation consulting. He is also experienced in quantifying and evaluating loss claims and economic damages, evaluating complex data sets resulting from allegations of breach of contract, employee and officer misconduct, breach of fiduciary duty and misuse of corporate funds. His experience varies across a wide range of industries, including construction, health care, energy, oil and gas, insurance, agriculture and others. Kevin is a member of the Association of Certified Fraud Examiners (ACFE) national chapter and Houston chapter, as well as the National Association of Forensic Economics (NAFE). He earned his Bachelor of Science degree in accounting from the University of Houston-Clear Lake and currently meets continuing professional eductation requirements of Association of Certified Fraud Examiners.

## Professional Experience

- More than seven years of experience in forensics and litigating services
- Experienced with engagements in various areas, including personal injury, wrongful death, employment disputes, commercial disputes, divorce, bankruptcy and valuation
- Specialized in economic damages analysis and modeling pertaining to personal injury, wrongful death and wrongful termination
- Experienced in quantifying and evaluating loss claims and economic damages, evaluating complex data sets resulting from allegations of breach of contract, employee and officer misconduct, breach of fiduciary duty and misuse of corporate funds
- Regularly performs economic damages analysis, lost profits analysis, business interruption analysis, fraudulent transfer and solvency analysis, preparing written expert reports, creating trial demonstratives and providing litigation consulting
- Experienced assisting in the preparation for expert witness testimony, preparation for mediation, trial and arbitration
- Experienced in a wide variety of disciplines and industries, including construction, health care, energy, oil and gas, insurance, farming/agriculture and others

## Professional Involvement and Recognition

- Member, Association of Certified Fraud Examiners (ACFE), national chapter and Houston chapter
- Member, National Association of Forensic Economics (NAFE)

## Education and Certifications

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners
- Bachelor of Science, accounting, University of Houston-Clear Lake
- Currently meets continuing professional education requirements of Association of Certified Fraud Examiners



November 13, 2020

Steven Augustine
Thompson, Coe, Cousins & Irons, LLP
One Riverway, Suite 1400
Houston, Texas 77056

Re:     Justin Moore and Judith Moore v. DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety
        USA, Capital Safety Group, and DBI/SALA; SafeWorks, LLC d/b/a Power Climber Wind; and
        Power Climber BVBA d/b/a Power Climber Wind

Dear Mr. Augustine:

This engagement letter confirms that Thompson, Coe, Cousins & Irons, LLP ("you" and "your"), as attorney for your client, DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety USA, Capital Safety Group, and DBI/SALA ("Your Client"), has retained Weaver and Tidwell, L.L.P. ("Weaver", "we", "us", and "our") to provide professional services in the above-referenced matter on behalf of Your Client. You will determine the scope of work to be performed and requirement for any appearance in court or deposition. Work product prepared by us for this engagement will be submitted directly to you.

Weaver will not be performing attest services as defined by the American Institute of Certified Public Accountants ("AICPA") and therefore the services do not include the compilation, review, or audit of financial records or financial statements. In conducting our research or reaching our conclusions, we may rely on representations by you and Your Client's employees.

Your client has authorized you to request services from Weaver on Your Client's behalf. Weaver is not required to obtain approval from Your Client prior to providing services requested by you. It is our understanding you will keep Your Client apprised of the nature and progress of our services and the related fees. Weaver's communications with you will discharge Weaver's client communication responsibilities as described in *Statement on Standards for Forensic Services No. 1* promulgated by the AICPA.

## Challenges to Our Opinions

You agree to promptly notify Weaver of any legal proceeding challenging the basis, opinion or testimony of Weaver professional(s) assigned to this engagement. The notice provided by you following the assertion of any objection, motion or other legal proceeding in the nature of a challenge to the admissibility or basis of the expert work of a Weaver professional shall be in writing and include the style of the case, the case number, and court in which the challenge has been asserted, as well as the nature of the challenge. Weaver reserves the right to take all steps necessary to respond to any challenge to the Weaver professional's opinion or testimony, including interceding on the Weaver professional's behalf with written motion and briefing, and you and Your Client agree to cooperate with Weaver to facilitate Weaver's response. Such efforts by Weaver though will not be taken on your behalf or otherwise supplant efforts which you may decide are appropriate and necessary to protect your interests or those of Your Client.

Thompson, Coe, Cousins & Irons, LLP
November 13, 2020

Page 2 of 6

## Fees and Our Invoices

Our fee is based upon the complexity of the work to be performed and the tasks required. We will bill at the flat hourly rate of $310.

We recognize that responsibility for the payment of our invoices resides with Your Client and we will not look to you for the payment of our fees and expenses on this engagement. Your Client agrees to its obligation to pay Weaver for services rendered.

We attempt to travel on our own time; however, travel required during normal business hours will be billed at the above rates. In addition, we will bill for out-of-pocket expenses incurred such as travel expenses, parking, copies, postage, etc.

Prior to starting any work on this engagement Weaver requires receipt of a retainer in the amount of $3,000 (the "Retainer"). The Retainer will be held and applied against Weaver's final invoice related to this engagement. The Retainer is not an estimate of our fee on this engagement.

We will invoice periodically (usually monthly) for services rendered and any out-of-pocket expenses incurred. Any questions concerning the correctness or accuracy of any of our invoices must be communicated to us in writing within thirty (30) days of the invoice date. Any claim not made within that period shall be deemed waived.

Payment is due immediately upon receipt of our invoice. Weaver will add a late charge to any invoices that are not paid within 30 days after receipt of the invoice. The late charge will be assessed at 1% per month on the unpaid balance commencing thirty (30) days after the date shown on the invoice. Weaver reserves the right to stop work or decline to issue reports or provide testimony in the event of an unpaid balance in excess of the Retainer.

The obligation to pay for our services exists whether arising from your request or if otherwise identified by Weaver during the course of this engagement and is not contingent on the results obtained as we do not warrant or predict results or the final outcome of the engagement.

## Ethical Conflict Resolution

We provide services to many attorneys, companies, and individuals in various industries and geographic locations, including services of a similar nature to this engagement. We have reviewed the information you have provided to us about the parties and related persons and entities participating or connected to this engagement and we are not aware of any conflicts of interests which would impact our ability to perform the requested services. You agree to inform us if there is a change or addition of any parties or related persons and entities—including attorneys—participating or connected to this engagement. We reserve the right to withdraw from this engagement if, in our professional judgment, our continued involvement in this engagement would be inappropriate due to a conflict of interest.

In the unlikely event that circumstances occur which we in our sole discretion believe could create a conflict with either the ethical standards of our firm or the ethical standards of our profession in continuing our engagement, we may suspend our services until a satisfactory resolution can be achieved or we may resign from the engagement. We will notify you of such conflict as soon as practicable, and we will discuss with you any possible means of resolving the conflict prior to suspending our services.

Thompson, Coe, Cousins & Irons, LLP
November 13, 2020

Page 3 of 6

## Documentation and Confidentiality

If our documentation is subject to a protective order or confidentiality agreement, you agree to provide a copy of such to us. We agree to abide by such orders which we are provided a copy of or any such agreements which we sign.

The documentation we prepare pertaining to and in support of this engagement, along with any resulting work product, is our property and constitutes confidential information. If we are requested to make the documentation available to regulators, government agencies, peer reviewers, or other outside parties, we will notify you before producing any documents in response to the request (unless prohibited by law or direction of law enforcement). Unless access to the requested documentation is required by law, regulation, or court order, we will comply with your direction as to the disclosure of the confidential information and will assist you in any efforts you may take to protect the confidentiality of the documentation, at your or Your Client's expense.

No (i) disclosure of our work product from this engagement or any portion, abstract, or summary thereof or (ii) reference to us, shall be made orally or in writing (including without limitation by inclusion or reference in a discovery response, motion, or reply) without our prior written consent and that of the professional signing the work product (if applicable); except where compelled by a court.  To the extent disclosure of our work product is permitted, it shall only be made in the original, complete, and unaltered form provided by us with all restrictive legends and other agreements intact.

All documents provided by you that we do not need to retain in our files will be returned to you if requested in writing within ninety (90) days of completion of this engagement. We reserve the right to destroy the documents if there are no instructions from you within ninety (90) days of the completion of the engagement.

## Limitations on Liability and Indemnifications

The parties do not intend this engagement or engagement letter to be for the benefit of any third-party. Unless you inform us in writing, we are not aware of the identity of any third-parties to which any of our work product will be supplied and we do not anticipate any such third-parties' reliance upon our professional services unless expressly stated herein.

During the course of the engagement, we may communicate via fax, email, or other electronic mechanism. Please be aware that communication in those mediums contains a risk of misdirected or intercepted communications. Any request to limit such transmissions or use a more secure means of communication must be made in writing.

You and Your Client hereby release, indemnify, and hold us and our partners, employees, and contractors, and each of their heirs, executors, personal representatives, successors and assigns ("Our Representatives") harmless from and against any liability and costs, including related liabilities, losses, damages, costs, expenses, and attorneys' fees, resulting from: (i) knowing misrepresentations to us by any party or the officers, employees, or others acting or purporting to act on their behalf, (ii) disclosure of our work product to anyone not a party to this engagement letter for which we did not give prior written consent, and (iii) interception, unintentional disclosure, unauthorized use, or failed delivery of electronic communications transmitted or received by us in connection with this engagement.

Thompson, Coe, Cousins & Irons, LLP
November 13, 2020

Page 4 of 6

Our and Our Representatives' total aggregate liability pertaining to this engagement and engagement letter to you (or Your Client, successors, or permitted assigns) shall be limited to one (1) times the amount of our fees (excluding any reimbursable expenses) that party paid to us for the services in question. In no event shall we or Our Representatives be liable for indirect, incidental, consequential, special, multiple, exemplary, or punitive losses or damages—even if advised of their possible existence.

You and Your Client agree to only look to the limited liability partnership, Weaver and Tidwell, L.L.P., for satisfaction of any claim or cause of action arising from this engagement or engagement letter. In no event will our partners, directors, employees, or agents be liable to you for any liability, damages, expenses, or losses of any nature, caused by or resulting from the engagement, engagement letter, or use of our work product.

All limitations on liability and indemnifications contained herein shall apply to the fullest extent permissible by applicable laws, regardless of the cause of action (whether contract, negligence, or otherwise), except as finally determined to have resulted solely from our fraud, gross negligence, or willful misconduct.

### Dispute Resolution Procedure Including Jury Waiver

The parties agree that no claim arising out of or relating to this engagement or engagement letter shall be filed more than two years after the earlier of the termination of this engagement or the date of the delivery of our work product in question, if any. This limitation applies and begins to run even if you have not suffered any damage or loss, or have not become aware of the existence or possible existence of a dispute.

Any dispute between the parties arising from or relating to this engagement or engagement letter shall, if negotiations and other discussions fail, be first submitted to mediation before resorting to litigation. The parties agree to conduct any mediation in good faith and make reasonable efforts to resolve any dispute by mediation. If the parties are unable to agree upon a mediator, either party may invoke the mediation service of the American Arbitration Association (AAA) in accordance with the provisions of the Commercial Mediation Procedures then in effect. The parties agree to conduct the mediation in Houston, Texas or another mutually agreed upon location, and each party shall bear its own expenses, including attorney's fees and costs, except for the fees of the mediator which shall be borne equally by the parties.

This engagement letter and all disputes between the parties shall be governed by, resolved, and construed in accordance with the laws of the State of Texas, without regard to conflict-of-law principles. Any action arising out of or relating to this engagement or engagement letter shall only be brought in, and each party agrees to submit and consent to the exclusive jurisdiction of, the federal or state courts situated in Tarrant County, Texas.

Each party hereby irrevocably waives any right it may have to trial by jury in any proceeding arising out of or relating to this engagement or this engagement letter.

Whenever possible, this engagement letter shall be interpreted in such a manner as to be effective and valid under applicable laws, regulations, or published interpretation, but if any term of this engagement letter is declared illegal, unenforceable, or unconscionable, that term shall be severed or modified and the remaining terms of the engagement letter shall remain in force. The

Thompson, Coe, Cousins & Irons, LLP
November 13, 2020

Page 5 of 6

parties agree that the court should modify any term declared to be illegal, unenforceable, or unconscionable in a manner that will retain the intended term as closely as possible.

## Miscellaneous

We may at times provide you with documents marked as drafts. You and Your Client understand that those documents are for your review purposes only and do not constitute our final opinions. You should not distribute or rely upon those documents.

We inform you that we have non-CPA licensees who may provide services pertaining to this engagement.

We do not provide legal advice or services, and you should refer to appropriate counsel for advice or services of that nature.

This engagement letter sets forth all of the agreed upon terms and conditions of our engagement with respect to the matters covered herein, and supersedes any that may have come before. This engagement letter may not be amended or modified except by further writing signed by all the parties.

*[Intentionally Left Blank]*

Thompson, Coe, Cousins & Irons, LLP
November 13, 2020

Page 6 of 6

We appreciate the opportunity to assist you and look forward to working with you and your team.

Sincerely,

*Weaver and Tidwell, L.L.P.*

**WEAVER AND TIDWELL, L.L.P.**

Please sign and return a copy of this letter.

By signing below, Thompson, Coe, Cousins & Irons, LLP indicates acknowledgment of, and agreement with, the arrangements for our engagement as described herein, including each party's respective responsibilities, and the signatory also represents that they have been authorized to execute this agreement.

**Thompson, Coe, Cousins & Irons, LLP**


By:_____

Printed Name:_____

Title:_____

Date:_____

By signing below, DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety USA, Capital Safety Group, and DBI/SALA indicates acknowledgement of the arrangements for our engagement as described herein, including each party's respective responsibilities, and further agrees to those obligations and agreements specific to DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety USA, Capital Safety Group, and DBI/SALA reflected herein, including those in the sections titled **Fees and Our Invoices**, **Limitations on Liability and Indemnifications**, and **Dispute Resolution Procedure including Jury Waiver**.

**DB Industries, LLC d/b/a 3M Fall Protection, Capital Safety USA, Capital Safety Group, and DBI/SALA** ("Your Client")


By:_____

Printed Name:_____

Title:_____

Date:_____