

**Rimkus Consulting Group, Inc.**
**8200 Cameron Road, Suite C-140**
**Austin, TX 78754**
**Telephone: (512) 795-0811**
**Certificate of Authorization No. F-1545**
**Certification Expiration Date September 30, 2021**

# Report of Findings

**Justin Moore and Judith Moore v. DB Industries, LLC, and Safeworks, LLC, Investigation**

**Claim No: CLSXS190030**
**Cause No: 6:19-CV-00038-C**

**Rimkus File No: 100021436**

**Prepared For:**

**Lewis Brisbois Bisgaard & Smith, L.L.P.**
**24 Greenway Plaza, Suite 1400**
**Houston, TX 77046**

**Attention:**

**Ryan Marlatt**



Gary T
Yamaguchi

Digitally signed by: Gary T Yamaguchi
DN: CN = Gary T Yamaguchi C = US
O = Unaffiliated OU =
A01410D0000016F155818B600000A1
9
Date: 2020.11.19 07:41:13 -08'00'

**Gary T. Yamaguchi, Ph.D., P.E.**
**Texas Professional Engineer License**
**Number 102904**
**Principal Consultant**

November 19, 2020

EXHIBIT 1

**TABLE OF CONTENTS**

I.      Introduction                                                    1

II.     Conclusions                                                    2

III.    Discussion                                                     4

     • Qualifications

     • Background

     • Inspections

     • Mechanical Analysis

     • Accident Reconstruction

     • Biomechanical Analysis

IV.     Basis of Report                                               24

V.      Attachments                                                   31

    A.   Photographs

    B.   Figures

    C.   Curriculum Vitae

EXHIBIT 1

## Section I
## INTRODUCTION

On June 8, 2017, Mr. Justin Moore was working within wind turbine Tower 41 at the Invenergy site in Goldthwaite, Texas. As he started to descend the tower, the continuous loop belt on the IBEX climb assist device broke. Mr. Moore reportedly fell 10 to 20 feet before his LAD-SAF-X3 fall arrest protection device grabbed onto the fixed protection cable and arrested his fall. Mr. Moore reported that he was not improperly holding onto the LAD-SAF-X3 and interfering with its operation. Mr. Moore reported that he sustained injuries to his bilateral shoulders as a result of this incident.

Rimkus Consulting Group, Inc. (Rimkus) was retained to analyze the accident and determine the likely reason(s) leading to Mr. Moore's lengthy fall, whether there was a defect or deficiency of Mr. Moore's climb-assist or fall-arrest devices that caused or contributed to the fall, and whether the injuries he claims are consistent with the accident. This report was reviewed by Garrick F. Mitchell, P.E., ACTAR, Transportation Division Manager, West Region, and Michael A. K. Liebschner, Ph.D., P.E., Principal Consultant.

This report was prepared for the exclusive use of Lewis Brisbois Bisgaard & Smith, L.L.P. and was not intended for any other purpose. Our report was based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

EXHIBIT 1

## Section II
## CONCLUSIONS

1. Mr. Moore did not maintain three points of support at all times while descending the ladder within Tower 41. If he had maintained three points of support as directed in the LAD-SAF-X3 and the IBEX 1000 and 1000P User Instructions, he would not have fallen when the IBEX cable broke.

2. In order for Mr. Moore to have fallen the distance he reported, he was most likely holding onto the LAD-SAF-X3 with his hand with the lever arm positioned upward, which was contrary to the LAD-SAF-X3 operating instructions.

3. If the lever arm is held in an upward position, the LAD-SAF-X3 is still supposed to lock onto the cable via a secondary inertial locking mechanism during a free fall, as mandated by the American National Standard ANSI Z359.15-2016. Tests using both Mr. Moore's LAD-SAF-X3 and an undamaged exemplar LAD-SAF-X3 on the subject 3/8-inch cable confirmed that holding the lever in the upward position prevented the inertial locking mechanisms on both LAD-SAF-X3s from grabbing the cable, even when accelerated downward at greater than one gravitational acceleration (1 g). These tests were demonstrated failures of the LAD-SAF-X3's secondary (inertial) locking mechanism.

4. There is no inherent incompatibility between using the IBEX Climb Assist and the LAD-SAF-X3 in descent mode. The IBEX Climb Assist only reduces the muscular effort required to ascend or descend the ladder and does not increase the speed at which a person descends.

5. The IBEX cable weld, which was fabricated in the field by others, had multiple deficiencies, including signs of overheating and a step-change in diameter more than four times greater than allowed in the specifications. The step-change in diameter

EXHIBIT 1

was "smoothed" by what appeared to be hand cutting with a knife.  The failed section did not meet the allowable specification for cable joining.

6. The following shoulder injuries sustained by Mr. Moore are consistent with him grabbing at rungs of the ladder while falling: Right shoulder impingement, bilateral biceps tendinopathy, right infraspinatus tendinopathy.

7. The left rotator cuff tear (commonly, "rotator cuff" refers to the supraspinatus muscle) and left supraspinatus tendinopathy is not consistent with Mr. Moore grabbing at rungs of the ladder while falling.  A rotator cuff tear is consistent with repetitive stress, forced adduction, or overloaded abduction of the shoulder. Ladder climbing and regularly working with his elbows above shoulder level is the likely cause.

8. The SLAP tear of the right shoulder is biomechanically consistent with the subject accident.  Mr. Moore reportedly grabbed the ladder while falling.  It is reasonable that his body's downward momentum forcibly extending his elbow, with the biceps (long head) muscle activated, would develop a high tensile load pulling outward upon its attachment at the superior glenoid labrum.  This mechanism of injury does not require the person falling to be able to catch the ladder with the hand and stop the fall.  It only requires muscle activation and forced elbow extension during the brief interval of time in which the person is trying to stop their fall.

9. The posterior disc herniations in the cervical region are inconsistent with sudden fall arrest following a 10 to 20-foot fall.  There was no evidence in the medical record of significant posterior soft tissue injuries, and therefore, no hyperflexion of the neck occurred.  The only scientifically proven mechanism for producing traumatic disc herniations is hyperflexion and compression.  Without hyperflexion, the cervical disc herniations could not have been produced in a one-time loading situation.  There is also a long time period of 26 months between the alleged fall and the diagnosis of these herniations, during which Mr. Moore did not complain of neck pain to his medical providers.

EXHIBIT 1

# Section III
# DISCUSSION

## Qualifications

The following report concerns a mechanical engineering analysis and biomechanical accident reconstruction for which the author has received excellent training and relevant experience in the fields of mechanical engineering, physics, and biomechanics.   His educational background includes a Bachelor of Arts degree in Physics from Occidental College, a Bachelor of Science degree in Engineering and Applied Sciences (Mechanical Design) from the California Institute of Technology, a master's degree in Mechanical Engineering from the Massachusetts Institute of Technology, and a doctorate in Mechanical Engineering (Design Division) from Stanford University.

The author worked on an experimental magnetic fusion reactor as an Integration Engineer at Lawrence Livermore National Laboratory.   He taught courses in biomechanics, rehabilitation engineering, and engineering design for 14 years at Arizona State University, where he was a tenured faculty member. He has received numerous awards for teaching and research, has received speaking invitations, has published papers in peer-reviewed journals, and has written a book entitled Dynamic Modeling of Musculoskeletal Motion (2006).

Since 1990, the author has been involved in numerous analyses involving accident reconstruction and biomechanics.  He worked at Exponent Failure Analysis Associates and InSciTech, Inc., to pursue original research and development in these fields and to conduct investigations of accidents in vehicular, commercial, and domestic settings full-time.  He joined Rimkus Consulting Group, Inc. in November 2019.  He is a registered Professional Engineer (Mechanical) in the states of Arizona, California, Texas, and Washington, and has certificates in accident reconstruction (Northwestern University Traffic Institute) and fall protection.

EXHIBIT 1

Other unique qualifications of relevance to this matter include more than 40 years of experience as a rock climber and mountaineer, over which he witnessed the evolution of mechanical belay, rope ascent, and fall arrest systems. He has consulted and performed testing on matters involving alleged failures of mechanical belay and rappelling devices, rope access work injuries, and has tested the performance of climbing helmets. Additional details are contained in his full resume (**Attachment C**).

## Background

This report focuses upon two mechanical systems that were in use by Mr. Moore to assist and safeguard him as he worked within Tower 41; the IBEX Climb Assist (IBEX), a motorized system made by Power Climber Wind (PCW, a division of SafeWorks, LLC), and the LAD-SAF-X3 made by 3M DBI-SALA. These are independent systems that provide different functions. The IBEX provides partial weight-bearing assistance to the user as he/she climbs or descends. It is not intended to provide full weight support nor protection against falling. The LAD-SAF-X3 (LAD-SAF) provides protection against sustaining a long fall. It rides along a fixed vertical cable with the user as he/she climbs or descends and clamps onto the cable in the event the user falls. It is supposed to grab onto the cable within a short distance (a maximum of 20 inches when tested according to ANSI Z359.16-2016).

Another potential issue is the question of compatibility between the IBEX and the LAD-SAF systems. 3M and SafeWorks, LLC have completed joint testing and have concluded that at least for ascending and stop modes, these systems are compatible.

As described in the product literature, the LAD-SAF-X3 Detachable Cable Sleeve (**Photograph 1**) is a portable connection device that connects the worker's harness to the ladder cable and glides freely up and down the cable as the worker climbs. Once attached, the sleeve does not require any further handling by the climber and allows the climber to move up and down the entire length of the ladder safety system with ease and confidence. It is designed for one-handed attachment and detachment anywhere along the cable. In the event of a fall, the sleeve is designed to lock onto the cable and arrest

EXHIBIT 1

the fall and to remain locked until the worker can regain his footing or be rescued. Even if something interfered with the primary mechanical locking system, a secondary inertial locking system is supposed to engage. An integrated energy absorber/fall indicator is built into the lever arm. Its capacity is for one user up to 310 pounds in weight. It is intended for usage on 3/8 inch diameter 1x7 and 7x19 solid core cable.

### Accident Records

Mr. Moore stated the following in a written description of the incident:

> "The IBEX cable broke. I was on the yaw deck about to descend. I had applied pressure to initiate the IBEX. I reached for the hatch and started my descent. It was not a foot after I started the descent that the IBEX broke. Actually, if my memory serves me, I believe it broke as I was pulling the hatch down. I took a ride for about 10 to 20 feet. The LAD SAF deployed with flying colors. Not sure why it didn't deploy immediately as my hands were never on the LAD SAF. However, it did stop me but not before it slammed me against the ladder. I was at the saddle deck or near it. I got on the radio and told Corey Wade I was fine. My LAD SAF was deployed and was really stuck on the cable so Corey sent me his LAD SAF. Got down safely."

Later, when filing an Employee's Claim for Compensation for a Work-Related Injury, he wrote, "Skyclimber IBEX cable snapped. The safety device LAD-SAF-X3 was faulty and did not catch me within 18 inches. X-3 did not work. I fell over 20 feet." He indicated that both his shoulders and ribs were affected.

Equipment used by Mr. Moore is specified on the Invenergy Fall Arrest System Inspection Checklist (**Photograph 2**) as LAD-SAF-X3 serial #0005580, DBI-SALA full-body harness model 1102388 (Exofit), energy absorbent lanyard SALA Force 2, and SRK-11 (self-rescue kit) T01863.

ANSI/ASSE Z359.16-2016 Safety Requirements for Climbing Ladder Fall Arrest Systems

Among other requirements, the 3.1.3.2 Dynamic Performance Test requires the average arrest force to not exceed 1,350 pounds and the maximum arrest force not to exceed 1,800 pounds when a test weight of 282 +/- 2 pounds is dropped and caught by the carrier sleeve. The total vertical displacement of the test weight shall not exceed 39 inches (1 m) maximum travel. Other requirements include, 3.2.3.1 Security of the Carrier Sleeve requirement, which requires two deliberate manual actions to remove the carrier sleeve from the cable. Some excerpts from the ANSI/ASSE Standard are included here:

"3.2.5.1 Carrier sleeves shall be automatic in their locking (fall arrest) function. If the carrier sleeve includes an external lever or other actuating feature that requires relative movement (pivot, rotate, etc.) to initiate locking of the sleeve, then a second independent locking means to initiate locking is required, which cannot be disengaged or interfered with during a fall event by reflexively grabbing the carrier sleeve. Carrier sleeves that rely on a sensing means to initiate locking, such as a velocity or acceleration sensing, also require a second independent means to initiate locking…"

"3.2.5.2  When tested in accordance with the Locking Function Test, the carrier sleeve shall lock on the carrier and the maximum movement of the carrier sleeve along the carrier "L" shall not exceed 20 inches or the total vertical displacement of the test weight including any extension of energy absorbing elements shall not exceed 39 inches.  The test weight shall remain clear of the ground…"

"E3.2.5.1 The purpose of requiring independent means to initiate locking is to provide redundancy and to reduce the possibility that the device may be deactivated if reflexively grabbed or held during onset of a fall. This reflexive reaction is often referred to as a "panic grab." Examples of two independent means to initiate locking include a lever arm and speed sensing, lever arm and inertia sensing, inertia sensing combined with speed sensing."

EXHIBIT 1

The LAD-SAF-X3 used by Mr. Moore had lever arm and inertia sensing.

Note that there are no standards for climb assist systems such as the IBEX Climb Assist.

## Medical Record Review

A brief summary of Mr. Moore's medical treatment following the fall incident of June 8, 2017, is provided. Records prior to the incident were unremarkable from a biomechanics perspective, although a note regarding prior surgery to the right knee was made by Theresa Jones of Family First Healthcare. A few months after the incident, on December 1, 2017, he was listed as being 6 feet tall and 239 pounds.

Photographs were provided for a surgical procedure dated September 10, 2017, at Cedar Park Regional Medical Center.

On July 11, 2018, 13 months following the incident, Daniel Lerma, D.C., reported the findings of an MR arthrogram of the right shoulder dated July 14, 2017, interpreted by Dr. Michael Harper. Dr. Harper's impressions of the right shoulder were a small full-thickness tear of the anterior one-third of the supraspinatus tendon with no muscle atrophy, moderate infraspinatus tendinopathy, medial subluxation and tendinopathy of the biceps tendon, and SLAP tear. His impressions of the left shoulder were no labral tear, no partial or full-thickness cuff tear, some tendinopathy, and medial subluxation of the biceps tendon.

Dr. Lerma also included the results of an MRI of the right shoulder dated February 15, 2018, and interpreted by Dr. Gregory Connor. This included post-surgical sequel of interval rotator cuff repair and biceps tenodesis, new since July 14, 2017. The supraspinatus tendon was surgically repaired, and a partial interstitial tear of the infraspinatus tendon was listed. The MRI report also listed the SLAP type II tear of the superior glenoid labrum. Minimal degenerative arthrosis of the acromioclavicular joint was also noted.

EXHIBIT 1

On August 21, 2018, William Nemeth, M.D., provided an injury analysis, adding bilateral impingement syndrome. In addition to the previous diagnoses, he added a mechanism of injury to both shoulders as "forceful abduction of both shoulders as he fell 20 feet trying to grab a safety wire to keep him from falling to the ground from a very high perch."

Mr. Moore underwent 10 weeks of physical therapy, terminating in early 2019. Slow progress was noted, and his prognosis for a physical therapy approach was guarded. The discharge note on March 28, 2019, by Stacie Adams and Benjamin Menke indicated that Mr. Moore still had large amounts of pain and tenderness in abduction and internal rotation of the shoulder.

On August 7, 2019, Mr. Moore visited David Blatchley, D.C. On a pain scale diagram, he indicated a pain level of 7 out of 10, with 0 being no pain and 10 being severe pain. He circled his left shoulder and left arm, and his right shoulder and his right arm. There was no mention of neck pain.

On August 12, 2019, Mr. Moore underwent an MRI exam of the cervical spine, referred by Theresa Jones. James Callas, M.D., interpreted the images. A posterior annular tear with focal right paracentral/foraminal 6.6 mm disc herniation was noted at C5-C6. There was moderately severe central canal stenosis and contact to the exiting C6 nerve root on the right. At C6-C7, there was a posterior annular tear with 2.8 mm central disc herniation and mild canal stenosis and mild left neural foraminal narrowing. At C4-C5 there was a posterior annular tear with a 2.3 mm broad-based right paracentral disc herniation with mild canal stenosis to the right and without severe neural foraminal narrowing. And at C3-C4 there was a 1.3 mm central disc herniation causing mild compression on the anterior thecal sac without severe central canal stenosis or neural foraminal narrowing. On August 26, 2019, Dr. Callas reviewed X-ray findings of the cervical spine, finding straightening of the cervical spine and mild changes of spondylosis at C5-C6 and C6-C7 consisting of mild anterior osteophyte formation.

Kenneth Ford, M.D., performed a peer review of Mr. Moore's medical records on August 27, 2019. He did not believe the findings of the neck MRI were causally related to the

EXHIBIT 1

incident of June 8, 2017. Regarding the mechanism of injury and compensable injuries sustained during the incident, he indicated "trying to break a fall by grabbing a ladder after a cable line broke, injuring both shoulders." Based on his review, he listed right shoulder rotator cuff tear, right shoulder labral tear, and right shoulder subluxing biceps tendon status post right shoulder arthroscopy with limited glenohumeral debridement, subacromial decompression, acromioplasty, mini-open rotator cuff repair, and open biceps tenodesis, which have resolved, as well as left shoulder subluxation of the biceps tendon status post left shoulder arthroscopy with limited glenohumeral debridement, subacromial decompression, acromioplasty, and open biceps tenodesis, which has resolved. Dr. Ford also listed pre-existing, ordinary disease of life conditions including degenerative disc disease of the thoracic spine at T1-T2, multilevel degenerative disc disease of the cervical spine at C3-C4, C4-C5, C5-C6, and C6-C7, left shoulder impingement syndrome, and right shoulder degenerative joint disease of the acromioclavicular joint, which in his opinion were not causally related to the compensable injury. He did not believe that any of the pre-existing diagnoses or conditions were compensably aggravated by the work-related incident.

**Inspections**

SafeWorks

Training with an operating IBEX Climb Assist was performed by Mr. Greg Crew, Vice President of Global Product Management at SafeWorks, L.L.C. in Tukwila, Washington, on July 31, 2020. The purpose of this inspection was to receive training on the IBEX Climb Assist system and to observe first-hand the operation of a LAD-SAF fall arrest device used in conjunction with the IBEX.

The system at SafeWorks consisted of a vertical aluminum ladder, 5/16 inch (1x7 solid core) vertical safety cable, and the IBEX Climb Assist system. The IBEX consisted of a loop of blue polymer "cable" that was driven by the motor and sheaves located at the bottom of the ladder. The ascender (Petzl) was attached to the IBEX cable and used to provide an upward pull on the chest D-ring of the 3M DBI-SALA Exofit full-body harness.

EXHIBIT 1

The teeth of the ascender's cam left small downward-pointing holes in the IBEX cable. As the steel safety cable was not 3/8 inch in diameter, a LAD-SAF-X2 was used as the fall arrest device instead of a LAD-SAF-X3. In a side-by-side comparison, the external cases of the LAD-SAF-X2 and a LAD-SAF-X3 appeared to be identical, but the LAD-SAF-X2 is rated for both 5/16 inch and 3/8 inch cables. The ladder was ascended and descended several times using each of the force settings of the IBEX. The LAD-SAF-X2 was evaluated along with the IBEX under conditions of normal operation (not touching it while ascending and descending) as well as descending under conditions of misuse (holding the LAD-SAF-X2 with the lever arm and attachment carabiner in an upward position).

The LAD-SAF-X2 (and LAD-SAF-X3) is intended to be a completely independent fall arrest system that operates without any need for the operator to manually handle it during ascent or descent. It was found that the process of descending had to be accomplished with the body moving very smoothly, with the torso remaining close to the cable, for the LAD-SAF-X2 to move smoothly downward. Any outward pulls or jerks on the cable caused it to lock onto the cable and prevent further descent. The instructions provided with the LAD-SAF-X2 indicate that if that occurs, the user is to climb one or two steps upward to release its grip upon the cable and then resume the descent. However, a user might be tempted to manually release the cam by pulling upward on the carabiner or lever. To prevent further inadvertent actuations of the cam, a user might even improperly hold the LAD-SAF-X2 in one hand while descending, which is contrary to the instructions for using the device.

Holding onto the LAD-SAF-X2 with one hand while descending meant that three points of support were lost intermittently as the remaining hand was moved down the ladder from one rung to the next. Also, it was found that the ladder hand could be slid down the outside railing of the ladder, technically maintaining "three points of contact" but not three solid points of support.

EXHIBIT 1

The LAD-SAF-X2 was also evaluated with respect to its ability to operate despite conditions of misuse. It was found that the cable-gripping operation of the cam could be circumvented by holding the lever arm upward and pushing the upper portion of the LAD-SAF-X2 toward the cable. Rapidly sliding the LAD-SAF-X2 down the cable – without it locking onto the cable – could then be accomplished. As with many cam-operated rope and cable grabbing devices, the cable had to become jammed in between the jaw of the cam and another surface to create the friction necessary to arrest a fall. The act of pushing the LAD-SAF-X2 toward the cable rotated the cam inward and downward (away from the cable) and created space on the opposite side of the cable. This effectively prevented the cable from becoming compressed as the LAD-SAF-X2 was moved rapidly downward.

Further training was also conducted remotely on August 18, 2020, by Mr. Crew and Morgan Knickrehm of SafeWorks, L.L.C., on evaluating weld failures in the IBEX cables.

### ESi – Inspection of the IBEX Cable and LAD-SAF-X3

A joint inspection was carried out on August 19, 2020, at ESi in Dallas, Texas. In this inspection, only the two broken ends cut from the IBEX cable were examined. In this report, they are referred to as Part A and Part B (**Photograph 3**). Part A has the short, broken, half-thickness end, whereas Part B has the long, extended, half-thickness section. Selected photographs taken at this inspection by Rimkus and photos taken with a Nikon stereo microscope by ESi are included in **Attachment A** of this report.

The welded section was split longitudinally along the length of the weld, and the half-pieces separated transversely in what appeared to be tensile failures. There were multiple transverse splits and voids along the interior split surface. Externally, there were a number of gouges in the cable, and one of the external gouges on Part A was immediately adjacent to the transverse separation (**Photograph 4**). At the transversely separated end of Part B was a large void partially filled with a black substance (**Photograph 5**). The exact site and reason for initial failure is beyond the scope of this report.

EXHIBIT 1

When examining the welded section, the IBEX cable weld was observed to have multiple deficiencies. The inner core material had sections that were hardened, felt like scales, and were no longer fibrous. These areas were consistent with the melting of the fibers, indicating overheating during the welding process.

Small pinpoints on the exterior surface of the blue polymer belting were consistent with having been made by the IBEX ascender's toothed cam.

Also, there was a step-change in diameter between the nominal cable and the welded section. The step-change in diameter was "smoothed" by what appeared to be hand cutting with a knife (**Photographs 4 and 7**). The change in diameter was more than four times greater than allowed in the specifications. As such, the failed section did not meet the allowable specification for cable joining.

- Part A (short broken end) had an average diameter (perpendicular to horizontal section) of 0.369 +/- 0.003 inches. The change in average diameter was -0.053 inches relative to the diameter of the cable away from the weld.

- Part B (long extended broken section) had an average diameter (perpendicular to horizontal section) of 0.389 +/- 0.005 inches. The change in average diameter was -0.025 inches relative to the diameter of the cable away from the weld.

- The specified allowable changes in diameter are +0.004 inches and -0.012 inches. The failed section did not meet the allowable specification for cable joining.

The LAD-SAF-X3 (model no. 6160054, serial no. 0005580) used by Mr. Moore was also inspected (shown in **Photograph 2**). It appeared as expected for a device having been used in a significant fall arrest. The load limiting lever arm had been extended by 5.34 inches. It was also twisted counterclockwise while facing toward the cable (when attached). There were normal wear marks around the case, and the inside of the channel and cam bearing surface had scrape marks consistent with a fall arrest.

EXHIBIT 1

The LAD-SAF-X3 was also X-ray imaged by ESi. These images showed some of the details of the internal geometry but were otherwise unremarkable.

Mr. Moore's 3M DBI-SALA Exofit Nex harness (Model 113192) and gloves (Mpact Mechanix) were also examined. There was nothing out of the ordinary with the gloves and harness. The two index fingers of the gloves were well worn, with the left index finger worn through.

### Invenergy – Site Inspection of Tower 41

Tower 41 at the Invenergy site in Goldthwaite, Texas, was inspected jointly on October 6, 2020 (**Photograph 8**).

Prior to heading to Tower 41, the experts assembled at the Invenergy headquarters and were shown the steel cable and the IBEX cable that had been taken from Tower 41 following the subject incident (**Photograph 9**). The steel cable was visibly kinked and slightly flattened 24 feet 10 inches below the top bracket's upper attachment hole (**Photograph 10**). Black tape markings were affixed above and below the kink, and it was confirmed by Invenergy that the marked section was where Mr. Moore's LAD-SAF-X3 was removed from the cable following the incident. The cable appeared to be 7x19 solid core construction and measured 0.376 +/- 0.009 inches in diameter, which is nominally 3/8 inches.

Inside Tower 41, the experts who desired to inspect the main ladder, IBEX, and cable placement were allowed to ascend the short ladder leading to the transition deck. The currently existing IBEX system installed at the bottom of the ladder is shown in **Photograph 11**. **Photograph 12** shows the IBEX cable loop stretching upwards on both sides of the ladder along with the safety cable hanging from the top of the ladder.

At the base of the main ladder, a metal tag specifying a 3/8 Cable Safe Climb System by Tuf-Tug Products, 7x19 solid core wire rope replacement cable was in place, installed in June 2020. (The label depicted in PLG PHOTO 000062 was identical to that on the

EXHIBIT 1

replacement cable, except that it was undated.  Presumably, this label was affixed to the cable in use at the time of the incident.)  There is every indication that a 7x19 solid core steel cable was in use at the time of the incident.  It was noted that the hatch covers had no handles on the underside.

To get to the transition deck of Tower 41, a shorter ladder first had to be ascended.  It also had a 3/8 inch fall protection cable but no IBEX system due to the short distance. After reaching the bottom of the ladder on the way out, the author informally tested an exemplar LAD-SAF-X3 (Model No. 6160054, Serial No. 0085764) by accelerating it manually down the fixed cable with the lever arm held in an upward position and slight forward pressure pushing the upper portion of the sleeve toward the cable.  The LAD-SAF-X3 did not lock in place in three trials.

## ESi – Disassembly, Inspection, and Testing of the LAD-SAF-X3

The subject LAD-SAF-X3 was evaluated through a series of functional tests prior to disassembling it and inspecting the interior.  The lower end of the subject cable extracted from Tower 41 was hung vertically from another cable extending from Unistrut supports. Approximately 40 pounds of weight was attached to the lower end of the cable using nylon webbing and another LAD-SAF-X3 brought by the author (model no. 6160054, serial no. 0085764, see **Photograph 13**).  It was confirmed that the cable was nominally 3/8 inch in diameter (0.366 inch by measurement in this section), appeared to be 7x19 solid core construction, and was free of imperfections.  The tests, performed in order, are listed:

*Lay Flat Test (ESi)*: With lever arm rotated up, see if rounded end of upper pulley axle is flush with flat surface.

*Side Load Test of Subject LAD-SAF-X3, Right, two trials (ESi)*:  Rotating lever arm up, loading the lever arm sideways to the right, then inverting the LAD-SAF-X3, the cam can be heard rotating by an audible click at the end of its motion.

EXHIBIT 1

*Side Load Test of Subject LAD-SAF-X3, Left, two trials (ESi)*:   Rotating lever arm up, loading the lever arm sideways to the left, then inverting the LAD-SAF-X3, the cam did not rotate.   In a working device not subjected to a fall, this would indicate interference between the lever arm and the inertial locking function.   Releasing the side load, the cam rotated to its stopped position, and an audible click was heard at the end of its motion.

*Unloaded Let-Go Test of Subject LAD-SAF-X3 (Ellis Fall Safety Solutions)*.   When the lever arm was held in the up position, and then the entire device was let go to fall with a 1 g acceleration, the lever arm rotated, and the subject LAD-SAF-X3 grabbed the cable. When the device was held by the carabiner and moved up and down, it moved smoothly up the cable but sometimes abruptly stopped when moved downwards.

*Unloaded Let-Go Tests of Subject LAD-SAF-X3 by ESi*. Holding the end of the lever arm of the subject LAD-SAF-X3, the device was successfully installed onto the cable. When released, the lever arm rotated, and the LAD-SAF-X3 grabbed the cable.

*Panic Grab Test of Subject LAD-SAF-X3 by ESi*. Holding the lever arm upward, and accelerating the LAD-SAF-X3 downward with first one hand and then with two hands, moving it as fast as the technician could go, the LAD-SAF-X3 did not grab the cable.   Six trials were performed (see **Figure 1**).   The technician was asked if he exerted a side load as he was moving the LAD-SAF-X3. He reported he was not exerting a side load, just trying to move it as fast as he could.

When the LAD-SAF-X3 was accelerated downward faster than one gravitation acceleration, the carabiner was observed to invert (turn upside down).   In other words, if the LAD-SAF-X3 was pulled downward faster than the carabiner could freely fall, the carabiner was pulled downward at its attachment point.   Under such conditions, the center of mass will swing around behind the attachment point, briefly invert, and then swing to the opposite side.   When the LAD-SAF-X3 was accelerated downward slower than one gravitational acceleration, the carabiner hung downward from the attachment point, as expected.

EXHIBIT 1

*Panic Grab Test of Subject LAD-SAF-X3 (Spectrum Forensics)*. The LAD-SAF-X3 was accelerated manually down the cable seven times at increasing acceleration rates. It did not lock onto the cable. Dr. Bastiaan Cornelissen of Spectrum Forensics stated he was going as fast as he was able at the end.

*Panic Grab Test of Subject LAD-SAF-X3 (the author)*. 11 trials were performed with a downward acceleration. The subject device did not grab the cable. The device was accelerated as fast as possible with one and two hands. This was more than a 1 g acceleration, confirmed by the carabiner inverting during the downward acceleration.

*Panic Grab Simulation Test, Unloaded by ESi.* The lever arm was secured with electrical (plastic) tape in the upward position to prevent it from rotating. Holding the LAD-SAF-X3 by the carabiner (carabiner inverted), the LAD-SAF-X3 was dropped, and it did not grab the cable and slid all the way to the bottom anchor. The carabiner rotated from the inverted position to a downward-hanging position, confirming that the rate of acceleration was less than one gravitational acceleration. There was a little bit of back and forth rocking the second time it was dropped. In a subsequent video, it was dropped a third time.

*Functional Tests by ESi.* TheLAD-SAF-X3 arrested itself on the cable when released with no load on the lever arm other than the carabiner weight.

*Panic Grab Tests of Exemplar LAD-SAF-X3 (Model no. 61160054, Serial number 0127363) by Spectrum Forensics*. Five unloaded drop tests and four hand-driven, downward acceleration tests were conducted on the vertical cable. The LAD-SAF-X3 did not grab the cable when the lever arm was held upward, and the LAD-SAF-X3 was pulled downward at maximum speed.

*Panic Grab Tests of Exemplar LAD-SAF-X3 (Model no. 61160054, Serial number 0127363) by the author.* Three unloaded drop tests and seven hand-driven, downward acceleration tests were conducted on the vertical cable. The LAD-SAF-X3 did not grab the cable when the lever arm was held upward, and the LAD-SAF-X3 was pulled

EXHIBIT 1

downward at maximum speed.  Accelerations greater than one gravitational acceleration were confirmed by inversion of the carabiner.

*Panic Grab Simulation Test, Loaded with a 10 lb weight, by ESi.*  The lever arm was taped in an upward position with electrical (plastic) tape. A sling was used to tie the weight to the carabiner.  Holding the 10 lb weight, the weight and the LAD-SAF-X3 were dropped. The LAD-SAF-X3 stopped almost immediately on the cable. The tape appeared to have stretched, allowing the lever arm to rotate.

Following the functional tests, the LAD-SAF-X3 was disassembled by grinding off the rivet heads on the faceplate (**Photograph 14**).  Upon inspection, the internal inspection was unremarkable.  The internal components displayed only signs of normal wear and tear, and some small flakes of grime on the bearing surfaces that would not have affected the function of the LAD-SAF-X3.

### Mechanical Analysis

The subject and exemplar LAD-SAF-X3s appeared to work reliably and well when used as intended, and the loading was applied through a downward pull on the carabiner, causing rotation of the lever arm.  The eccentric weight of the lever arm and carabiner was sufficient to cause the cam to engage the cable, grab, and continue rotating. Because of the cam's eccentric shape, rotation of the cam squeezes the cable between the bearing surface of the cam and the outer wall of the cable guide.  Continued downward force and motion cause the cam to rotate further, moving the bearing surface more strongly against the cable and increasing the frictional force between the LAD-SAF-X3 and the cable, causing it to come to a stop.

The LAD-SAF-X3 was observed to work well in preliminary training at SafeWorks, LLC, when the sleeve was used with the IBEX during ascent and descent modes.  While descending with the maximum IBEX weight support setting, however, the descent was less smooth, sometimes causing the LAD-SAF-X2 to catch on the cable during trials at

EXHIBIT 1

SafeWorks. Documents describing joint testing conducted by SafeWorks and 3M did not appear to show an incompatibility when the IBEX was used as recommended.

It was clear during the functional testing that the LAD-SAF-X3's inertial locking mechanism did not work when the lever arm was manually held in the upward position, and the sleeve was accelerated manually as fast as possible, with downward accelerations less than and greater than one gravitational acceleration. This result was found with both the subject LAD-SAF-X3 used by Mr. Moore and with a newer exemplar brought by Spectrum Forensics. This was also found to be true in Tower 41 using an exemplar LAD-SAF-X3 brought by the author.

With the lever arm held in an upward position and the LAD-SAF-X3 accelerated in a downward direction, the cam of the LAD-SAF-X3 failed to engage the cable with sufficient force to ensure further cam rotation as the LAD-SAF-X3 moved downward. The combination of the helical bias spring, the inertia of the cam, and the coefficient of friction between the cam and the cable were insufficient to ensure that the cam would lock against the cable.

In rope access fall-arrest devices, small teeth are often employed to ensure rotation of the cam (or wheel) during the initial phases of a fall arrest. These would not work for a non-woven steel cable, but the idea is clear. As the fall initiates in an inertial locking scenario, the cam has to first contact the cable, and then there has to be enough friction to cause further rotation of the cam so that it will forcibly jam the cable against the cable sleeve. It appeared during panic grab testing at ESi that there was insufficient friction between the cable and the cam's bearing surface to create this effect.

Incidentally, it was noticed while inside Tower 41 that the ladder rungs felt slightly slick with an oil-like substance, and it is possible that there may have been some surface contamination on the cable as well.

EXHIBIT 1

## Accident Reconstruction

The kink and flattened section of the cable at 24 feet, 10 inches from the upper end, is consistent with a high force catch, and Mr. Moore's account of falling 10 to 20 feet is consistent with that. A better estimate of the fall distance would be obtained by subtracting the distance of the yaw deck below the location of the upper cable attachment.

When the IBEX cable broke at its weld, Mr. Moore fell and was not arrested by his LAD-SAF-X3 for some distance. Mr. Moore would have fallen at a rate nearly equal to one gravitation acceleration, assuming little residual support from the broken IBEX cable. If he was not holding onto the LAD-SAF-X3, his body would have fallen faster than the LAD-SAF-X3, due to its internal friction between the sleeve walls, cam, and cable. He would have quickly exerted a downward force on the attachment carabiner and lever arm, driving the cam into the cable and quickly arresting his fall. If he was holding onto the LAD-SAF-X3, he and the LAD-SAF-X3 would have fallen together at about 1 g acceleration, and the inertial locking mechanism would have failed initially, resulting in a long fall.

It is logical to conclude that Mr. Moore must not have had three solid points of support when the IBEX cable broke. If he had maintained three solid points of support, he would not have fallen in the first place due to some unexpected situation, such as power failure or the breakage of the IBEX cable.

## Biomechanical Analysis

The medical records indicate the following injuries and conditions to his shoulders:

- Right shoulder impingement (supraspinatus).

- Left rotator cuff tear (supraspinatus).

- Bilateral biceps tendinopathy.

- Right infraspinatus tendinopathy.

- Left supraspinatus tendinopathy.

- SLAP (Superior Labrum Anterior Posterior) Type 2 tear of the right shoulder.

The left supraspinatus tear and left supraspinatus tendinopathy are not compatible with a fall injury, e.g., grabbing at a ladder rung while falling. Supraspinatus is a muscle on the superior portion of the shoulder, which enables abduction of the shoulder. It can be overstressed and torn when the muscle is activated, and the arm is driven toward the side of the body in adduction, or if it becomes overstressed trying to abduct the arms while throwing a weight. The classic mechanism of supraspinatus tear, for instance, is throwing a wet blanket over a clothesline. If the arm is pulled upward, the supraspinatus is relaxed rather than tensed.

Right shoulder impingement, however, is compatible with a fall, as it can happen with the arm being pulled upward with respect to the shoulder joint.

Infraspinatus can be stressed with the arm pulled forward and is compatible with a grasping injury.

The SLAP tear apparently was discovered in an MR Arthrogram on July 14, 2017, about 5 weeks after the fall incident. This pathology was accompanied by medial subluxation (partial dislocation) of the biceps tendon. The peer-reviewed scientific literature indicated a specific biomechanical mechanism for this injury. Grabbing at a ladder rung while falling may cause a forcible extension of the elbow at a time the biceps was actively contracting. The forced extension of the elbow likely increased the force in the bi-articular biceps muscle, causing it to pull outward on its muscle attachment on the superior glenoid. Similarly, the bilateral biceps tendinopathies are also compatible with a fall injury for the same reason.

Mr. Moore also has claimed posterior annular tears with herniations in his cervical vertebrae C4-5, C5-6, and C6-7 levels. Herniations of the spinal discs from one-time

EXHIBIT 1

acute loads are very rare and require significant flexion and a simultaneous, axially compressive load. Curiously, these were not discovered until a cervical MRI on August 12, 2019, more than 2 years following the fall incident. It is noted that he had a visit to the chiropractor the week prior to the MRI, where he did not mention neck pain. The significant time lag indicates these are likely unrelated to the subject fall incident.

The biomechanical function of a spinal disc is to absorb axial loading (vertically directed through the spine) in daily activities such as walking, jumping, or even sitting upright; therefore, degenerative wear and tear is the most common cause for disc herniations or bulges. The material properties and strength of human spinal discs have been well tested and established by various biomechanical studies. The peer-reviewed biomechanical literature, most of them published in top medical journals such as "Spine," has unanimously concluded that structural damage to spinal disc tissue (such as herniation) in a brief traumatic event would be unlikely to occur unless there was significant axial loading (such as heavy lifting) to a hyper-flexed (excessively forward bending) spine. Studies also reported that pre-existing degenerative spinal discs were not more prone to prolapse in a traumatic, single loading event.

Despite commonly held misconceptions, most disc bulges and herniations are the result of long-term degeneration and not of a single, brief event. Most often, disc bulges and herniations develop as a result of repetitive loading over many years as part of the natural aging and degeneration process and often are not associated with any symptoms or pain. The annulus fibrosus has about 15 to 25 layers; in each layer, the fibers are oriented in the opposite direction to those in the adjacent layer. As the disc experiences axial loading due to walking, running, lifting, etc., the water content expands and gradually tears each layer – not all of the layers are torn at once because, like an automotive tire, they have strengthening fibers that vary in direction in adjacent layers. Over time, individual layers can tear, and the nucleus expands outwardly, causing bulges. Over time, individual tears become fissures. If the fissures grow through all the annular layers, there will be movement of nuclear material, and a herniation will result. Therefore, a disc herniation is primarily a long-term, degenerative condition. As discs degenerate, bulges and

EXHIBIT 1

protrusions can lead to the narrowing of the spaces occupied by the spinal cord and exiting nerve roots and cause crowding and deformation of these sensitive tissues. Additionally, changes in the force distribution throughout the spine in response to altered disc mechanics initiate an active bone response that can accumulate and act to narrow the central canal or neural foramen.

It should be pointed out that within the scope of this biomechanical analysis, injury is defined as a structural change to body tissues, such as bony fracture, ligamentous tear, joint dislocation, and disc material damage, such as disc herniation. This biomechanical analysis does not consider subjective pain complaints. In addition, a review of medical records was not to offer opinions with regards to diagnoses, treatment, or prognoses. Rather, the diagnoses in the provided medical records were taken at face value.

The opinions expressed in this report are offered to a reasonable degree of probability within the accident reconstruction, biomechanics, and scientific fields. The methods used and studies cited in this report are relevant to the biomechanics of human motion and injury mechanisms resulting from accidental events. Biomechanics is the application of principles and methods of engineering mechanics to the study and solution of problems arising in biology and medicine. The science of injury biomechanics is fundamentally different from that of medicine in that it does not offer diagnoses, treatment, or prognoses, but instead addresses the relationships between events and damages to tissue by studying the physics of accidental events, the properties of tissues, and the application of loads to tissues in accidental events. This is a discipline widely accepted within the scientific community; injury biomechanics forms the basis for the safety aspects of vehicle interior design and the rules and regulations that govern vehicles' crashworthiness. In this particular case, the application of biomechanics principles explains the motions of Mr. Moore during the fall incident, the nature of the loads and mechanisms experienced by the tissue, and the potential for those loads and mechanisms to result in damage or failure to tissue. These methods have been tested and have yielded consistent results in the articles cited in the **Basis of Report** and others. The methods used and results expressed in these reports can be verified experimentally.

EXHIBIT 1

## Section IV
## BASIS OF REPORT

1. Plaintiffs' Original Complaint.

2. Plaintiff's Certificate of Interested Parties.

3. Consent to Magistrate.

4. Order from Court for Plaintiff's to Amend Complaint.

5. Plaintiff's Amended Complaint.

6. Order from Court Plaintiff's Amended Complaint.

7. Defendant DB Industries, LLC, Capital Safety USA, Capital Safety Group, and DBI/SALA's Answer to Plaintiffs' Original Complaint.

8. Corporate Disclosure Statement.

9. Defendant Safeworks, LLC d/b/a Power Climber Wind's Original Answer to Plaintiffs' Amended Complaint.

10. Certificate of Interested Persons.

11. Special Order ReAssigning Case to Judge Wes Hendrix.

12. Applications and Orders Granting Pro Hac Vice.

13. Order Requiring Scheduling Conference.

14. Notice of Attorney Appearance for DBI.

15. Joint Status and Scheduling Conference.

EXHIBIT 1

16. Scheduling Order.

17. Defendants' Agreed Motion for and Order Granting Withdrawal and Substitution of Counsel of Record.

18. Order Regarding Local Counsel Retention.

19. Notices of Appearance.

20. Defendants' Motion to Proceed Without Local Counsel.

21. Order Granting Defendants' Motion to Proceed Without Local Counsel.

22. Unopposed and Agreed Motion for Entry of Stipulated Protective Order.

23. Protective Order.

24. Joint Motion and Order Regarding Continuation of Deadlines.

25. Amended Scheduling Orders.

26. Letter Agreement Regarding State Court Case.

27. Order on Notice of Non-Suit Against All Defendants (State Court Case).

28. Plaintiff's Original Petition (State Court Case).

29. Plaintiff's Notice of Intent to Serve Subpoena.

30. Subpoena to Produce Documents to Invenergy, LLC.

31. Power Climber's Motion to Proceed Without Local Counsel.

32. D B Industries, LLC's Objections and Responses to Plaintiffs' Interrogatories.

33. Defendant D B Industries, LLC's Responses to Plaintiffs' Requests for Production

EXHIBIT 1

34. D B Industries, LLC's Responses to Plaintiffs' Requests for Production of Documents To D B Industries, LLC (Second Set).

35. D B Industries, LLC's Second Supplemental Responses to Plaintiffs' Requests for Production of Documents to D B Industries, LLC (Second Set).

36. Defendant, Safeworks, LLC's Objections and Answers to Plaintiffs' Interrogatories.

37. Defendant, Safeworks, LLC's Objections and Responses to Plaintiffs' Second Set of Request for Production.

38. Defendant, Safeworks, LLC's Objections and Responses to Plaintiffs' Second Set of Request for Production.

39. Defendants', Safeworks LLC's and Power Climber, Responses to Plaintiffs' Request for Production.

40. Plaintiff Judith Moore's Answers to Defendants Db Industries, LLC, Capital Safety USA, Capital Safety Group and DBI/Sala's First Set of Interrogatories.

41. Plaintiff Justin Moore's Answers to Defendants Db Industries, LLC, Capital Safety USA, Capital Safety Group and DBI /Sala's First Set of Interrogatories.

42. Plaintiff Justin Moore's Answers to Defendants Db Industries, LLC, Capital Safety USA, Capital Safety Group and DBI/Sala's First Set of Interrogatories.

43. Plaintiffs' Responses to Defendants DB Industries, LLC, Capital Safety USA, Capital Safety Group and Dbi/Sala's First Set of Requests for Production.

44. Plaintiffs' Responses to Defendants DB Industries, LLC, Capital Safety USA, Capital Safety Group and DBI/Sala's First Set of Requests for Production.

45. DBI 2nd Supplemental Production Documents:

  a. DBI1_00000001 to DBI1_00001550.

EXHIBIT 1

46. DBI Failure Modes and Effects Analysis, March 25, 2013, revised April 5, 2013.

47. Cedar Park Regional Medical Center.

    a. CPRMC 000001 to 000029.

48. Family First Healthcare.

    a. FFHC 000001 to 000100.

    b. FFHC BILLS 000002.

49. Leander Chiropractic Center.

    a. LNDR CHIR 000001 to 0000007.

50. Longhorn Imaging.

    a. LHIMG 000001 to 000003.

51. Texas Orthopedics Sports and Rehabilitation Associates.

    a. TXORTH 000001 to 000029.

    b. TXORTH BILLS 000001 to 000003.

52. Texas Physical Therapy Specialists.

    a. TXPT 000001 to 000062.

53. Justin Moore's Medical, Employment, and Other Records.

    a. PLG EMP 000001 to 000010.

    b. PLG PHOTO 000001 to 000062.

    c. PLG PRDCT 000001 to 000041.

EXHIBIT 1

    d.  PLG REPORT 000001.

    e.  PLG STMT 000001 to 000002.

    f.  PLG TAXES 000003 to 000014.

    g.  PLG WC 000001 to 000008.

    h.  PLG WC FORD 000001 to 000008.

    i.  PLG WC LERMA 000001 to 000013.

    j.  PLG WC NEMETH 000001 to 000006.

54. Safeworks Document Production.

    a.  SAFEWORKS 000092 to 001659 including attachments in Natives folder.

55. Spectrum Forensics Protocol for Examination of Climb Assist and Fall Arrest System Components, rev. 1, June 15, 2020, and rev. 2, July 6, 2020.

56. Plaintiffs' Disclosure of Expert Witnesses (Second), including:

    a.  Initial Report, Moore Fall Incident Investigation, Bastiaan E. Cornelissen, Ph.D., P.E., and Mark D. Russell, Ph.D., P.E.

    b.  Preliminary Report on the Justin Moore Case, J. Nigel Ellis, Ph.D., CSP, P.E., CPE.

Various materials, including the following published articles were referenced:

    a.  Adams, M.A., and Hutton, W.C. (1982) "The mechanics of prolapsed intervertebral disc." *International Orthopaedics*, V6, n.4, pp. 249-253.

    b.  Adams, M.A., and Hutton, W.C. (1982) "Prolapsed intervertebral disc – A hyperflexion injury." *Spine*, V7, n.3, pp. 184-191.

c.  Andrews, J.R., Carson, W.G., and McLeod, W.D. (1985) "Glenoid labrum tears related to the long head of the biceps." *American Journal of Sports Medicine*, V13, n.5, pp. 337-341.

d.  Bey, M.J., Elders, G.J., Huston, L.J., Kuhn, J.E., Blasier, R.B., and Soslowsky, L.J. (1998) "The mechanism of creation of superior labrum, anterior, and posterior lesions in a dynamic biomechanical model of the shoulder: The role of inferior subluxation. J. Shoulder Elbow Surg., July/August, pp. 397-401.

e.  Boos, N., Semmer, N., Elfering, A., Schade, V., Gal, I., Zanetti, M., Kissling, R., Buchegger, N., Hodler, J., and Main, C.J. (2000) "Natural history of individuals with asymptomatic disc abnormalities in magnetic resonance imaging." *Spine* V25, n.12, pp. 1484-1492.

f.  Burkhart, S.S., and Fox, D.L. (1992) "SLAP lesions in association with complete tears of the long head of the biceps tendon:  A report of two cases."  *Journal of Arthroscopic and Related Surgery*, V8, n.1, pp. 31-35.

g.  Codman, E.A. (1990) "The classic – Rupture of the supraspinatus tendon." Clinical Orthopaedics and Related Research, May, n.254, pp. 3-26.

h.  Costa, A.S.S., Leite, J.A.D., Melo, F.E.A., and Guimaraes, S.B. (2006) "Biomechanical properties of the biceps-labral complex submitted to mechanical stress."  *Acta Cirurgica Brasileira*, V21, n.4, pp. 214-218.

i.  Dickie, D.E. (1975) Rigging Manual.  *Construction Safety Association of Ontario*, Toronto, Ontario, Canada.

j.  Ellis, J. N. (1988) Introduction to Fall Protection. *American Society of Safety Engineers*, Des Plaines, IL.

k.  Fardon, D.F., and Milette, P.C. (2001) "Nomenclature and classification of lumbar disc pathology – Recommendations of the Combined Task Forces of the North

American Spine Society, American Society of Spine Radiology, and American Society of Neuroradiology. *Spine,* V26, n.5, pp. E93-E113.

l.  Hutton, W.C. and Adams, M.A. (1987) "The biomechanics of disc degeneration." *Acta Orthopaedica Belgica*, V. 53, n. 2, pp. 143-147.

m. Kapandji, I.A. (1982) The Physiology of the Joints. *Churchill Livingstone*, New York, NY.

n.  Kuhn, J.E., Lindholm, S.R., Huston, L.J., Soslowsky, L.J., and Blasier, R.B. (2003) "Failure of the biceps superior labral complex:  A cadaveric biomechanical investigation comparing the late cocking and early deceleration positions of throwing."  *Journal of Arthroscopic and Related Surgery*, V19, n.4, pp. 373-379.

o.  McCurley, L. (2016), Professional Rope Access.  *John Wiley & Sons*, Hoboken, NJ.

p.  Netter, F. (1989), Atlas of Human Anatomy. *Icon Learning Systems*, Teterboro, NJ.

q.  OSHA 1910.29 Subpart D, "Fall protection systems and falling object protection -- Criteria and practices."

r.  Sulowski, A.C. (1991) Fundamentals of Fall Protection.  *International Society for Fall Protection*, Toronto, Ontario, Canada.

s.  White, A. A. and Panjabi, M. M. (1990) Clinical Biomechanics of the Spine, Second Edition.  *J. B. Lippincott Co.*, Philadelphia, PA.

t.  Whiting, W.C., Zernicke, R.F. (1998) Biomechanics of Musculoskeletal Injury. *Human Kinetics*, Champaign, IL.

u.  Yamaguchi, G. T. (2006) Dynamic Modeling of Musculoskeletal Motion – A Vectorized Approach for Biomechanical Analysis in Three Dimensions.  *Springer,* New York, NY.

EXHIBIT 1

# Section V
# ATTACHMENTS

A. Photographs

B. Figures

C. Curriculum Vitae

EXHIBIT 1

**Section V**

**ATTACHMENT A**

# Photographs

Photographs taken during our inspection, including photographs that were not included in this report, were retained in our files and are available to you upon request.

EXHIBIT 1

**Photograph 1**
An exemplar LAD-SAF-X3. The cable sleeve is on the left, and the auto-locking steel carabiner is on the right. The sleeve and the carabiner are joined via the extensible lever arm, which, when loaded severely, will deform and extend to reduce the impact force sustained by the user.



**Photograph 2**
LAD-SAF-X3 used by Mr. Moore. The lever arm was extended during the fall incident.



November 19, 2020
Rimkus File No. 100021436

**EXHIBIT 1**

**Photograph 3**
Broken ends of the blue IBEX cable, positioned end to end.  The piece referred to as Part A is on the left, and the part referred to as Part B is on the right.



**Photograph 4**
Part A, shown with gouges (red arrows) on the external surface of the weld immediately adjacent to a transverse separation.  The yellow arrow highlights the section that appeared to have been whittled to smooth the step-change in diameter. (Photo provided by ESi.)



November 19, 2020
Rimkus File No. 100021436

EXHIBIT 1

**Photograph 5**
Tip of broken section of Part B, showing voids filled with an unknown black substance. The voids are deep and are of varying shape.  (Photo provided by ESi.)



**Photograph 6**
Hardened sections of the inner core material of Part B.  (Photo provided by ESi.)



November 19, 2020
Rimkus File No. 100021436

**EXHIBIT 1**

**Photograph 7**
Whittled down section of Part A, seen from the side.



**Photograph 8**
Tower 41



EXHIBIT 1

**Photograph 9**
The steel cable and blue IBEX cable extracted from Tower 41.



**Photograph 10**
Kink in the cable 25 feet 10 inches below the upper attachment hole.



**EXHIBIT 1**

**Photograph 11**
IBEX Climb Assist system mounted at the base of the main ladder in Tower 41.



EXHIBIT 1

**Photograph 12**
Vertical ladder looking upward from the transition deck. The 3/8 inch steel safety cable can be seen stretching upwards in addition to the two sides of the blue IBEX cable loop.



**Photograph 13**
Bottom weight for the subject cable extracted from Tower 41, as set up for the functional tests at ESi on October 7, 2020.  Approximately 40 pounds were added.



EXHIBIT 1

**Photograph 14**

Photo showing the partially disassembled LAD-SAF-X3. The cam and the lever arm rotate about the same spindle. Downward movement of the lever arm causes the "tooth" to interact with the cam, causing the cam to rotate clockwise, pinching the cable between the cam and the cable guide. In the event the lever arm is held in an upward position, the cam is intended to be able to rotate independently of the lever arm, enabling the cam to rotate and grip the cable even if the lever arm does not rotate.



**Section V**

**ATTACHMENT B**

# Figures

EXHIBIT 1

**Figure 1**
Sequence of still images taken during one of many Panic Grab Tests at ESi on October 7, 2020. The sequence proceeds from left to right. The red arrow points to the free end of the carabiner. In the first frame on the left, the carabiner was hanging downward at the start of the downward acceleration. In the second frame, the carabiner was approaching a horizontal orientation. In the third and fourth frames, the carabiner has become inverted. In the last frame, the technician has decelerated, and the carabiner has returned to a downward hanging orientation. The subject LAD-SAF-X3, and an undamaged exemplar LAD-SAF-X3, failed to lock onto the subject cable in any of these functional tests. The inversion of the carabiner confirmed that the accelerations achieved in some of these tests exceeded 1 g.



**Section V**
**ATTACHMENT C**

# Curriculum Vitae

EXHIBIT 1



FORENSIC ENGINEERS AND CONSULTANTS



# Gary T. Yamaguchi, Ph.D., P.E., NCEES

Principal Consultant
Biomechanical Division

---

## Background

Dr. Yamaguchi received his Ph.D. in Mechanical Engineering (Design Division, Biomechanics) from Stanford University, his S.M. (Masters) in Mechanical Engineering from MIT, his B.S. in Engineering & Applied Science from Caltech, and his A.B. in Physics from Occidental College. His consulting practice focuses on determining biomechanical mechanisms of injury, reconstructing both vehicular and biomechanical accidents based on evidence. His areas of practice include analyses of low-speed and high-severity vehicular accidents, vehicle-to-pedestrian impacts, spinal injuries, slips, trips, and falls, fall protection systems, sports injuries, mechanical design, product liability, and premises liability.

Dr. Yamaguchi is also a registered Professional Engineer (Mechanical) with significant expertise in modeling and analyzing the dynamics of human body motions. As a professor at Arizona State University, he conducted original research to improve orthopedic surgical procedures, to develop neural-controlled prostheses, to analyze human gait and stance, to model animals used in spinal cord injury research, and to design devices for persons with disabilities (rehabilitation engineering). He taught courses in biomechanics, muscle physiology, engineering design, and bioengineering fluid dynamics. His research was funded by the National Science Foundation and the Whitaker Foundation.

Dr. Yamaguchi has contributed to numerous journal articles and book chapters, and over 100 additional publications in official reports, proceedings, and transactions in the fields of injury biomechanics, accident reconstruction, musculoskeletal dynamics, movement simulation, neuromuscular coordination and control, rehabilitation engineering, and magnetic fusion energy. He is the author of a monograph book, Dynamic Modeling of Musculoskeletal Motion – A Vectorized Approach to Biomechanical Analysis in Three Dimensions, published by Kluwer Academic Publishers (2001) and Springer (2006).

### Contact Information
(206) 962-4073
gyamaguchi@rimkus.com

16932 Woodinville
Redmond Road NE,
Suite A-105
Woodinville, WA 98072

**EXHIBIT 1**



FORENSIC ENGINEERS AND CONSULTANTS

# Professional Engagements

- **Cadaver Testing**
  - TASER International – Philadelphia, PA (2009), Performed cadaver testing of a self-contained neuromuscular stimulation projectile.

- **Dynamic Musculoskeletal Modeling**
  - Calloway Golf Company – Carlsbad, CA (2003), Created a dynamic 16-degree-of-freedom model of the golf swing for optimizing the performance of specific individuals.

# Forensic Engagements

- **Biomechanical Injury Assessments**
  - Lake Placid, NY (2019), Determined the cause of a catastrophic neck injury and quadriplegia from ski jumping and landing on an airbag.
  - Yuma, AZ (2019), Evaluated the mechanism of airbag injury for a lacerated atria caused by an impact between an automobile and a luminaire pole.
  - Amsterdam, The Netherlands (2018), Reconstructed the sequence of events leading to a man tripping and falling off a docked cruise ship.
  - Long Beach, CA (2018), Investigated a longshoreman's claim that he fell into an uncovered hole, injuring his shoulder.
  - Sacramento, CA (2017), Evaluated three claims of lumbar, thoracic, and/or cervical disc herniations alleged to have resulted from low-speed rear-end collisions.
  - Prescott, AZ (2017), Evaluated claims of head injury for a helmeted woman in an ATV accident.
  - Phoenix, AZ (2017), Analyzed the fall of a child who fell from a playground structure and landed face down on a worn-out energy-absorbing surface.
  - Lafayette, LA (2016), Investigated the claim of a barge worker who sustained an alleged back injury from lifting a hatch cover.
  - Hilo, HI (2014), Documented zipline three-dimensional (3-D) geometry after one patron struck a pole and broke his arm, and another patron broke her ankle.
  - Hilo, HI (2014), Determined how a worker's arm was caught by a vertical wire baling machine.
  - Port Arthur, TX (2014), Evaluated the claim of an undersea diver who sustained a back injury from lifting a heavy hatch inside a deep-water diving bell.
  - Long Beach, CA (2014), Investigated a claim of knee injury sustained while working aboard a tugboat.
  - Shawnee, KS (2014), Analyzed spinal injuries sustained because of seatbelt non-usage for two occupants of a tractor-semitrailer that was blown off a highway overpass by a tornado.
  - Sanger, CA (2014), Evaluated video recordings of the decedent's movements preceding a fatal shooting by police.
  - Baton Rouge, LA (2013), Evaluated back injury claims for a worker who was lifting tow cables from one barge to another.

**EXHIBIT 1**



- Ingleside, IL (2013), Tested the severity of a fatal occipital head impact sustained by a man who jumped off a moving golf cart while facing backwards.
- Honolulu, HI (2013), Investigated a claim of a shoulder rotator cuff tear alleged to have resulted from a rear-end accident.
- Scottsdale, AZ (2013), Determined trip versus slip in a hotel shower.
- Cottonwood, AZ (2013), Evaluated two claims of football injuries that occurred on a new artificial turf field.
- Lake Charles, TX (2013), Evaluated the effectiveness of a novelty helmet in a motorcycle to limousine accident.
- Long Beach, CA (2012-2013), Analyzed head and neck injuries sustained during emergency stops by two gantry crane operators in Long Beach Harbor.
- Phoenix, AZ (2010), Tested and determined how a truck driver fell and ended up partially beneath his truck.
- Phoenix, AZ (2010) and Sacramento, CA (2013), Evaluated multiple premises liability cases involving persons falling through unfinished roofs at construction sites and unmaintained residential decks.
- Honolulu, HI (2009), Determined the mechanism of fatal head injury following a fall into a drainage ditch.
- Upland, CA (2008), Determined hand and arm positioning during an accidental firearm discharge.
- Houston, TX (2008), Evaluated the injury claims of 31 plaintiffs within a bus that was struck by a locomotive.
- Flagstaff, AZ (2007), Tested a claim of back injury caused by a stack of Styrofoam insulation that blew over.
- Kingman, AZ (2006), Investigated the mechanism by which two infants received mirror image skull fractures.
- Los Angeles, CA (2006), Investigated the fatal fall of a child from a seaside hiking trail.
- Chicago, IL (2006), Investigated how a small girl on a bicycle was run over by a slow-moving garbage truck.
- Bethel, AK (2005), Tested the distance, speed, and force of impact for a diesel box truck that suddenly lurched backward and crushed a worker while unloading mail from an aircraft.
- Carlsbad, NM (2004), Determined the mechanisms of injury when a roll of conveyor belting was knocked off a trailer, crushing the driver.
- Flagstaff, AZ (2004), Analyzed the sequence of events leading to a fatal pedestrian accident with a train.
- Carefree, AZ (2004), Evaluated whether a motorcycle helmet would have mitigated injuries in a fatal accident.

- **Accident Reconstructions**
  - Picacho, AZ (2019), Reconstructed a fatal, high-speed truck-to-semitrailer underride accident.
  - Loreauville, LA (2018), Evaluated impact speed and direction of force in a high-speed frontal collision with seat track and seat belt failure.

EXHIBIT 1



- St. Johns, AZ (2016), Evaluated the effect of a collision to an elk, followed by a head-on collision with another vehicle.
- Scottsdale, AZ (2014), Reconstructed the high-speed rollover and pole impact of an SUV.
- Tucson, AZ (2014), Determined the cause of a fatal construction site accident involving roadway collapse and an overturned tractor and belly dump trailer.
- Waikoloa, HI (2013), Investigated a high-speed left turn accident leading to a double fatality.
- Long Beach, CA (2009), Reconstructed the sequence of events that caused an intermodal tractor-semitrailer to overturn.

- **Mechanical Design Evaluations**
- Mesa, AZ (2019), Evaluated the automatic shut-off feature for a power trowel that did not turn off, causing head injuries.
- Mountain View, CA (2016), Tested potential mechanisms of injury from compound archery bows.
- Las Vegas, NV (2014), Evaluated the failure and design of stadium seating at a motor speedway, leading to a traumatic disc herniation.
- Anchorage AK (2014), Evaluated the mechanical design of the boom-to-cab attachment for an aircraft deicing machine and investigated how the driver fell out of the cab and onto the tarmac.
- Scottsdale, AZ (2013), Evaluated intellectual property claims for a neuromuscular stimulation device allegedly developed for law enforcement.
- San Leandro, CA (2013), Tested short distance arrested falls from an order selector to determine witness marks when the fall arrest hooks were falsely latched, and tested human subjects to determine if a fall arrest harness could create bruising.
- Hawaii Kai, HI (2015), Tested the design of "Baker Board" platforms for usage by powerline workers and determined the mechanism of failure in a product liability case.
- Tucson, AZ (2010), Evaluated the design and tested the "SRTE No Worries" rappelling device following a fatal accident.
- Sacramento, CA (2006), Evaluated the design and conducted drop testing in a matter alleging failure of an automated hydraulic rock-climbing belay device.
- Phoenix, AZ (2006), Performed rigorous testing of competing neuromuscular electrical stimulation devices for law enforcement in an intellectual property dispute.
- Newark, NJ (2005), Evaluated patent filings to determine the state of the art of trampoline enclosures following a trampolining accident.
- Lake Tahoe, CA (2004), Evaluated a snowboarding accident allegedly caused by a defective binding attachment.

## Professional Experience

- **Rimkus Consulting Group, Inc.**                                              **2019 – Present**
- Principal Consultant – Biomechanical

    Provides consulting services to insurance carriers, law firms, and corporate clients.  Evaluates and analyzes human body movements, the forces created by impacts and rapid velocity changes, and

**EXHIBIT 1**



FORENSIC ENGINEERS AND CONSULTANTS

how those forces are then distributed within the body to create tissue failures. Analyzes and reconstructs vehicular accidents, industrial accidents, sporting events, and falls or falling objects. Performs mechanical investigations of product use or misuse and evaluates the mechanical design and construction of consumer products. Uses both computer and physical models to reconstruct accidents and determine injury mechanisms.

- **InSciTech, Inc.**                                                                 **2013 – 2019**
  - Senior Consultant – Biomechanics

    Provided consultations in the areas of human body dynamics, accident reconstruction, and mechanical design. Performed dynamic testing and computer simulations to determine impact forces and accelerations. Performed both vehicular accident reconstructions and biomechanical accident reconstructions in matters involving spinal injury, recreational activities, premises liability, product liability, mechanical design, and fall protection.

- **Exponent Failure Analysis Associates**                                             **2003 – 2013**
  - Principal Engineer – Biomechanics

    Specialized in the biomechanics and biodynamics of human injury, particularly regarding rollover and other complex vehicular accidents, industrial settings, and sporting activities. Provided expertise in accident reconstruction, fall protection, mechanical design (product liability and intellectual property issues), and rehabilitation engineering. Analyzed traumatic injuries associated with transportation, the workplace, falling, outdoor recreation, consumer products, and products designed for persons with disabilities. Conducted original research and published papers in these fields.

- **Arizona State University**                                                         **1989 – 2003**
  - Associate Professor – Whitaker Department of Bioengineering

    Taught courses in biomechanics, rehabilitation engineering, engineering design, bioengineering fluid dynamics, and muscle physiology. Performed original research and development in the areas of biodynamic analysis and simulation of human and animal movement. Analyzed orthopedic surgeries for children with cerebral palsy. Directed the Whitaker Center for Neuromechanical Control.

- **Palo Alto Veterans Affairs Medical Center**                                        **1985 – 1989**
  - Biomedical Engineer – Rehabilitation Engineering Research & Development Center

    Performed original research and developed specifications for devices to restore paraplegics' ability to walk. Attended rounds in the spinal cord injury center. Developed new computer models of musculoskeletal systems, including a model of the knee joint and a 3-D human walking model.

- **Lawrence Livermore National Laboratory**                                           **1981 – 1984**
  - Integration Engineer – Magnetic Fusion Energy Division

    Responsible for all mechanical interfaces within a prototype magnetic "mirror" fusion reactor, including interfaces between high energy neutron beams, diagnostic instrumentation, high-field superconducting magnets, vacuum vessel, and heat shielding panels cooled by liquid nitrogen and water. Performed high magnetic field calculations, wrote 3-D computer modeling software and

**EXHIBIT 1**



FORENSIC ENGINEERS AND CONSULTANTS

created reactor models. Analyzed magnetic field distortions and designed a trim coil system to restore symmetry to the magnetic confinement field. Responsible for the design and construction of a purified water-cooling system for all reactor components.

## Education and Certifications

- **Physics 3/2, A.B.:** Occidental College (1979)
- **Engineering & Applied Science, B.S.:** California Institute of Technology (1979)
- **Mechanical Engineering, S.M.M.E.:** Massachusetts Institute of Technology (1981)
- **Mechanical Engineering (Design Division), Ph.D.:** Stanford University (1989)
- **Registered Professional Engineer:** Arizona (#49143); California (#M 35961); Texas (#102904), NCEES National Record

## Continuing Education

- **Level 5 (Elite) National Training System certified USA Archery Coach (2016)**
- **Fall Protection for the Competent Person:** eTraining (2012)
- **PC-Crash Essentials and Expert Skills:** MEA Forensic (2010)
- **Traffic Accident Reconstruction:** Northwestern University for Public Safety (2008)
- **TPI Certified Golf Biomechanist Professional Level 2:** Titleist Performance Institute (2008)
- **Commercial Driver's License:** North Cascades National Park (1979)

## Honors

- **Lloyd L. Withrow Distinguished Speaker Award: Society of Automotive Engineers**
- **Excellence in Oral Presentation Awards: Society of Automotive Engineers (2006, 2007, 2008)**
- **Young Investigator Award: National Science Foundation**
- **Teaching Excellence Award: Arizona State University College of Engineering**
- **O. Hugo Schuck Best Paper in Conference: American Automatic Control Council**

## Patents

- **"Apparatus and Method of Dynamic Inertial Balance for Golf Clubs" U**.S. Patent 6,758,083 B2, 2004.

## Publications

- **"Performance of certified climbing helmets during simulated climbing falls"** ASTM Journal of Testing and Evaluation, 2014.
- **"Joint-specific changes in locomotor complexity in the absence of muscle atrophy following**

**EXHIBIT 1**



FORENSIC ENGINEERS AND CONSULTANTS

**incomplete spinal cord injury"** Journal of Neuroengineering and Rehabilitation, 2013.

- **"Assessment of the TASER XREP blunt impact and penetration injury potential using cadaveric testing"** Journal of Forensic Sciences, 2013.

- **"Auditory localization of backup alarms: The effects of alarm mounting location"** Society of Automotive Engineers, 2011.

- **"Conducting high frequency electrical measurements – Case study using a TASER M18 device"** Proceedings of the 2010 IEEE Symposium on Product Compliance Engineering, 2010.

- **"Lumbar loads in low to moderate speed rear impacts"** Society of Automotive Engineers, 2010.

- **"Theoretical analysis of a method of computing dynamic roof crush during rollovers"** Society of Automotive Engineers, 2007.

- **"Intrinsic musculotendon pathways and parameters within the human foot"** Journal of Applied Biomechanics, 2007.

- **"Methods for determining spinal flexion/extension, lateral bending, and axial rotation from marker coordinate data: Analysis and refinement"** Human Movement Science, 2006.

- **"Occupant mechanics in rollover simulations of high and low aspect ratio vehicles"** Transactions of the Society of Automotive Engineers, 2006.

- **"Development of a computational method to predict occupant motions and neck loads during rollovers"** Society of Automotive Engineers, 2005.

- **"Electromyographic activity and posturing of the human neck during rollover tests"** Society of Automotive Engineers, 2005.

- **"Development of an inexpensive upper-extremity prosthesis for use in developing countries"** Journal of Prosthetics and Orthotics, 2004.

- **"Projects at Arizona State University"** in: National Science Foundation—Engineering Senior Design Projects to Aid the Disabled, Creative Learning Press, 1991–2002.

- **"Morphological data for the development of musculoskeletal models: An update"** In: Biomechanics and Neural Control of Posture and Movement, 2000.

- **"Feeding motor patterns in anurans: Insights from biomechanical modeling"** American Zoologist, 2001.

- **"A new technique for determining 3-D joint angles: The tilt/twist method"** Clinical Biomechanics, 1999.

- **"Three-dimensional head kinematics and cervical range of motion in the diagnosis of patients with neck trauma"** Journal of Manipulative and Physiological Therapeutics, 1996.

- **"A computationally efficient method for solving the redundant problem in biomechanics"** Journal of Biomechanics, 1995.

- **"Attributes of engineering graduates and their impact on curriculum design"** Journal of Engineering Education, 1993.

- **"Restoring unassisted natural gait to paraplegics with functional neuromuscular stimulation: A computer simulation study"** IEEE Transactions on Biomedical Engineering, 1990.

- **"Dynamic musculoskeletal models of human locomotion: Perspectives on formulation and control"**

**EXHIBIT 1**



in: <u>Adaptability of Human Gait: Implications for the Control of Locomotion</u>, 1991.

- **"Achieving near-normal simulated gait with reduced muscle sets"** in: <u>Multiple Muscle Systems: Biomechanics and Movement Organization</u>, 1990.

- **"Appendix: A survey of human musculotendon parameters"** in: <u>Multiple Muscle Systems: Biomechanics and Movement Organization</u>, 1990.

- **"A planar model of the knee joint to characterize the knee extensor mechanism"** Journal of Biomechanics, 1989.

- **"Restoring natural gait to paraplegics through functional neuromuscular stimulation: A feasibility study"** in: <u>Issues in the Modeling and Control of Biomechanical Systems</u>, ASME Press, 1989.

- **"Feasibility and conceptual design of functional neuromuscular stimulation systems for the restoration of natural gait to paraplegics"** Stanford University, Department of Mechanical Engineering, 1989.

- **"Digital synthesis of auditory localization information"** Massachusetts Institute of Technology, Department of Mechanical Engineering, 1981.

**EXHIBIT 1**