IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| JUSTIN MOORE and JUDITH MOORE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| DB INDUSTRIES, LLC d/b/a 3M FALL | § | |
| PROTECTION, CAPITAL SAFETY USA, | § | CIVIL ACTION NO. 6:19-CV-00038-H |
| CAPITAL SAFETY GROUP, and DBI/SALA; | § | |
| | § | |
| SAFEWORKS, LLC, d/b/a POWER | § | |
| CLIMBER WIND; | § | |
| | § | |
| and | § | |
| | § | |
| POWER CLIMBER BVBA d/b/a POWER | § | |
| CLIMBER WIND; | § | JURY DEMANDED |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

COMES NOW Plaintiffs, pursuant to the Court's Order of June 6, 2019 (Doc. 10), and

for their claims for damages against the Defendants named above state as follows:

## I.

## PARTIES

1.      Plaintiffs Justin Moore (hereinafter "MOORE") and Judith Moore are married

natural persons and residents and citizens of the State of Texas. They reside in Williamson County,

Texas.  Ms. Moore's real name is Judith Rios Moscaica, she uses the name "Judith Moore".

2.      Defendant DB Industries, LLC, d/b/a 3M FALL PROTECTION, CAPITAL

SAFETY USA, CAPITAL SAFETY GROUP, and DBI/SALA (hereinafter "DBI") is a Minnesota

limited liability company with its principal place of business in Red Wing, Minnesota. DBI is authorized and doing business on a regular and continuing basis in the State of Texas.  The sole member of DB Industries, LLC is Capital Safety North America Intermediate Holdings LLC, a Delaware limited liability company. The sole member of Capital Safety North America Intermediate Holdings LLC is Capital Safety North America Intermediate Holdings Inc., a Delaware Corporation. Capital Safety North America Holdings Inc. has a registered office in Delaware.  Capital Safety North America Holdings Inc. operates as a holding company and has a business address of 3M Center, Building 224-5N-40, St. Paul, MN 55144. DB Industries, LLC became a wholly owned subsidiary of 3M Company on August 3, 2015, but the acquisition did not change the identity of the members of DB Industries, LLC or any related LLCs.    DBI also does business with the names 3M Fall Protection Group, Capital Safety USA, Capital Safety Group, and DBI/SALA and is one of the world's largest sellers of fall prevention equipment and system. DBI has answered and appeared for all purpose.  Collectively, DBI Industries, LLC, Capital Safety North America Intermediate Holdings LLC and Capital Safety North America Intermediate Holdings Inc. are referred as "the DBI Defendants" in this Complaint.

3.      Defendant Power Climber BVBA d/b/a POWER CLIMBER WIND (hereinafter "POWER CLIMBER") is a Belgian corporation with its principal place of business in Kontich, Belgium.  POWER CLIMBER is authorized and doing business on a regular and continuing basis in the State of Texas. It has answered and appeared for all purposes.

4.      Defendant SafeWorks, LLC d/b/a POWER CLIMBER WIND (hereinafter "SAFEWORKS") is a Washington limited liability company.  SAFEWORKS is authorized and doing business on a regular and continuing basis in the State of Texas. At all times material hereto, the Defendant Safe Works, LLC, was a Washington limited liability company with its principal

place of business in Washington. The sole member of Safe Works, LLC is Safe Works Holdings, Inc., a Delaware corporation with its principal place of business in Washington. It has answered and appeared for all purposes.

5.      Power Climber Wind is a registered trademark of SAFEWORKS, and according to marketing materials published by SAFEWORKS, POWER CLIMBER is a division of SAFEWORKS.  Power Climber Wind claims to have a headquarters in Seattle, Washington and in Kontich, Belgium.  Plaintiffs believe that either SAFEWORKS, POWER CLIMBER or both collectively are doing business as Power Climber Wind. This business includes, but it not limited to, manufacturing and servicing climb assist systems for wind turbines on a regular and continuing basis in the State of Texas.

6.      At all times material to this case, DBI, POWER CLIMBER and SAFEWORKS. did business in, and had significant contacts in, the State of Texas and was doing business in Texas by, among other acts, entering into contracts with residents of the State of Texas with the understanding that some or all of the contracts would be performed within the State of Texas; entering into contracts with persons located within the State of Texas; hiring individuals to perform work within the State of Texas; committing a tort in the State of Texas; contracting with Texas residents for products and services to be provided within the State of Texas.  These causes of action arise out of such business, contacts.  Further, the exercise of jurisdiction over the defendants is consistent with the United States Constitution and is consistent with traditional notions of substantial justice and fair play.

## II.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332.   The amount in controversy, without interest and costs, exceeds the jurisdictional threshold of $75,000 under 28 U.S.C. § 1332.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events and omission giving rise to the claim occurred in the Northern District of Texas.

### III.

### FACTS

9.     On June 8, 2017, MOORE was performing his duties for his employer, Invenergy LLC, at their electric-generating wind turbine tower located in Mills County, Texas.   While MOORE was descending the ladder in the interior of the wind turbine tower using products manufactured and sold by DBI, POWER CLIMBER and SAFEWORKS, an IBX nylon polymer belt failed catastrophically.   In the image below, the IBEX nylonpolymer belt is blue in color, and is installed vertically, next to a steel cable ("wire rope"):



10.   Mr. Moore was attached to the nylon polymer belt when it failed catastrophically,  and its sudden and unexpected failure caused him to lose balance and begin to fall down the shaft of the wind turbine. Justin Moore sustained serious and permanent injuries in that fall.  A photograph of the failed belt is shown below:



<u>LAD-SAF DEVICE AND IBEX</u>

11.   At the time of Mr. MOORE's fall, he was utilizing two pieces of safety equipment on his person that were manufactured and distributed by the Defendants are relevant to this case. One was a LAD-SAF device X-3, SN:0005580 cable clamp/sleeve, (hereinafter referred to as "LAD-SAF device" or "LAD-SAF"), and the other was an IBEX Climb Assist 1000

(hereinafter referred to as "IBEX").   A cross section of the polymer nylon belt is shown below:



12.     At the time of MOORE's fall, he was utilizing both pieces of safety equipment in a reasonably foreseeable manner, and each piece of safety equipment had reached MOORE without substantial change in the condition in which it was sold.

13.     The LAD-SAF device, described above was designed, tested, assembled, manufactured, marketed and sold or otherwise placed in the stream of commerce by the DBI Defendants. At all times relevant, the DBI Defendants engaged in the business of selling, designing, manufacturing, marketing, and distributing safety products such as the LAD-SAF device, which are meant to prevent persons from falling while ascending or descending on a ladder. A photograph of the LAD-SAF device is shown below:



An example of how a LAD-SAF device would run along a steel cable (wire rope") is shown here:



14.    The IBEX described above was designed, tested, assembled, manufactured, marketed and sold or otherwise placed in the stream of commerce by POWER CLIMBER and/or SAFEWORKS under the trade name Power Climber Wind.   At all times relevant, POWER CLIMBER and SAFEWORKS were engaged in the business of selling, designing, manufacturing,

marketing, and distributing climb assist systems, like IBEX, which are meant to assist individuals in ascending and descending ladders in wind turbines and other towers.

15.     The function of the ladder safety system was to be an essential component in arresting falls of those using the ladder to climb up and down the tower.  The purpose of the ladder safety system is to minimize personal injuries and provide safety from personal injuries during falls from fixed ladders.

16.     At the time the systems were designed and sold by DBI, SAFEWORKS and POWER CLIMBER, the companies knew or should have known that their products would be used by persons that may have personal protection equipment or climb assist systems manufactured and sold by other companies.  POWER CLIMBER and/or SAFEWORKS knew or should have known that the LAD-SAF device was one such item of personal protection equipment.

17.     At the time of his injuries, MOORE was utilizing a LAD-SAF device, specifically used by POWER CLIMBER and/or SAFEWORKS in their marketing materials, with the IBEX designed and sold by POWER CLIMBER and/or SAFEWORKS in a foreseeable manner, and MOORE was the type of user POWER CLIMBER and/or SAFEWORKS should have known the system was meant to provide fall protection.

18.     Prior to MOORE's injuries, employees of Invenergy, LLC were taught by POWER CLIMBER and/or SAFEWORKS how to install, commission and maintain the IBEX in Invenergy's wind towers.  Thereafter, employees of Invenergy installed the IBEX system in the subject wind turbine following the instructions of POWER CLIMBER and/or SAFEWORKS.

19.     At all times relevant to these claims and causes of action, the defendants acted (or failed to act) by and through their principals, vice-principals, employees and agents acting within the course and scope of their employment, agency or other relationship.

**IV.**

**CAUSES OF ACTION AGAINST DBI: STRICT PRODUCTS LIABILITY**

20.     The Plaintiffs incorporate all prior and subsequent paragraphs.

21.     The LAD-SAF device which Mr. Moore was using at the time of his fall was manufacture, marketed and distributed by the DBI Defendants.  At all times relevant to these causes of action, the Defendants were a "manufacturer" of the LAD-SAF device within the meaning of Tex. Civ. Prac. & Rem. Code § 82.001 and other provisions of Texas common law and statutes.

22.     The DBI Defendants designed, manufactured, and distributed the LAD-SAF device in question and the related equipment through agents and representatives in the United States. At all times relevant to these causes of action, the DBI Defendants were regularly engaged in the business of supplying or placing products such as the LAD-SAF device in question into the stream of commerce for users such as Mr. Moore, his co-coworkers and other individuals who climb towers as part of their occupation.  The DBI Defendants' conduct was undertaken solely for commercial purposes.

23.     The LAD-SAF device in question and its related components remained unchanged from the time that they were originally manufactured, sold, and distributed by the DBI Defendants up until the time that Mr. Moore began to use LAD-SAF device.

24.     The LAD-SAF device in question reached the end users in substantially the same condition as when it was originally manufactured, distributed and sold by the DBI Defendants; the LAD-SAF device was defective and unreasonably dangerous at all times after its manufacture, sale and distribution until the time that it was a producing cause of Mr. Moore's fall and his injuries and the damages.

25.     At the time that the DBI LAD-SAF device in question was designed, and at the time that it left control of the DBI Defendants, there were safer alternative designs.  Specifically, there were alternative designs that, in reasonable probability, would have prevented or significantly reduced the risk of injury to Mr. Moore.  These safer alternative designs were economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the LAD-SAF device left control of the DBI Defendants.

26.     Further, at the time the LAD-SAF device in question was placed into the stream of commerce, it was, or should have been, reasonable expected and foreseeable that persons such as Mr. Moore would use the device in a manner in which it was being used at the time of the incident in question.

27.     At the time that the LAD-SAF device in question left the control of The DBI Defendants, it was defective and unreasonably dangerous in that it was not adequately designed, manufactured, or marketed to minimize the risk of injury or death. The LAD-SAF device in question was unreasonably and dangerously defective in the following ways:

a)      the LAD-SAF device was not adequately designed so that it would perform and engage or deploy in a timely and effective manner even when used with an IBEX system;

b)      the LAD-SAF device was not adequately designed so that it would perform and engage or deploy in a timely and effective manner even when if the device were subjected to a lateral force or load;

c)      the LAD-SAF device was not adequately designed to ensure that it would perform and engage or deploy in a timely and effective manner even when if the device were subjected to reflexive grabbing;

d)      The product was not designed, tested, engineered and manufactured so that it would operate effectively even if the user reflexively grabbed the device or other pieces of equipment while falling.

e)       The LAD-SAF device was not designed, tested, and engineered so that it would operate effectively with other systems in use throughout the country such as the IBEX Climb Assist products or systems;

f)      There were design flaws in the LAD-SAF device which were not reasonably foreseen or known by Mr. Moore and other end-users as the utilized the LAD-SAF device in the normal and foreseeable manner;

g)      the LAD-SAF device would not timely and adequately deploy if and when lateral forces were exerted or applied to the device;

h)      the LAD-SAF device would not timely and adequately deploy (or engage) if a user reflexively grabbed (or attempted to grab) the LAD-SAF device or other equipment/structures while falling;

i)      the LAD-SAF Defendants sometimes claim that the IBEX system and the LAD-SAF device are incompatible and that using the ISBX system and LAD-SAF device will somehow prevent the fall arrest device from properly functioning.  To the extent that these allegations by the LAD-SAF Defendants are correct, the LAD-SAF device was not properly designed and engineered;

j)  the LAD-SAF device was not adequately designed so that it would perform and engage or deploy in a timely and effective manner even when if the device were subjected to reasonable and foreseeable use and misuse;

k)  the LAD-SAF device did not timely and adequately deploy or engage when Mr. Moore was falling;

l)  The labels, warnings, and instructions provided with the LAD-SAF device did not identify, instruct, and warn that the device could fail when using it in a foreseeable manner, especially for persons working in environments found in wind turbine towers as compared with other comparable designs/products.

m)  The warnings and instructions provided by DBI with the LAD-SAF device should have fairly and accurately described how the LAD-SAF device could fail or how it should be mounted or used with a cable in a wind turbine tower, such as the one Mr. Moore used, to avoid injuries from falls and impact;

n)  The instructions and warnings accompanying the product did not adequately instructed and warned the foreseeable users, such as Mr. Moore, as to the hazard of reflexive grabbing of the LAD-SAF device and of actions to avoid such reflexive grabbing;

o)  There was no effective warning or instruction provided to warn the foreseeable user against using the LAD-SAF device in conjunction with the IBEX system with an explanation as to why and how the LAD-SAF device and IBEX combination was incompatible (if they are, in fact incompatible).

28.  Reasonable alternative and a safer design could have been practically adopted at the time of sale or distribution of the LAD-SAF device; the alternative design would have reduced

or avoided the foreseeable risks of harm posed by the LAD-SAF device; the omission of the alternative design rendered the LAD-SAF device unreasonably dangerously defective.

29.     Reasonable and safer marketing of the LAD-SAF device could have been practically adopted at the time of sale or distribution of the LAD-SAF device; The alternative marketing would have reduced or avoided the foreseeable risks of harm posed by the LAD-SAF device; The omission of the alternative marketing rendered the LAD-SAF device unreasonably dangerously defective.

30.     The risk to be addressed by such design, testing and engineering of the LAD-SAF device was not obvious to, or generally known by, foreseeable users of the product;

31.     Plaintiff used the LAD-SAF device in a reasonably foreseeable way.

32.     At times, the LAD-SAF Defendants claim that Mr. Moore and other end-users somehow mis-used the device in question.  To the extent that there was a misuse (which is denied) it was a foreseeable misuse of the produce.

33.     Any complaint which the LAD-SAF Defendants make about Mr. Moore and the other end-users alleged misuse of the device in question amounts to the failure to guard against the product's defects.

34.     The DBI Defendants are not entitled to a rebuttable presumption that they are not liable for any injury to Mr. Justin Moore caused by the engineering or design of the LAD-SAF device because they have not established that the LAD-SAF device's design complied with the mandatory standards adopted by any governmental entity or industry group.  Additionally, in the unlikely event that The DBI Defendants do establish compliance with any government-mandated or industry-required design of the LAD-SAF, Plaintiffs will present evidence that such standard(s) is inadequate to protect the public from unreasonable risk

of injury or damage.

35.     The defects in the LAD-SAF device rendered it unreasonably, dangerously defective, and were a producing cause of the incident in question, Mr. Moore's injuries, and the Moore family's damages.

(Inferred Defect)

36.     The incident that harmed MOORE during his fall was of a kind that ordinarily occurs as a result of product defect, and it was not, in this particular case, solely the result of causes other than product defect existing at the time of sale or distribution of the LAD-SAF device

37.     This defect was a producing cause of Plaintiffs' damages.

38.     Based on the foregoing, Defendants Power Climber and Safeworks are strictly liable for the injuries sustained by Mr. Moore and for the Plaintiffs' injuries and damages.

## CAUSES OF ACTION AGAINST DBI:

## NEGLIGENCE AND GROSS NEGLIGENCE

39.     Plaintiffs incorporate all prior and subsequent paragraphs in this Petition.

40.     The DBI Defendants owed a duty to act as reasonable and prudent companies would have acted under the same or similar circumstances. They breached these duties and were negligent as that term is defined at law.  Among other acts and omissions, Defendants breached the duty to exercise reasonable care in the manufacture, distribution, design and sale of fall arrest devices such as the LAD-SAF in question.  Further, the defendants were

negligent by, among other acts or omissions:

41.

a)   Not designing, testing, engineering and manufacturing the device in question so that it would operate effectively even if the user reflexively grabbed the device or other pieces of equipment while falling;

b)    Not designing, testing and engineering, the LAD-SAF device so that it would operate effectively with other systems in use throughout the country such as the IBEX Climb Assist products or systems;

c)   Selling or otherwise distributing a LAD-SAF device which would not timely and adequately deploy if and when lateral forces were exerted or applied to the device;

d)   Selling or otherwise distributing LAD-SAF device that would not timely and adequately deploy (or engage) if a user reflexively grabbed (or attempted to grab) the LAD-SAF device or other equipment/structures while falling;

e)   Selling or otherwise distributing a LAD-SAF device which was incompatible with IBEX system when such incompatibility would prevent the DBI Defendants' fall arrest device from adequately and timely engaging to stop or arrest the fall of an individual;

f)   selling or otherwise distributing a LAD-SAF device quitch was not adequately tested so that it would perform and engage or deploy in a timely and effective manner even when used with an IBEX system;

g)   selling or otherwise distributing a LAD-SAF device which was not adequately tested so that it would perform and engage or deploy in a timely and effective manner even when if the device were subjected to a lateral force or load;

h)      selling or otherwise distributing a LAD-SAF device which was not adequately tested so that it would perform and engage or deploy in a timely and effective manner even when if the device were subjected to reflexive grabbing;

i)      selling or otherwise distributing a LAD-SAF device which was not adequately tested so that it would perform and engage or deploy in a timely and effective manner even when if the device were subjected to reasonable and foreseeable use and misuse;

j)      selling or otherwise distributing a LAD-SAF device which did not timely and adequately deploy when Mr. Moore was falling;

k)      Not providing adequate warning or instruction to warn the foreseeable user against using the LAD-SAF device in conjunction with the IBEX system with an explanation as to why and how the LAD-SAF device and IBEX combination was incompatible (if they are, in fact incompatible);


l)      Not providing effective labels, warnings, and instructions with the LAD-SAF device which would identify, instruct, and warn that the device could fail when using it in a foreseeable manner, especially for persons working in environments found in wind turbine towers as compared with other comparable designs/product;

m)      not providing effective warnings and instructions with the LAD-SAF device which would fairly and accurately describe how the LAD-SAF device could fail or how it should be mounted or used with a cable in a wind turbine tower, such as the one Mr. Moore used, to avoid injuries from falls and impact;

n)    Not providing effective instructions and warnings accompanying the product to adequately instruct and warn the foreseeable users, such as Mr. Moore, as to the hazard of reflexive grabbing of the LAD-SAF device and of actions to avoid such reflexive grabbing.

42.    In the alternative and in the addition, the DBI Defendants undertook to render services to individuals such as Mr. Justin Moore for the protection of the public but did so in a negligent manner.

43.    In this context, the DBI Defendants failed to exercise reasonable care to perform their undertaking, and this failure to exercise reasonable care increased the risk of harm to end users and members of the public such as Mr. Moore.  The DBI Defendants are liable for such negligent undertaking as set forth in *Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000) and the cases which follow this precedent.

44.    The DBI Defendants' acts and omissions constituting negligence and gross negligence were a proximate cause of Mr. Justin Moore's injuries and the Plaintiffs' damages.

45.    The DBI Defendants were actually, consciously aware of the risks associated with the sale or distribution of products such as the LAD-SAF device in question, and were grossly negligent in the design, manufacture, marketing, distribution, and sale of the LAD-SAF device in question. Such acts and omissions were a proximate cause of Mr. Justin Moore's injuries and the Plaintiffs' damages.

<u>BREACH OF WARRANTY CLAIMS AGAINST DBI DEFENDANTS</u>

46.    The Plaintiffs reallege preceding and succeeding paragraphs and incorporate said paragraphs as if fully set forth herein.

47.    The DBI Defendants sold the LAD-SAF device described above; and

48. At the time of sale, the DBI Defendants made statements of fact or promises to the buyer relating to the LAD-SAF device that became part of the basis of the bargain. Those statements of fact or promises are:

   a) "The LAD-SAF device detachable cable sleeves will arrest the fall of personnel while climbing a fixed ladder."; and

   b) "The maximum length of movement of the safety sleeve, in an accidental fall, shall not be more than six (6) inches."; and

   c) Other statements as may be found in discovery in this case.

49. Reasonably relying on the statements of fact or promises, the buyer purchased the LAD-SAF device

50. The LAD-SAF device provided by DBI did not conform to the statements of fact or promises.

51. The Plaintiff is a person who may reasonably be expected to use or be affected by the LAD-SAF device.

52. The damages, losses, and injury claimed in the recovery by the Plaintiffs herein were damages of which the DBI Defendants had reason to know of at the time of selling their product. Such damages, losses, and injury could not reasonably be prevented by cover or otherwise; and they were caused by the nonconformance of the LAD-SAF device to the statements of fact or promises.

53. The breach of the express warranties was a producing cause of the Plaintiffs' damages.

**V.**

**CAUSES OF ACTION AGAINST POWER CLIMBER AND SAFEWORKS:**

**STRICT PRODUCT LIABILITY CLAIMS**

54.     The preceding and succeeding paragraphs are incorporated herein by reference.

55.     The IBEX system (including a polymer/nylon belt) which Mr. Moore was using at the time
        of his fall was manufactured, marketed, and distributed by Power Climber and Safeworks.
        At all times relevant to these causes of action, the Defendants were "manufacturers" of the
        IBEX system within the meaning of Tex. Civ. Prac. & Rem. Code § 82.001 and other
        provisions of Texas common law and statutes.

56.     Power Climber and Safeworks designed, manufactured, and distributed the IBEX system
        in question and its related equipment (including a polymer/nylon belt) through agents and
        representatives in the United States.  At all times relevant to these causes of action, Power
        Climber and Safeworks were regularly engaged in the business of supplying or placing
        products such as the IBEX system (including a polymer/nylon belt) in question into the
        stream of commerce for users such as Mr. Moore, his co-coworkers and other individuals
        who climb towers as part of their occupation.  Power Climber and Safeworks' conduct was
        undertaken solely for commercial purposes.

57.     The IBEX system in question and its related components (including a polymer/nylon belt)
        remained unchanged from the time that they were originally manufactured, sold, and
        distributed by the Power Climber and Safeworks up until the time that Mr. Moore began
        to use IBEX system on the day in question.

58.     The IBEX system in question (including a polymer/nylon belt) reached the end users in
        substantially the same condition as when it was originally manufactured, distributed, and
        sold by the Power Climber and Safeworks; the IBEX system (including a polymer/nylon

belt) was defective and unreasonably dangerous at all times after its manufacture, sale and distribution until the time that it was a producing cause of Mr. Moore's fall and his injuries and the damages.

59.    At the time that the IBEX system in question was designed, and at the time that it left control of the Power Climber and Safeworks, there were safer alternative designs. Specifically, there were alternative designs that, in reasonable probability, would have prevented or significantly reduced the risk of injury to Mr. Moore.  These safer alternative designs were economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the IBEX system left control of the Power Climber and Safeworks.

60.    Further, at the time the IBEX system in question was placed into the stream of commerce, it was, or should have been, reasonable expected and foreseeable that persons such as Mr. Moore would use the device in a manner in which it was being used at the time of the incident in question.

61.    At the time that the IBEX system in question left the control of Power Climber and Safeworks, it was defective and unreasonably dangerous in that it was not adequately designed, manufactured, or marketed to minimize the risk of injury or death. The IBEX system in question was unreasonably and dangerously defective in the following ways:

a)    The IBEX was not manufactured to the specifications, capabilities or standards as originally designed, tested, and intended by POWER CLIMBER and/or SAFEWORKS.

b) The IBEX cable was not manufactured to the specifications, capabilities or standards as originally designed, tested, and intended by POWERCLIMBER and/or SAFEWORKS.

c) When used in a foreseeable manner, the IBEX would conflict with or interfere with the operation of other anticipated safety equipment to prevent it from working properly.

d) In failing to anticipate that the components or operation of the IBEX and the components of the IBEX system could come into contact during actual use and interfere with their intended function of arresting falls.

e) A reasonable alternative safer design could have been practically adopted at the time of sale or distribution of the IBEX system;

f) The alternative design would have reduced or avoided the foreseeable risks of harm posed by the IBEX system (including a polymer/nylon belt);

g) The omission of the alternative design rendered the IBEX unreasonably dangerous.

h) The alternative design would have reduced or prevented the Plaintiff's harm.

i) Supplying a polymer/nylon belt and requiring end users to "weld" or join the ends of the belt;

j) Supplying a polymer/nylon belt and requiring end users to "weld" or join the polymer ends of the belt knowing that the uses could not, in fact, "weld" or join the nylon portion of the belt;

k) Utilizing a polymer/nylon belt and configuring so that end users could not adequately inspect the belt and its components;

l)      Utilizing a polymer/nylon belt as part of the IBEX system and configuring it so that the belts would fail catastrophically with no meaning warning to end users;

m)      Utilizing a polymer/nylon belt in such a manner that after the ends of the belt were "welded", the end users could not effectively find the ends to maintain and inspect the joint;

n)      Not using a more durable and effective strap, wire rope, or cable instead of the polymer/nylon strap;

o)      Not having any redundancy or other similar feature built into the system to ensure that a catastrophic failure of the belt would not cause a user to fall;

p)       Not providing timely and adequate instructions to allow end-users to effectively inspect the components of the IBEX system, including the polymer/nylon belt;

62.    Reasonable alternative and a safer design could have been practically adopted at the time of sale or distribution of the IBEX system; the alternative design would have reduced or avoided the foreseeable risks of harm posed by the IBEX system; the omission of the alternative design rendered the IBEX system unreasonably dangerously defective.

63.    Reasonable and safer marketing of the IBEX system could have been practically adopted at the time of sale or distribution of the IBEX system; The alternative marketing would have reduced or avoided the foreseeable risks of harm posed by the IBEX system; The omission of the alternative marketing rendered the IBEX system unreasonably dangerously defective.

64.    The risk to be addressed by such design, testing and engineering of the IBEX system was not obvious to, or generally known by, foreseeable users of the product;

65.     The IBEX was in a defective condition because foreseeable risks of harm posed could have been reduced or avoided by the provision of reasonable instructions or warnings, in one or more of the following ways:

a)      by providing sufficient warning and instruction to allow its use with other foreseeable equipment, such as the IBEX system in this application, to provide fall protection and avoid conflict with other equipment such as the IBEX system; and

b)      by properly instructing and warning the Plaintiff that the IBEX could, under certain circumstances, foul, tangle or interfere with the operation of IBEX system and other safety devices and restrict their ability to prevent falls and injury.

66.     The omission of reasonable instructions or warnings rendered the IBEX system unreasonably dangerous.

67.     The risk to be addressed by the instructions or warnings was not obvious to or generally known by foreseeable product users.

68.     The omissions of one or more of the instructions or warnings described above were a producing cause of Plaintiffs' damages.

69.     Plaintiff used the IBEX system in a reasonably foreseeable way.

70.     At times, Power Climber and Safeworks claim that Mr. Moore and other end-users somehow mis-used the equipment, system, and product(s) in question.  To the extent that there was a misuse (which is denied) this was a foreseeable misuse of the produce.

71.     Any complaint which Power Climber and Safeworks make about Mr. Moore and the other end-users alleged misuse of the device in question amounts to the failure to guard against the product's defects.

72.     Power Climber and Safeworks are not entitled to a rebuttable presumption that they are not

liable for any injury to Mr. Justin Moore caused by the engineering or design of the IBEX system because they have not established that the IBEX system's design complied with the mandatory standards adopted by any governmental entity or industry group.  Additionally, in the unlikely event that Power Climber and Safeworks do establish compliance with any government-mandated or industry-required design of the Power Climber and Safeworks IBEX system, Plaintiffs will present evidence that such standard(s) is inadequate to protect the public from unreasonable risk of injury or damage.

73. The defects in the IBEX system rendered it and its component parts (including the polymer/nylon belt) unreasonably, dangerously defective, and were a producing cause of the incident in question, Mr. Moore's injuries, and the Moore family's damages.

74. Based on the foregoing, Defendants Power Climber and Safeworks are strictly liable for the injuries sustained by Mr. Moore and for the Plaintiffs' injuries and damages.

(Inferred Defect)

75. The incident that harmed MOORE during his fall was of a kind that ordinarily occurs as a result of product defect, and it was not, in this case, solely the result of causes other than product defect existing at the time of sale or distribution of the IBEX.

76. The defects in the IBEX system were a producing cause of Plaintiffs' damages.

**CAUSES OF ACTION AGAINST POWER CLIMBER AND SAFEWORKS**

77. The preceding and succeeding paragraphs are incorporated herein by reference.

78.    Power Climber and Safeworks each owed an obligation to act as reasonable and prudent companies would have acted under the same or similar circumstances.

79.    Representatives of Power Climber Wind trained employees of Invenergy, LLC in the installation, commissioning, use and maintenance of the IBEX.

80.    POWER CLIMBER and/or SAFEWORKS breached their obligations and were negligent and failed to exercise reasonable care in designing and selling the IBEX system to be used with the LAD-SAF device.

81.    POWER CLIMBER and/or SAFEWORKS were negligent in training, or instructing, employees of Invenergy LLC on the installation commissioning, use or maintenance of the IBEX.

82.    To the extent that the climb assist system and the fall arrest device are or were incompatible, POWER CLIMBER and/or SAFEWORKs were negligent in marketing the IBEX system being compatible with LAD-SAFE device.

83.    POWER CLIMBER's and/or SAFEWORKS' failure to exercise reasonable care was conduct that created a risk of physical harm to a foreseeable user such as the Plaintiff when he suffered his fall.

84.    In addition to the above, Defendants POWER CLIMBER and SAFEWORKS undertook to perform services that they knew, or should have known, were necessary for the protection of individuals such as Justin Moore. The Defendants marketed their IBEX products as compatible with IBEX system DEVICE, and further undertook to provide post-sale warnings and instructions to Mr. Moore's employer for the benefit of end-users such as Justin Moore. The Defendants failed to exercise reasonable care in performing those services when they knew, or should have known, that Mr. Moore and other end-users were

relying upon the Defendants' performance of those duties. Further, the Defendants' performance of these duties increased the risk of harm to individuals such as Mr. Moore. Defendants are liable under *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) and the cases which follow it, because they assumed a duty to act on behalf of Mr. Moore and the other end-users and then were negligent in carrying out those assumed duties.

85.    Defendants owed legal duties to Mr. Moore based upon the special relationship which existed at the time of the incident in question.  The special relationship was created by Mr. Moore and the other end users' foreseeable dependence upon the Defendants to provide timely and accurate information about the climbing products which they sold and the necessary inspections and maintenance of the product (including the polymer/nylon belt which failed) based upon reports of field conditions and the failures of other belts— information which would not be available to individuals such as Mr. Moore.  It was foreseeable that end users would rely upon the Defendants to respond to reports of increased wear of component parts of the climbing system (including the belt) and to respond to reports of other component failures (including belt failures) by effectively issuing additional instructions and warnings.    The end users did not have access to the same level and type of information available to the Defendants concerning the life cycle and failure modes/proclivities of the products which the defendants distributed. Mr. Williams under the principles set out in Restatement of Torts 314.

86.    The Defendants undertook to perform services for Mr. Moore which they knew, or should have known, were reasonably necessary for his safety and protection.  Mr. Moore relied upon the Defendants to perform the obligations which they undertook to do.

87.    The Defendants' failure to act reasonably in undertaking the duties which they assumed

actually increased the risk of harm to end users such as Mr. Moore by creating a sense of false security, by impeding the effective inspection of various component parts (including the belt), and by providing instructions and warnings to end users concerning safety and security which the Defendants knew, or in the exercise of reasonable care should have known, would make a component failure more likely.

88.   The acts and omissions of POWER CLIMBER and/or SAFEWORKS were a proximate cause of Plaintiff's injuries.

COUNT IX

BREACH OF WARRANTY CLAIMS AGAINST POWER CLIMBER

89.   The Plaintiffs reallege the allegations of paragraphs 1 through 17 and incorporate said paragraphs as if fully set forth herein.

(Breach of Express Warranty)

90.   The POWER CLIMBER and/or SAFEWORKS sold IBEX system described above; and

91.   At the time of sale, POWER CLIMBER and/or SAFEWORKS made statements of fact or promises to the buyer relating to the IBEX that became part of the basis of the bargain including, but not limited to, the statements contained in POWER CLIMBER's and/or SAFEWORKS's sales, contract, promotional, and warranty documents.

92.   Reasonably relying on the statements of fact or promises, the buyer purchased the IBEX.

93.   The IBEX system provided by POWER CLIMBER and/or SAFEWORKS did not conform to the statements of fact or promises.

94.   MOORE is a person who may reasonably be expected to use, consume or be affected by the IBEX.

95.     The damages, losses, and injury claimed in the recovery by the Plaintiffs herein were damages of which POWER CLIMBER and/or SAFEWORKS had reason to know of at the time of selling their products.  Such damages, losses, and injury could not reasonably be prevented by cover or otherwise; and they were caused by the nonconformance of the IBEX to the statements of fact or promises.

96.     The breach of the express warranties was a producing cause of the Plaintiffs' damages.

(Breach of Implied Warranty of Merchantability)

97.     The preceding and succeeding paragraphs are incorporated herein by reference.

98.     POWER CLIMBER and/or SAFEWORKS were a merchant as the time it sold the IBEX.

99.     Defendants impliedly warranted that the IBEX safety system were merchantable.

100.    The IBEX was in fact not merchantable because it:

    (a)     was not fit for the ordinary purposes for which such goods are used; and

    (b)     failed to conform to the promises or affirmations of fact made on the instructions, marketing materials and the label.

101.    The lack of merchantability was a producing cause of the Plaintiffs' damages.

(Breach of Implied Warrant of Fitness for a Particular Purpose)

102.    POWER CLIMBER and/or SAFEWORKS, at the time of the sale of the IBEX, had reason to know the particular purpose of the IBEX.

103.    Defendants had reason to know that the buyer was relying on the Defendants' skill or judgment to furnish the IBEX.

104.    The buyer relied upon the Defendants' skill and judgment.

105.    The IBEX was not fit for the particular purpose.

106.   The failure of the IBEX to fit the particular purpose was a producing cause of the Plaintiffs' damages.

## VI.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS:

## GROSS NEGLIGENCE

107.   The Defendants knew of the extreme degree of risk accompanying their acts and omissions, considering the probability and magnitude of the potential harm, and despite its actual, subjective awareness of the risks involved, nevertheless proceeded with conscious indifference to the rights, security, and welfare of others, including Justin Moore. Regarding the Defendants' gross negligence, it was undertaken by its principals and vice-principals; further, the Defendants approved and ratified the acts and omissions which constitute gross negligence.   Such ratification is demonstrated by the Defendants' continuing to supply the products in question to end users without any meaningful change to the design of the products.   Further evidence of ratification is found by examining the warnings and instructions which accompanied the original sale/distribution of the IBEX system and the LAD-SAF and noting that in many instances, the same warnings and instructions were continued for many years after this incident even though the Defendants were long aware of the risks associated with their products.   Plaintiffs are entitled to punitive and exemplary damages to punish these Defendants to prevent them from engaging in this conduct in the future and to deter others similarly situated to the Defendants.

## VII.

## INJURIES AND DAMAGES

108.   As a result of the fall described in paragraph 9, Justin Moore suffered physical injuries, which resulted in the following damages:

   a)   physical pain, disfigurement, physical impairment of his body and mental anguish, in the past and reasonably likely to be sustained in the future;

   b)   aggravation of Justin Moore's underlying physical and mental conditions.  In this connection, the Defendants, as tortfeasors are required to take a plaintiff (in this case Mr. Justin Moore) as they find him.  Mr. Moore had conditions which merely made him more susceptible to the physical injuries and mental injuries resulting from the incident in question.  Prior to the incident question, Mr. Justin Moore suffered from various particular conditions, and the incident in question and subsequent injuries brought about physical pain, impairment, mental anguish, and other damages in the past and, in a reasonable probability, will bring about physical pain, impairment, mental anguish, and other damages to Mr. Moore in the future.  In this context, the incident in question and the injuries, not the pre-existing conditions, is the producing and proximate cause of Mr. Moore's damages.

   a)   loss of earning capacity/earnings in the past and reasonably likely to be sustained in the future; and

   b)   the reasonable value of the medical care expenses reasonably needed by and actually provided to MOORE, and in a reasonable probability will be incurred in the future.

109.   As a result of the fall described in this Complaint, Judith Moore suffered a loss of her

husband's affection, solace, comfort companionship and household services in the past and, in reasonable probability, will suffer such losses in the future.

## VIII.

## JURY TRIAL REQUESTED

110.    Plaintiffs ask the Court for a jury trial of all issues submissible to a jury in this matter.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for a money judgment against the Defendants for compensatory damages, punitive damages, costs, and for such other relief as may by law be appropriate in these circumstances.

Respectfully submitted,

**SOMMERMAN, MCCAFFITY,
QUESADA & GEISLER, LLP**

*/s/ Sean J. McCaffity*

_____

Sean J. McCaffity
State Bar No. 24013122
smccaffity@textrial.com

3811 Turtle Creek Blvd., Suite 1400
Dallas, TX  75219
Telephone: 214/720-0720
Facsimile: 214/720-0184

And

**THE ROBERT PAHLKE LAW GROUP**
Robert G. Pahlke, NSBA# 13201
Kyle J. Long, NSBA #22683
2425 Circle Drive, Suite 200
Scottsbluff, NE 69361
Telephone: 308-633-4444
Facsimile: 308-633-4445
rgp@pahlkelawgroup.com
kyle@pahlkelawgroup.com

And

James E. Wren
State Bar No. 22018200
One Bear Place #97288
Waco, TX 76798-7288
Telephone: 254-710-7670
james.wren@baylor.edu

And

SHANNON, PORTER & JOHNSON
Brandon S. Archer
State Bar No. 24059392
P.O. Box 1272
San Angelo, TX 76902-1272
Telephone (325) 653-4274
Facsimile (325) 657-0787
archer@shannonporter.com

*Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PLAINTIFFS**